1  Scott A. Brown, SBN 177099
   BROWN | POORE LLP
2  3100 Oak Road, Suite 100
   Walnut Creek, California 94597
3  Telephone:    (925) 943-1166
   sbrown@bplegalgroup.com
4
   Attorneys for Plaintiff
5  LUIS LOPEZ

6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9

10
   LUIS LOPEZ,                          Case No.  3:21-CV-06150
11
              Plaintiff,                DECLARATION OF SCOTT A. BROWN
12                                      IN SUPPORT OF PLAINTIFF'S
                                        OPPOSITION TO MOTION FOR
13 v.                                   SUMMARY JUDGMENT, OR SUMMARY
                                        ADJUDICATION
14
   NORTHWEST CASCADE, INC. and DOES 1
15 to 10,
                                        Judge:    Hon. Kandis A. Westmore
16            Defendants.               Date:     August 4, 2022
                                        Time:     1:30 p.m.
17                                      Dept.:    Via Zoom Videoconference

18                                      Complaint Filed:   August 10, 2021
19                                      Trial Date:        November 7, 2022

20

21

22

23

24

25

26

27

28
                                   -1-
   DECLARATION OF SCOTT A. BROWN ISO PLAINTIFF'S OPPOSITION TO MSJ
                 LOPEZ V. NORTHWEST CASCADE, INC. ET AL

I, Scott A. Brown, declare:

1.      I am a partner of the law firm of Brown | Poore LLP, attorneys for the plaintiff in this action.  I have personal knowledge of the matters stated in this declaration and could competently testify to them if called as a witness.

2.      Attached as Exhibit A are true and correct copies of excerpts from the deposition of Patrick Donohoue on June 3, 2022.

3.      Attached as Exhibit B are true and correct copies of excerpts from Defendant's production of documents in this litigation.

4.      Attached as Exhibit C are true and correct copies of excerpts from Volume 1 of the deposition of Luis Lopez on February 28, 2022.

5.      Attached as Exhibit D are true and correct copies of excerpts from Volume 2 of the deposition of Luis Lopez on March 25, 2022.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the deposition of Cesar Garcia on May 26, 2022.

7.      Attached as Exhibit F is a true and correct copy of excerpts from Plaintiff's Initial Expert Disclosure on June 27, 2022, including an Affidavit from Dr. Phillip H. Allman.

8.      Attached as Exhibit G is a true and correct copy of my email to defense counsel Glen Williams and Rex Berry on June 10, 2022.  No response was received.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed this 7th day of July 2022 in Walnut Creek, California.

_____*//s// Scott A. Brown*_____
SCOTT A. BROWN

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

LUIS LOPEZ,

           Plaintiff,

     vs;                  Case No.
                           3:21-cv-06150-KAW

NORTHWEST CASCADE, INC. and
DOES 1 to 10,

           Defendants.
_____/

Videotaped Videoconference Deposition of

PATRICK DONOHOUE

Friday, June 3, 2022

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371
depos@callahanreporting.com

Reported by:
MICHELLE D. BARBANTE
CSR NO. 12601

| | | |
|---|---|---|
| 10:16:41 | 1 | A.   Correct. |
| | 2 | Q.   When did that occur? |
| | 3 | A.   So March of 2014. |
| | 4 | Q.   Okay.  And how did that opportunity arise? |
| 10:16:51 | 5 | A.   We -- we started Honey Buckets down in |

California.  Had one manager down here that -- who got
it first started off in -- in October of 2013, and for a
variety of reasons had to -- had to leave, and -- and I
was managing the Washington operation at the time and
moved down here to get this thing going.

Q.   What was your title at the Washington
operation?

A.   Operations manager.

Q.   And as operation manager, did you have the
authority to hire and fire employees?

A.   Yes.

Q.   And did you have the authority to discipline
them if necessary?

A.   Yes.

Q.   Okay.  Were you able to set or introduce
corporate policy for Honey Bucket as an operations
manager?

MR. WILLIAMS:  Vague and calls for a legal
conclusion.  You can answer to your -- to your
understanding.  Excuse me.

10:17:52 1          THE WITNESS:  Not necessarily set policy.

2     Definitely procedures, you know, operational procedures

3     I was in -- in control of.  As far as the policies, no.

4     BY MR. BROWN:

10:18:04 5          Q.  Okay.  With respect to operations procedures,

6     did you have input as to revisions or changes that might

7     be made as the operations manager?

8          A.  Yes.

9          Q.  Okay.  And did you have decision-making

10:18:22 10   authority with respect to personnel managers while you

11    were an operations manager?

12              MR. WILLIAMS:  Vague and ambiguous.  Do you

13    understand?

14              THE WITNESS:  I don't -- I don't know -- I

10:18:32 15   don't know what you mean by "personnel managers."

16    BY MR. BROWN:

17         Q.  Okay.  That's okay.  I think you answered it

18    earlier.  When you came down to California, were you

19    -- was that still your title, operations manager?

10:18:44 20        A.  Yes.

21         Q.  Okay.  And before you became an operations

22    manager, did you have to go under -- under any sort of

23    training or -- or procedures?

24         A.  Yeah.  Yes, I -- I did.  There are several

10:19:00 25   classes that I had to take as far as the human resources

10:20:12  1        A.  Yes.

2         Q.  When you moved to California in March of 2014,

3    did you remain -- was your title still operations

4    manager?

10:20:25  5        A.  Yes.

6         Q.  And is it still operations manager?

7         A.  Yes.

8         Q.  Okay.  Have you had any other positions or

9    titles since 2014?

10:20:35 10       A.  I was an area manager for a couple years.

11        Q.  And as operation manager, who do you currently

12   report to?

13        A.  I currently report to Jason Perry.

14        Q.  And is Mr. Perry the COO of Northwest Cascade?

10:20:57 15       A.  That's correct.

16        Q.  Okay.  And do you know who he reports to?

17        A.  Greg Potts.

18        Q.  And what is Mr. Pott's title?

19        A.  CEO.

10:21:11 20       Q.  And how long has Mr. Potts been CEO?

21        A.  A few years.

22        Q.  Are Mr. Perry and Mr. Potts located in the

23   Washington headquarters?

24        A.  Mr. -- Mr. Perry is not, but Greg is, yes.

10:21:29 25       Q.  Where is Mr. Perry located?

10:28:03  1        Q.   Would that be in your personnel file?

2        A.   I believe so.   I could -- we could get it

3   reproduced, but yes.

4        Q.   And what other topics do you recall being

10:28:15  5   covered?

6        A.   Again, it was all around discrimination,

7   harassment and -- and recognizing that -- those

8   different behaviors and how to -- how to handle and deal

9   with that stuff.

10:28:32  10        Q.   And is it your understanding that Honey Bucket

11   follows the FMLA Act with respect to leaves of absence

12   for employees?

13        A.   Yes.

14        Q.   Okay.   And you've been trained that it's

10:28:46  15   illegal to fire somebody for having a medical condition;

16   is that right?

17        A.   Yes.   And we would never do that, and I've

18   never done that.

19        Q.   And you've been trained that it's illegal to

10:28:57  20   fire somebody for having a disability; is that correct?

21        A.   Yes.

22        Q.   Okay.   Have you ever heard of the California

23   Family Rights Act or CFRA?

24        A.   Yes.

10:29:10  25        Q.   And likewise, do you understand that the CFRA

10:29:10  1   prohibits an employer from interfering with an

2   employee's right to take medical leave?

3              MR. WILLIAMS:  Calls for a legal conclusion,

4   but you can answer to your understanding.

10:29:21  5              THE WITNESS:  That is my understanding, yes.

6   BY MR. BROWN:

7        Q.  Okay.  And have you taken training specifically

8   on the CFRA?

9        A.  I don't believe I've had specific training, no.

10:29:38 10        Q.  Okay.  But you understand that it's improper to

11   terminate somebody based on a medical condition under

12   the CFRA as well?

13              MR. WILLIAMS:  Vague as to "improper medical

14   condition," and calls for legal conclusion, but you can

10:29:49 15   answer to your understanding.

16              THE WITNESS:  Yes.  Again, I would never do

17   that, so --

18   BY MR. BROWN:

19        Q.  Have you ever heard the phrase "disability

10:29:57 20   accommodation laws" or something along those lines?

21        A.  Yes.

22        Q.  Okay.  And what's your understanding of

23   disability accommodation laws?

24        A.  Really we have to do everything -- to put it

10:30:11 25   real short here is you have to do everything in your

10:30:15 1  power to make reasonable accommodations to the -- to the

2  employee.

3      Q.   And has it always been, at least as long as you

4  can recall, Honey Bucket's policy to -- to try to follow

10:30:29 5  state and federal disability accommodation laws?

6      A.   Absolutely, yes.

7      Q.   Are you familiar with what's called the

8  interactive process?

9      A.   No.   It's a new term for me.

10:30:42 10      Q.   You mentioned reasonable accommodation.   You

11  are familiar with that term; is that correct?

12      A.   Yes.

13      Q.   And are you aware that holding an employee's

14  job until they're able to return to work after an injury

10:30:55 15  is one type of reasonable accommodation?

16          MR. WILLIAMS:   Calls for a legal conclusion.

17  Assumes facts not in evidence.   So you can answer to

18  your understanding.

19          THE WITNESS:   That is my understanding, yes.

10:31:05 20  BY MR. BROWN:

21      Q.   And as a supervisor, what are you obligations

22  when somebody tells you, an employee comes to you and

23  says he or she is unable to work because of a medical

24  condition?

10:31:19 25          MR. WILLIAMS:   Vague as to "obligations" and

10:31:21 1    incomplete hypothetical.  Lacks foundation.  You can

2    answer how you understand the question.

3              THE WITNESS:  Yeah.  So it -- it depends --

4    there's a whole bunch of different variables that play

10:31:34 5    into that.  On a typical injury, that injury gets

6    reported immediately, and the -- the -- the employee

7    would fill out what we call an incident report.  The

8    supervisor would -- would go to them, complete the

9    investigation, and that paperwork would be forwarded to

10:31:54 10    our -- to our safety director and -- and my boss as

11    well.

12    BY MR. BROWN:

13        Q.  And in December of 2020, who was your safety

14    director?

10:32:07 15        A.  Eric Wright.

16        Q.  And when an employee comes to you and tells you

17    they're unable to work because of a medical condition,

18    are you supposed to advise them of their rights under

19    the FMLA?

10:32:32 20              MR. WILLIAMS:  Vague as to the term "medical

21    condition."  Calls for a legal conclusion.  Incomplete

22    hypothetical.  You can answer.

23              THE WITNESS:  Yes, I would inform them of

24    the -- the process and what needs to happen.

10:32:44 25    BY MR. BROWN:

10:35:18  1        Q.   Okay.   I appreciate your response, but my

2    question's a little different.   It's simply:   If an --

3    if an employee comes to you with a work-related injury

4    or any injury, do you or do you not tell them what

10:35:32  5    they're entitled to under the FMLA?

6              MR. WILLIAMS:   Incomplete hypothetical.   You

7    can answer.

8              THE WITNESS:   Yeah.   No, because I don't -- I

9    don't correlate the two.

10:35:42 10  BY MR. BROWN:

11        Q.   Okay.   If an employee comes to you with a

12    work-related injury or any injury, says he is unable to

13    work for a period of time, do you tell him or advise him

14    of his rights under the California Family Rights Act,

10:35:57 15    the CFRA that we mentioned?

16        A.   So -- so I mean of -- "any injury" is kind of

17    vague, but if it would fall under the -- you know, an

18    injury that happened at work, we would advise them of

19    the -- the FMLA and the -- the California benefits that

10:36:15 20    they -- they have.

21        Q.   Why would you not tell them about that?

22        A.   Why -- I said I would.

23        Q.   You would tell them about it?

24        A.   Yes.

10:36:21 25        Q.   Okay.   And what would you tell them with

10:36:27  1    respect to their eligibility under the CFRA?

2         A.   So what -- what I typically do is we -- we

3    craft a -- a letter of their benefits and -- and what

4    they need to do, different links they can click on to

10:36:45  5    file for the FMLA and -- and all the information they

6    need to get -- get the leave granted.

7         Q.   Okay.  And would this letter include

8    information about their eligibility status?

9         MR. WILLIAMS:  Vague as to "eligibility

10:37:01 10    status."  You can answer how you understand.

11         THE WITNESS:  Eligibility status for what?  I

12    don't understand.

13    BY MR. BROWN:

14         Q.   Sure.  Would the letter that you crafted them,

10:37:11 15    would that include, for example, whether they are

16    eligible or not for CFRA?

17         A.   Not at that time, no.  It's -- it's really a

18    link to how to apply for it is what it is.

19         Q.   Would the letter you send to them include the

10:37:34 20    amount of time that would count against their CFRA leave

21    entitlement?

22         MR. WILLIAMS:  Vague as to time.  You can

23    answer to your understanding.

24         THE WITNESS:  Yeah, there's usually a -- a date

10:37:44 25    on there I believe.

10:42:29  1          A.   In our -- our employee handbook.

2          Q.   Could we pull back Exhibit 1.  I believe that

3     was the table of contents, and if -- Mr. Donohoue, if

4     you can just scroll through and identify where that

10:42:50  5     would be contained?

6          A.   So -- so it would be in the -- the PTO section,

7     I believe.  And "General Work Rules," it's also in

8     there.

9          Q.   So general PTO is that -- I see it references

10:43:33 10     the PTO on page 5 and 6.  Is that where you believe it's

11     contained?

12          A.   So it's going to be in the "General Work Rules"

13     on -- on 3, page 3.

14          Q.   Okay.  Thank you.

10:43:44 15          A.   Yeah.  And it will be more clarity in the PTO

16     section, so it's going to be in both.

17          Q.   So it would be both on pages 3 and page 6, PTO

18     and General?

19          A.   Yeah.  Five.  Some -- somewhere in that --

10:43:58 20     that -- that range.

21          Q.   Okay.  Good enough.  Have you ever heard of the

22     phrase "progressive discipline"?

23          A.   I have.

24          Q.   Okay.  What's your understanding of what that

10:44:08 25     is?

10:44:08  1        A.   So it would be an escalation of discipline.

       2        Q.   Okay.   And does Honey Bucket have any written

       3   policies pertaining to progressive discipline for an

       4   employee?

10:44:08  5        A.   It's -- it's standard practice.   I don't -- I

       6   don't -- it's not written.

       7        Q.   So that's a "no"?

       8        A.   No.

       9        Q.   I'm sorry?   Just so we're clear, because I

10:44:08 10   think we had a double negative there, does Honey Bucket

      11   have any written policies that define or set forth what

      12   progressive discipline is?

      13        A.   I do not believe so.

      14        Q.   But you believe -- you used the phrase "best

10:44:47 15   practices."   Is that what you believe it is?

      16        A.   Yes.

      17        Q.   Okay.   And what different layers of discipline

      18   are involved with respect to progressive discipline?

      19        A.   You have -- starts with a verbal warning and

10:45:00 20   then a written warning and then -- then termination.

      21        Q.   And the verbal warning, is that -- who is that

      22   provided by?

      23        A.   Typically a supervisor.

      24        Q.   And --

10:45:15 25        A.   Their immediate supervisor.

10:45:16  1          Q.   Thank you.   Is it Honey Bucket's policy to

2     document that?

3          A.   Yes.

4          Q.   Even though it's a verbal warning, they

10:45:24  5     hopefully will document it somewhere?

6          A.   Yes.   Typically in an email.

7          Q.   Okay.   And then the written warning is that --

8     how is that documented?

9          A.   It's -- it's administered by the -- the area

10:45:40 10    manager, and they would do -- they would type it up and

11    then either have their supervisor and the employee sit

12    down and talk about it with the witness and have them

13    sign the -- the document.

14         Q.   Okay.   Is there any level of progressive

10:45:56 15    discipline between a written warning and termination at

16    Honey Bucket?

17         A.   There -- there could be, yes, depending on the

18    circumstances.   You've got to take each circumstance on

19    its own and -- and figure out the determining factors,

10:46:13 20    how severe it was and what the appropriate -- and take

21    the appropriate action.

22         Q.   Okay.   For example, suspension, you've heard of

23    a suspension or -- before?

24         A.   I have heard of a suspension, yes.

10:46:27 25         Q.   Okay.   Is that an example of something between

10:46:29  1    a warning and termination?

2         A.   Yes.   I would put that in between those two.

3         Q.   Anything else you put between those two

4    categories?

10:46:42  5         A.   I'm sure there's -- no, I can't think of

6    anything.

7         Q.   What type of offenses would fall within a

8    suspension but not termination?

9         MR. WILLIAMS:   Incomplete hypothetical.   Calls

10:46:58 10   for speculation.   Lacks foundation.

11   BY MR. BROWN:

12        Q.   Can you just give me some examples of offenses

13   that would fall in a suspension category?

14        A.   Again, it depends on the circumstance, what

10:47:11 15   -- what lead to that negative outcome, if it was

16   intentional, if it was a simple mistake, what -- what --

17   how comfortable I am with -- with the -- the direction

18   that this person got, it's -- again, there's a whole

19   bunch of -- whole bunch of factors that would -- or

10:47:38 20   variables that play into it, and we take each one

21   separately and hopefully apply the appropriate

22   discipline.

23        Q.   Thank you.   Mr. Donohoue, I can't help seeing

24   your eyes shifting to something on the -- on your

10:47:54 25   left-hand side of the table there.   Are you reading

10:50:21  1    Order -- Work Rules as we discussed earlier.

2         Q.  And the General Work Rules, those are not in

3    writing, are they?

4         A.  Yeah, it's in the employee handbook.

10:50:30  5    Q.  Okay.  So you do believe there's a general rule

6    in the employee handbook that says job abandonment will

7    lead to immediate termination?

8         A.  Not in those words, no.

9         Q.  What does it say?

10:50:45 10    A.  I'd have to read it to give you the exact

11   quote.

12        Q.  As operations manager, you've got complete

13   discretion to -- to give whatever type of discipline you

14   see fit; is that right?

10:51:05 15    A.  Essentially, yes.

16        Q.  Okay.

17        A.  Always run it up the -- the chain of command,

18   you know, if -- especially when it comes to termination,

19   I will send my recommendations and -- and -- to Greg or

10:51:21 20   Jason, and get those bought off on or approved.

21        Q.  Okay.  And when you mentioned chain of command,

22   would you send it up to anybody else for discussion

23   besides the two individuals you just mentioned?

24        A.  Typically just the two individuals.

10:51:38 25    Q.  Okay.  When did you first hear of Luis Lopez?

10:54:11  1           MR. WILLIAMS:  Vague as to time.

       2  BY MR. BROWN:

       3       Q.  The first year or so.

       4       A.  Yeah, I mean there's -- as with any employee,

10:54:22  5  there's good and bad.  You know, they do good and do

       6  bad.  And when they do good, I'm happy.  When they do

       7  bad, I'm not.

       8       Q.  Okay.  Did Mr. Lopez do his job well?

       9       A.  Sometimes, yes.

10:54:36 10       Q.  Okay.  Did -- did he appear to be knowledgeable

      11  in the industry and in route driving?

      12       A.  Yes.

      13       Q.  And did you notice he shared his knowledge with

      14  other employees?

10:54:49 15       A.  I didn't notice that, no.

      16       Q.  Did you ever need -- see or learn that he would

      17  help train other drivers at Honey Bucket?

      18       A.  Yes.

      19       Q.  Did you consider Mr. Lopez a valuable employee?

10:55:05 20       A.  Yes.

      21       Q.  Okay.  If the videographer could introduce, I

      22  believe it's called "Driver Compliment #1."

      23              (Plaintiff's Exhibit 3 was marked for

      24              identification.)

10:55:33 25  BY MR. BROWN:

10:56:55  1    Luis?

2             A.   No, it doesn't.

3             Q.   Okay.  Does -- do you draw a blank on this, or

4        it just doesn't -- no recollection?

10:57:03  5             A.   Yeah, it's from a couple years ago, and I can't

6        remember every email I get, but it's -- it appears to be

7        legitimate.  I'm sure it's real.

8             Q.   Okay.  As of June of 2020, did you believe that

9        Luis was competent at his job?

10:57:20 10             A.   Some days he was and some days he wasn't.

11             Q.   Okay.  And -- well, as of this date, he

12        apparently was, correct?

13             A.   Or probably a couple days before that, but yes,

14        he -- he received -- it appears he received a customer

10:57:36 15        compliment.

16             Q.   If you look at -- actually, can we introduce as

17        next in order, I believe they're called "Wage Change

18        Forms.pdf."

19                         (Plaintiff's Exhibit 4 was marked for

10:57:50 20                          identification.)

21        BY MR. BROWN:

22             Q.   Mr. Donohoue, Exhibit 4, this is the three

23        documents produced by your attorneys Bates-stamp No. 5

24        18 and 56, and they're labeled "Salary/Wage/Change of

10:58:19 25        Duty/Probation Completion Forms."  Are you familiar with

10:58:23 1    these documents?

2        A.  Yes.

3        Q.  Okay.  If you turn to the back document, which

4    is Bates-stamped 56, you see it's -- this represents a

10:58:34 5    wage increase to Luis from 14.42 to $20.60; is that

6    accurate?

7        A.  Yes.

8        Q.  Is that your signature at the bottom there?

9        A.  Yes, it appears so.

10:58:49 10        Q.  And if you look at the previous -- or the next

11    page, Bates-stamp 18, we see another increase from I

12    believe it's $12 to 14.50; is that correct?

13        A.  The -- the -- that's what it says.  I don't

14    believe that was him, though.

10:59:08 15        Q.  Well, if you look at the top, it says

16    "Luis Lopez."  Do you -- what do you mean?  Do you

17    refer -- referring to something else?

18        A.  I'm thinking that's a different Luis Lopez.

19    It's got a different employee number.

10:59:22 20        Q.  Okay.  Good catch.  We can only deal with what

21    we were given here.  All right.  Well, let's look at the

22    first -- actually, yeah, if you look at the bottom

23    there, or middle, it says "seasonal" at the previous job

24    title, correct?

10:59:36 25        A.  Yeah, that says "seasonal" there.

11:42:49  1    correct?

2        A.   Yes.  So he's going to miss one day of work.

3        Q.   Now in your conversation with -- with Luis on

4    the phone, did he say he was quitting Honey Bucket?

11:43:08  5        A.   No.

6        Q.   Did he say he was abandoning his job?

7        A.   No.

8        Q.   Did he ever tell you that?

9        A.   He didn't tell me anything.  He wouldn't talk

11:43:18 10   to me.  We tried on several attempts to get ahold of

11   him, and he -- he would not speak to us.

12       Q.   I appreciate that, but my question is a little

13   different.  On the phone call you had with Mr. Lopez on

14   December 15th, did he say he was quitting Honey Bucket?

11:43:31 15       A.   No.  He didn't say he wasn't going to show up

16   for four days he was scheduled to work either.

17       Q.   Thank you.  And on December 15th when you

18   talked to him on the phone, did he say he was abandoning

19   his job at Honey Bucket?

11:43:45 20       A.   No.  And he didn't -- he didn't explain to me

21   that he wasn't going to be showing up for work either.

22       Q.   You mentioned four days.  Does Honey Bucket

23   have some written policies that says if you miss

24   four days of work, you're going to be fired for

11:43:56 25   abandonment?

11:45:05  1    Mr. Lopez's abandonment?

       2         A.   Common sense I guess.

       3         Q.   Anything else?

       4         A.   No.

11:45:12  5         Q.   Did you talk to anybody that suggested that

       6    four days should be the -- the point -- the line in the

       7    sand at which you would terminate Mr. Lopez for

       8    abandonment?

       9         A.   So it was too many days is what it was, and --

11:45:26 10    and that's how I communicated that he's -- he's -- we

      11    haven't been able to get ahold of him, we don't know

      12    what's going on, he won't -- won't talk to us, he's not

      13    showing up to work and that's what I said.

      14         Q.   And again, thank you, but my question's

11:45:37 15    different.  Did you speak to anybody who told you

      16    four days should be the limit at which you draw a job

      17    abandonment or job termination for abandonment?

      18         A.   No.  And I didn't talk about ten days or a

      19    hundred days or -- four is -- is too many.

11:45:53 20         Q.   So it's --

      21         A.   More than a few.

      22         Q.   You made the decision to terminate him after

      23    four days on your own?

      24         A.   I made the recommendation to terminate, yes.

11:46:01 25         Q.   And who did you give the recommendation to?

11:46:03 1   A. Greg Potts and Jason Perry.

2   Q. Okay.  And did you discuss it further with

3 either Mr. Potts or Mr. Perry?

4   A. Yes.  I told them all the -- all the

11:46:15 5 information that I had.

6   Q. Okay.  And what did they tell you?

7   A. That it was the right course of action to -- to

8 terminate.

9   Q. I'm sorry, could you just repeat what you just

11:46:28 10 said?

11   A. Yeah.  It was the correct course of action.  It

12 was the appropriate thing to do to terminate his

13 employment for job abandonment, because he had not shown

14 up to work for four days.

11:46:40 15   Q. Okay.  Did you understand that Mr. Lopez was

16 entitled to take time off?

17   A. You've got to communicate you're taking time

18 off; you can't just not show up to work.  If you don't

19 show up to work and don't tell anybody, you -- you --

11:46:55 20 that -- you can't -- you're not entitled to -- to leave.

21 If there was a situation where he needed to leave, he

22 needs to communicate he needs to take the leave and not

23 just not show up to work.

24   Q. Okay.  Did you understand that Luis was

11:47:10 25 entitled to benefits under the FMLA?

11:47:20  1          A.   No.   Because he wasn't talking to us.

          2          Q.   Regardless of whether he's talking to you or

          3    not, once you learned he had a medical injury, did you

          4    understand that he was entitled to benefits under the

11:47:30  5    FMLA Act?

          6          MR. WILLIAMS:   Calls for a legal conclusion.

          7    It calls for speculation.   You can answer to your

          8    understanding.

          9          THE WITNESS:   So, again, it's been -- about an

11:47:44 10    hour ago it would be handled differently than a -- a --

         11    a -- if you had some -- a personal injury or -- or some

         12    personal medical issue, he needed some time off, that

         13    that would be under FMLA.   This would be handled through

         14    workers' comp.

11:48:03 15    BY MR. BROWN:

         16          Q.   Regardless of the way it was handled,

         17    Honey Bucket had a responsibility to notify him that he

         18    was entitled or eligible for FMLA benefits, didn't he?

         19          A.   Well, yeah, I'd like --

11:48:13 20          MR. WILLIAMS:   That lacks foundation.   Lacks

         21    foundation.   Calls for speculation.   Calls for a legal

         22    conclusion.   You can answer to your understanding.

         23          THE WITNESS:   So it's -- it's tough to notify

         24    somebody when they won't talk to you.

11:48:26 25    BY MR. BROWN:

11:48:27  1        Q.   You spoke to him on December 15th, correct?

2        A.   Yes.

3        Q.   Did you notify him that he was eligible for

4   FMLA benefits on December 15th?

11:48:36  5        A.   No.

6        Q.   Did you notify him he was eligible for CFRA

7   benefits on December 15th?

8        A.   I did not.

9        Q.   Why not?

11:48:47 10        A.   Why not?  Because it wasn't a -- it would have

11   been handled differently.  He wasn't planning on it.  He

12   didn't communicate that he was planning that he needed

13   significant time off.

14        Q.   If we can introduce as next in order -- shoot.

11:49:09 15   The problem is I've labeled these PDFs, and now I don't

16   know what I called them, so it's going to take a minute.

17   Oh, "Texts 120 dash 122," please.

18             (Plaintiff's Exhibit 9 was marked for

19              identification.)

11:49:50 20   BY MR. BROWN:

21        Q.   Mr. Donohoue, Exhibit -- Exhibit 9 is a

22   three-page document Bates-stamped produced from the

23   Defense 120 to 122.  Are you familiar with this

24   document?

11:50:06 25        A.   Not specifically, no.

11:58:13  1        Q.   Okay.   Great.   You reference a pension loan he

2   has.   What loan are you referring to?

3        A.   It would be a pension loan.   I wouldn't have

4   access to know the amount or what it is.   It would be a

11:58:31  5   function of the -- the payroll department.

6        Q.   Well, how do you conclude that the -- any money

7   he was owed would be offset by his -- a pension loan?

8        A.   I don't conclude that.   That goes to our

9   payroll department and they -- they handle those --

11:58:45 10   that -- that aspect of it.

11        Q.   Well, what you were you told in this respect?

12        A.   What it says in the text message.

13        Q.   And then when you say, "You opened a claim,"

14   what are you referring to?

11:59:04 15        A.   Workers' compensation claim number.

16        Q.   Okay.   And this is pertaining to the work comp

17   -- compensation claim that we discussed earlier?

18        A.   Yes.

19        Q.   Okay.   And so at the time you terminated

11:59:20 20   Mr. Lopez, he had an open claim for workers'

21   compensation, correct?

22        A.   Yes, he did.

23        Q.   Let's go to -- you know, why don't we take a

24   five-minute break.   We've gone about another hour.

11:59:41 25             THE VIDEOGRAPHER:   Okay.   All right.   We are

12:25:48  1  going on.

2          Q.   What did you discuss with Mr. Garcia?

3          A.   The -- the injury.

4          Q.   What did he say?

12:25:58  5  A.   We -- we didn't have much information, so not

6  -- not much.

7          Q.   What did you say to Mr. Garcia?

8          A.   Mainly about getting the incident report.

9          Q.   All right.  Anything else?

12:26:17 10  A.   Not specifically that I recall.

11         Q.   Okay.  And then you mentioned you talked to

12  Mr. Potts as well about Mr. Lopez's injury and the

13  decision to terminate him?

14         A.   He was involved, I believe, in some email

12:26:29 15  communication.

16         Q.   Okay.  And have you provided those emails to

17  your attorney?

18         A.   Again, everything I have -- I've done an

19  exhaustive search for anything with Luis, and I've

12:26:41 20  turned those over.

21         Q.   Okay.  How many email communications do you

22  have with Mr. Potts?

23         A.   A lot.

24         Q.   Okay.  About Mr. Lopez after December 15th,

12:26:53 25  2020?

12:26:53  1          A.   Again, there was a lot of data, a lot of stuff

2    that I sent over.  I don't remember exactly how many

3    from each person and what each one contained, so --

4          Q.   How many --

12:27:02  5          A.   Everything I have has been turned over.

6          Q.   You know, I understand that's your position,

7    but I'm still allowed to ask you questions about it.

8    How many times did you talk to Mr. Potts about Mr. Lopez

9    during this time frame?

12:27:15 10          A.   I don't recall ever talking to him.  I know

11   that there was some -- he was involved in some email

12   communications.

13         Q.   Okay.  Any text communications with Mr. Potts

14   about Mr. Lopez during this time frame?

12:27:28 15          A.   I do not believe so.

16         Q.   And what's your understanding of what

17   Mr. Pott's recommendation was in this regard?

18         A.   He -- he --

19              MR. WILLIAMS:  Vague as to recommendation.

12:27:34 20              THE WITNESS:  He approved my recommendation for

21   termination.

22   BY MR. BROWN:

23         Q.   And do you recall anything else -- any other

24   input he had?

12:27:48 25          A.   I do not.

12:30:43  1   me -- he declined medical attention at the time, but I

       2   have not heard from him since the" -- can you complete

       3   that for me?

       4         A.   Yeah.  So it says, "since the initial reporting

12:30:55  5   12-16 despite repeated attempts."

       6         Q.   Okay.  When he called you on December 16th,

       7   that was his day off, correct?

       8         A.   I believe so, yes.  Yes, it was.

       9         Q.   Okay.  And you -- you knew he'd been injured on

12:31:20 10   the job at the time you filled this out, correct?

      11         A.   Yes, because I had him fill it out until

      12   Monday, the 21st.  I think that's a Monday.  Anyway,

      13   December 21st is when it was filled out.

      14         Q.   And -- and you knew, as of the date you talked

12:31:36 15   to him, he was not able to work, correct?

      16         A.   On the 17th, yes.

      17         Q.   Okay.  And then down below it says, "Action

      18   taken by Manager."  Can you read that, please?

      19         A.   Yeah.  I apologize for my handwriting.

12:31:54 20         Q.   Oh, no worries.  Better than mine.

      21         A.   A little embarrassed by it, but I'll read it

      22   for you.  So "Asked Ceasar" -- or "asked for incident

      23   report.  Did not receive it until 12-17 via Cesar

      24   Garcia.  It was written in Spanish tried to get ahold of

12:32:11 25   him for 3 days to rewrite it to no avail."

```
12:59:09   1    time, and -- and I would need drivers that come to work

           2    when they're scheduled.

           3        Q.   Okay.  So was there anything Mr. Lopez could

           4    have told you that would have led you to reconsider

12:59:21   5    reinstating him?

           6            MR. WILLIAMS:  Calls for speculation.

           7    Misstates the evidence.  Lacks foundation.

           8            THE WITNESS:  Yeah, I -- I -- I wouldn't know.

           9    No, I wouldn't think so.

12:59:37  10    BY MR. BROWN:

          11        Q.   But -- but you were not interested in changing

          12    your decision to terminate Mr. Lopez when you heard back

          13    from him, correct?

          14        A.   No, I was -- I was not.

12:59:48  15        Q.   Okay.  And you can see in the second text he

          16    sends you that same day, a minute later, he mentions,

          17    "do you want me to make a doctor's appointment to send

          18    it to you," correct?

          19        A.   Which -- which -- which one are you looking at?

13:00:05  20        Q.   December -- the 12:18 p.m.  It says, I --

          21    "Luis" -- or excuse me, "I also noticed that I didn't

          22    get paid, do you want me to make a doctor's appointment

          23    to send it to you?"  When you saw that he referenced a

          24    doctor's appointment, did you realize that he was absent

13:00:22  25    because of the injury he discussed with you on
```

13:00:25  1    December 15th?

2              MR. WILLIAMS:  Calls for speculation.  Lacks

3        foundation.

4              THE WITNESS:  Yeah, I'm not -- I'm not sure.  I

13:00:31  5    mean, it's -- what I know is that he didn't contact me

6        for -- for four days before I made the decision to

7        terminate his employment.  Didn't contact him, we made

8        several attempts to get ahold of him, and -- and he

9        wouldn't return our calls.

13:00:46 10    BY MR. BROWN:

11            Q.  And I appreciate that.  My question's a little

12        different.  My question is simply:  Did you realize when

13        you saw he was referencing a doctor's appointment that

14        he had been absent because of the injury he discussed

13:01:00 15    with you on December 15th?

16            A.  No, I don't think it says that either, but --

17            Q.  I'm just asking, did you make the connection?

18        He's hurt on December 15th, you talked to him, he

19        tells you he needs a doctor's appointment note on

13:01:12 20    December 30th, did you think -- did you see there's a

21        connection there?

22            A.  I -- I gave him the workers' comp number so he

23        could get that taken care of.

24            Q.  You realize he's referring to the same injury,

13:01:23 25    correct?

```
13:01:26  1        A.  I -- probably, yeah.

          2        Q.  Okay.  Did that factor in at all in your

          3   consideration to reinstate him?

          4        A.  No, it was well after his -- nine days after

13:01:39  5   the -- the decision to terminate.

          6        Q.  Please introduce as Plaintiff's next in

          7   order -- what number are we on by the way?

          8            THE REPORTER:  I have 15.

          9            MR. BROWN:  15.  Thank you.  15 will be "Final

13:02:07 10   paycheck Emails 123 to 125," please.

         11            (Plaintiff's Exhibit 15 was marked for

         12                identification.)

         13   BY MR. BROWN:

         14        Q.  Exhibit -- Exhibit 15 is a three-page document

13:02:31 15   produced by the defense marked -- or Bates-stamped 123

         16   to 125, and it's an email exchange pertaining to Luis

         17   final paycheck on or about December 22nd, 2020.

         18            Mr. Donohoue, are you familiar with this email

         19   thread?

13:02:53 20        A.  Yes.

         21        Q.  Okay.  Turn to the second full page

         22   Bates-stamped 124.  At the top there's an email from

         23   Mr. Perry to you and a Melissa Vadnais.  Am I

         24   pronouncing that correctly?

13:03:11 25        A.  I believe so, yeah.
```

13:25:19  1          Q.   And then in the column next to that,

      2    "PaidHours," would be the equivalent of what that -- the

      3    number of hours that the employee was paid for that

      4    particular day, correct?

13:25:37  5          A.   Yes.   That would be my -- my assumption.

      6          Q.   So if you look, for example, at October 5th,

      7    2018, the trip time for Mr. Lopez was 11 hours,

      8    40 minutes and 18 seconds, correct?

      9          A.   Yes.

13:25:57 10          Q.   But the paid hours is ten, right?

     11          A.   That's what it says, yes.

     12          Q.   Do you know why the paid amount is less than

     13    the actual work time for Mr. Lopez on October 15th --

     14    or, excuse me, October 5th?

13:26:13 15          MR. WILLIAMS:   Calls for speculation.   Lacks

     16    foundation.

     17          THE WITNESS:   Unfortunately, I -- I don't know.

     18    I -- I -- like I say, I don't know where this data is

     19    coming from.   It doesn't look like payroll records to

13:26:26 20    me, so I'm not sure where -- where we got it from.

     21    BY MR. BROWN:

     22          Q.   Okay.   And I appreciate your response.   If you

     23    drop down, for example, again, at November 9th, 2018, do

     24    you see that, about three-quarters of the way down.   And

13:26:40 25    you scroll over, again, the "TripTime," it's 11 hours

```
 1              R E P O R T E R ' S   C E R T I F I C A T E

 2

 3              I, MICHELLE D. BARBANTE, a Certified Shorthand

 4    Reporter of the State of California, hereby certify that

 5    the witness in the foregoing deposition was by me duly

 6    sworn to tell the truth in the within-entitled cause;

 7    that said deposition was taken at the time and place

 8    therein stated; that the testimony of the said witness

 9    was reported by me, a duly certified shorthand reporter,

10    and was thereafter transcribed under my direction into

11    typewriting; and that the witness was given an

12    opportunity to read and, if necessary, correct said

13    deposition and to subscribe the same.

14              I FURTHER CERTIFY that I am not of counsel or

15    attorney for either or any of the parties in the

16    foregoing deposition and caption named, or in any way

17    interested in the outcome of the cause in said caption.

18              IN WITNESS WHEREOF, I have hereunto set my

19    hand this 16th day of June, 2022.

20                                    Michelle Barbante

21              _____

                MICHELLE D. BARBANTE
22              Certified Shorthand Reporter
                Certificate No. 12601
23              State of California

24

25
```

PATRICIA CALLAHAN REPORTING   (510) 885-2371

# EXHIBIT B

# SALARY/WAGE/CHANGE OF DUTY/PROBATION
# COMPLETION FORM

**Name** _Luis Lopez_                     **Emp#** _6552_

**Date of Salary Adjustment** _10-10-19_
                              **(First day of Pay Period)**

|  | **FROM** | **TO** | ☐ 70% of regular rate |
|---|---|---|---|
|  |  |  | ☐ 85% of regular rate |
|  |  |  | ☐ 100% of regular rate |
| **Base Salary/Wage** | $25.38 | $26.62 | ☐ % of regular rate |

---

**Completion of Probation?   Yes  /   No  (if no, termination report to follow)**
**Benefits Enrollment?        Yes  /   No**
**Circle One:**
**Full Time**          **Part-Time (less than 30hrs)     Seasonal (90 days or less)**
        ☐ **Inform Marketing for Company and Social Media Announcement**

---

**Previous Job Title:** _Route Driver_

**New Job Title:** _Route Driver   Class A_

**Previous PC:** _54_                 **New PC:** _56_

**Recommended by:** _Pat Donohue_

**Authorized by:** _____
                  Manager

**Approved by:** _____
                President/VP Honey Bucket/VP FloHawks

Revision Date: 10/16/2019
S:\MANAGERs_TOOLBOX/Payroll/Wage Increase or Change Duty.docx

**NWC-00005**

# SALARY/WAGE/CHANGE OF DUTY/PROBATION COMPLETION FORM

Name _Luis Lopez_      Emp# _6552_

Date of Salary Adjustment _11 / 19 / 15_
**(First day of Pay Period if possible)**

|  | FROM | TO |
|---|---|---|
| Base Salary/Wage: | $14.42 (lmt) | $20.60 (full sick) |

Completion of Probation?   Yes   /   No   (if no, termination report to follow)

Pension Increase?        Yes   /   No   (if no, termination report to follow)

PREVIOUS JOB TITLE: _Route Driver_

NEW JOB TITLE: _Route Driver_

PREVIOUS PC: _58_      NEW PC: _58_

Recommended by: _Pat Donohue_

Approved by: _____

Revision Date: 2/27/09
S:\MANAGERs_TOOLBOX/Payroll/Wage Increase or Change Duty.doc

NWC-00056

<u>MEMO</u>

**TO:**        **Luis Lopez**

**DATE:**      **December 22, 2020**

**FROM:**      **Patrick Donohoue**

**RE:**        **Termination of employment**


On 12/16/20, you contacted me to let me know you could not come to work. Cesar Garcia made contact with you on 12/17/20 to get an incident report. In spite of our many attempts to contact you, we have received no response from you since 12/17/20. As a result, you have violated Company policy by being a no call no show for four days on which you were scheduled to work.

Because of your decision to abandon your job and not contact a supervisor or myself, your employment with Northwest Cascade Inc. is terminated as of 12/22/20.


_____           _____

**Luis Lopez**                           **Date**


_____           _____

**Pat Donohoue**                         **Date**


_____           _____

**Witness**                              **Date**

| | |
|---|---|
| **From:** | Ceasar Garcia |
| **Sent:** | Monday, December 21, 2020 6:30 PM |
| **To:** | Pat Donohoue |
| **Subject:** | Luis Lopez incident report translated version |
| **Attachments:** | Dec 21, Doc 4.pdf |

Cesar Garcia Sr
Route supervisor
PC58
Office 800-325-2371
Cell REDACTED

ceasargarcia@honeybucket.com

1

# REPORT OF INCIDENT/INJURY

All incidents regardless of severity must be reported immediately to your supervisor. You must talk with your supervisor at the time of the incident or go to the person above them if they are not available. This form must be completed by the NWC Employee for any incident and returned to the Manager either the day of the incident or within 24 hours of occurrence.

Employee Name **Luis Lopez**                     PC **58**

Date of incident **12/15/20**                     Time **1:30** AM /(PM)

Location/Address **Telegraph Hill**

Description of incident/injury          Equipment / Truck # **C727**
**I slipped and fell over 2 pieces of wood
Landed on My knees**

First aid kit opened? Yes / No          If yes, has the first aid been replaced? Yes / No

Damage to NWC equipment/vehicle  No / Yes - Describe_____

_____

Damage to others property No / Yes – Describe_____

_____

Name of other person(s)_____ Telephone Number_____

Were there any witnesses No / Yes Witnesses Name(s)_____

Action taken by Manager _____

_____

Cost of incident _____ (attach receipts, estimates, etc.).

At Fault   Yes  or  No                Rt Sup/ Foreman Name_____

_____     **Luis Lopez**     **12/15/20**
Employee Signature           Print Name        Date

_____     **Cesar Garcia**   **12/15/20**
Investigator Signature       Print Name        Date

_____     _____    _____
Managers Signature           Print Name        Date

Copy to Safety Director                          Revised 11-18-15

**From:** Ceasar Garcia
**Sent:** Thursday, December 17, 2020 1:37 PM
**To:** Pat Donohoue
**Subject:** Luis López incident report
**Attachments:** Dec 17, Doc 1.pdf

Cesar Garcia Sr
Route supervisor
PC58
Office 800-325-2371
Cell REDACTED

ceasargarcia@honeybucket.com



NWC-00112

# REPORT OF INCIDENT/INJURY

All incidents regardless of severity must be reported immediately to your supervisor. You must talk with your supervisor at the time of the incident or go to the person above them if they are not available. This form must be completed by the NWC Employee for any incident and returned to the Manager either the day of the incident or within 24 hours of occurrence.

Employee Name ___Luis Lopez___          PC __58__

Date of incident ___12/15/20___          Time __1:30__  AM / (PM)

Location/Address __TELEGRAH HILL__

Description of incident/injury     Equipment / Truck # __727__
___ME RESbelt y cai sobr 2 Tables & Rodilles___

First aid kit opened? Yes (No)          If yes, has the first aid been replaced? Yes / No

Damage to NWC equipment/vehicle (No) / Yes - Describe ___

Damage to others property (No) / Yes – Describe ___

Name of other person(s) ___          Telephone Number ___

Were there any witnesses No / Yes Witnesses Name(s) ___

Action taken by Manager ___

Cost of incident ___ (attach receipts, estimates, etc.).

At Fault   Yes  or  No          Rt Sup/ Foreman Name

___Luis A. Lopez___    ___Luis Lopez___  ___12/15/20___
Employee Signature      Print Name         Date

___          ___          ___
Investigator Signature    Print Name        Date

___          ___          ___
Managers Signature       Print Name        Date

Copy to Safety Director          Revised 11-18-15

NWC-00113

**From:** Pat Donohoue
**Sent:** Monday, December 21, 2020 8:49 AM
**To:** Eric Wright
**Subject:** Luis lopez injury
**Attachments:** 3a8bae5e_39f1_415d_a7e7_d8b32189dd16.pdf

Here is the report I filled out for luis. I will send the one in spanish he filled out with the translation from Cesar as soon as he sends it to me.

NWC-00114

## REPORT OF INCIDENT/INJURY

All incidents regardless of severity must be reported immediately to your supervisor. You must talk with your supervisor at the time of the incident or go to the person above them if they are not available. This form must be completed by the NWC Employee for any incident and returned to the Manager either the day of the incident or within 24 hours of occurrence.

Employee Name ___Luis Lopez_____    PC _58_

Date of incident __12-15-20_____    Time _1:30__ AM / ⊘PM

Location/Address __Telegraph Hill  San Francisco_____

Description of incident/injury    Equipment / Truck # _____

_Luis Called me 12-15 to report the injury to his knee he said he slipped and hit his knee on a piece of Metal and would not be able to work 12-17. He declind Medical attention at the time but I have not heard from him since the initial reporting 12-15 dispite repeated attempts_

First aid kit opened? Yes / No        If yes, has the first aid been replaced? Yes / No

Damage to NWC equipment/vehicle ⊘No / Yes - Describe _____

_____

Damage to others property ⊘No / Yes – Describe _____

_____

Name of other person(s)_____    Telephone Number _____

Were there any witnesses No / Yes Witnesses Name(s)_____

Action taken by Manager _asked for incident report. Did not receive it until 12-19 via Cesar Garcia. It was written in spanish tried to get ahold of him for 3 day to rewrite it to no avail._

Cost of incident _____ (attach receipts, estimates, etc.).  Tow Truck Req. Yes or No

At Fault   Yes or No           Rt Sup/ Foreman Name _Dave Williams_

_____    _____    _____
Employee Signature      Print Name           Date

_____    _____    _____
Investigator Signature   Print Name           Date

_Qul/rl_____    _Patrick Donohoe_    _12-21-20_
Managers Signature      Print Name           Date

Copy to Safety Director                        Revised 1-15-20

NWC-00115

Luis_ REDACTED _.txt

send it to me.

[12/18/20 1:13 PM] Me: Please call me

[12/21/20 6:16 PM] Me: I need to see how you are doing and what is going on. Please call me to let me know.
Thanks

[12/30/20 12:17 PM] Luis: Hello Pat, I am doing good, I been walking normal just a little pain trying to get things, but I will be back in few days.

[12/30/20 12:18 PM] Luis: I also noticed that I didn't get paid, do You want me to make a doctor's appointment to send it to You?

[12/31/20 9:33 AM] Me: Your employment was terminated due to job abandonment. I sent a certified letter because we could not get a hold of you. Your final check was $0 because of your pension loan. We did open a claim incase you needed to seek medical attention and we were unaware of your status. The claim number is  REDACTED . The adjuster is  REDACTED   his phone # is 916 REDACTED .

[1/21/21 1:27 PM] Luis: Hello Pat, sorry to bother You,  but I need the last 4 pay stubs and also tell me about the uniforms?
I have those in my pick up.

NWC-00122

# NORTHWEST CASCADE INC. EMPLOYEE HANDBOOK







Table of Contents

# Contents

**NORTHWEST CASCADE INC. EMPLOYEE HANDBOOK** ............................................................................... 1

INTRODUCTION ...................................................................................................................................... 1

HANDBOOK REVISIONS ........................................................................................................................... 2

EMPLOYMENT AT WILL ........................................................................................................................... 2

BENEFITS ................................................................................................................................................. 2

WAGE AND HOURS .................................................................................................................................. 2

Regular Pay Days ..................................................................................................................................... 2

Rest Breaks ............................................................................................................................................. 2

Meal Periods ........................................................................................................................................... 2

Overtime Pay .......................................................................................................................................... 3

GENERAL WORK RULES ............................................................................................................................ 3

SMOKING ................................................................................................................................................ 3

PAID TIME OFF ........................................................................................................................................ 3

Eligibility ................................................................................................................................................. 4

Accrual .................................................................................................................................................... 4

Use ......................................................................................................................................................... 5

Holiday PTO ............................................................................................................................................ 5

Scheduled PTO ........................................................................................................................................ 5

Unscheduled PTO .................................................................................................................................... 5

Unpaid Time Off and Make-Up Time ....................................................................................................... 5

Compensation for PTO ............................................................................................................................ 6

PTO Advances ......................................................................................................................................... 6

Separation From NWC ............................................................................................................................. 6

PTO For Family Care and Other Leave Purposes ...................................................................................... 6

Bereavement Leave ................................................................................................................................. 6

DRESS AND GROOMING STANDARDS ...................................................................................................... 7

SAFETY POLICIES & PROCEDURES ............................................................................................................ 7

EMPLOYMENT MEDICAL EXAMINATION .................................................................................................. 7

MOBILE DEVICE USAGE POLICIES ............................................................................................................ 7

SOCIAL MEDIA POLICY ............................................................................................................................ 8

TECHNOLOGY USE AND SECURITY POLICY .............................................................................................. 10

Technology Resources ............................................................................................................................ 10

Access .................................................................................................................................................... 11

Use ......................................................................................................................................................... 11

Passwords ............................................................................................................................................... 12

Prohibition Against Violating Copyright Laws .......................................................................................... 12

Other Prohibited Uses ............................................................................................................................ 12

Internet ................................................................................................................................................... 12

Online Monitoring ................................................................................................................................... 13

License Restrictions ................................................................................................................................. 13

Security ................................................................................................................................................... 13

Remote Access To Technology Resources ................................................................................................ 14

Electronic Mail Guidelines ....................................................................................................................... 14

Confidential and Personal Information ................................................................................................ 15
Obligations on Termination ............................................................................................................... 16
Security ............................................................................................................................................. 16
CONFLICTS OF INTEREST ............................................................................................................ 16
ANTI-HARASSMENT POLICY ......................................................................................................... 17
Harassment Defined ......................................................................................................................... 17
Reporting .......................................................................................................................................... 18
Investigation ..................................................................................................................................... 18
Corrective Action .............................................................................................................................. 18
Training ............................................................................................................................................. 18
OPEN DOOR ................................................................................................................................... 18
EQUAL EMPLOYMENT OPPORTUNITY POLICY .......................................................................... 19
AFFIRMATIVE ACTION ................................................................................................................... 19
Employee Assistance Program ......................................................................................................... 20
DRUG FREE WORKPLACE POLICY .............................................................................................. 20
Legal Drugs ...................................................................................................................................... 21
Alcohol ............................................................................................................................................. 21
Illegal Drugs ..................................................................................................................................... 21
Marijuana .......................................................................................................................................... 21
Confidentiality ................................................................................................................................... 21
Substance Abuse Program (Employee Assistance Program) ........................................................... 21
Drug Testing ..................................................................................................................................... 22
Procedures for Drug Testing ............................................................................................................. 22
Confidentiality ................................................................................................................................... 23
WORK PLACE VIOLENCE PROCEDURES ..................................................................................... 23
Corrective Action and Discipline ....................................................................................................... 23
FIRST AID ........................................................................................................................................ 23
SECURITY CAMERAS ..................................................................................................................... 23
LEAVES OF ABSENCE ................................................................................................................... 24
Family Care, Medical and Military Family Leave ............................................................................... 24
Pregnancy-Related Disability Rights ................................................................................................. 30
Other Disability Leaves ..................................................................................................................... 31
Other Leaves of Absence .................................................................................................................. 32
ADDITIONAL NWC POLICIES ........................................................................................................ 32
ACKNOWLEDGMENT ..................................................................................................................... 33

| DriverId1 | DriverName1 | TripStartDate | TripEndDate | TripStartTime | ActivityType | StartTime | EndTime | Duration | TripEndTime | Trip Time | Paid Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6552 | LUIS  LOPEZ | 10/1/2018 | 10/1/2018 | 9:41:48 | | | | | 20:00:00 | 10:18:12 | 13.00 |
| 6552 | LUIS  LOPEZ | 10/2/2018 | 10/2/2018 | 7:30:00 | | | | | 20:06:02 | 12:36:02 | 12.50 |
| 6552 | LUIS  LOPEZ | 10/3/2018 | 10/3/2018 | 7:17:36 | | | | | 17:31:20 | 10:13:44 | 10.20 |
| 6552 | LUIS  LOPEZ | 10/5/2018 | 10/5/2018 | 6:59:19 | | | | | 18:39:37 | 11:40:18 | 10.00 |
| 6552 | LUIS  LOPEZ | 10/7/2018 | 10/7/2018 | 13:06:21 | | | | | 18:07:22 | 5:01:01 | 5.00 |
| 6552 | LUIS  LOPEZ | 10/8/2018 | 10/8/2018 | 6:26:50 | | | | | 19:07:30 | 12:40:40 | 12.70 |
| 6552 | LUIS  LOPEZ | 10/9/2018 | 10/9/2018 | 6:26:41 | | | | | 19:36:09 | 13:09:28 | 13.20 |
| 6552 | LUIS  LOPEZ | 10/12/2018 | 10/12/2018 | 6:38:28 | | | | | 21:04:06 | 14:25:38 | 14.40 |
| 6552 | LUIS  LOPEZ | 10/14/2018 | 10/14/2018 | 16:11:32 | | | | | 22:03:11 | 5:51:39 | 6.00 |
| 6552 | LUIS  LOPEZ | 10/15/2018 | 10/15/2018 | 6:46:14 | | | | | 20:19:15 | 13:33:01 | 13.60 |
| 6552 | LUIS  LOPEZ | 10/16/2018 | 10/16/2018 | 6:43:01 | | | | | 19:54:59 | 13:11:58 | 12.50 |
| 6552 | LUIS  LOPEZ | 10/17/2018 | 10/17/2018 | 8:07:35 | Off-period | 10/17/2018 12:52 | 10/17/2018 13:25 | 33:01 | 20:09:12 | 12:01:37 | 11.50 |
| 6552 | LUIS  LOPEZ | 10/18/2018 | 10/18/2018 | 7:54:25 | Off-period | 10/18/2018 11:38 | 10/18/2018 12:10 | 31:50 | 22:01:55 | 14:07:30 | 13.57 |
| 6552 | LUIS  LOPEZ | 10/19/2018 | 10/19/2018 | 7:47:02 | Off-period | 10/19/2018 16:35 | 10/19/2018 18:19 | 44:14 | 18:59:51 | 11:12:49 | 9.47 |
| 6552 | LUIS  LOPEZ | 10/21/2018 | 10/21/2018 | 10:59:13 | | | | | 19:09:32 | 8:10:19 | 7.75 |
| 6552 | LUIS  LOPEZ | 10/22/2018 | 10/22/2018 | 7:03:13 | | | | | 20:46:45 | 13:43:32 | 13.70 |
| 6552 | LUIS  LOPEZ | 10/26/2018 | 10/26/2018 | 7:56:29 | | | | | 20:03:47 | 12:07:18 | - |
| 6552 | LUIS  LOPEZ | 10/28/2018 | 10/28/2018 | 16:11:02 | | | | | 23:31:02 | 7:20:00 | 7.30 |
| 6552 | LUIS  LOPEZ | 10/29/2018 | 10/29/2018 | 8:08:22 | Off-period | 10/29/2018 14:36 | 10/29/2018 15:08 | 32:33 | 18:43:52 | 10:35:30 | 10.07 |
| 6552 | LUIS  LOPEZ | 10/30/2018 | 10/30/2018 | 5:55:52 | Off-period | 10/30/2018 15:32 | 10/30/2018 16:03 | 30:56 | 18:39:43 | 12:43:51 | 12.18 |
| 6552 | LUIS  LOPEZ | 11/1/2018 | 11/1/2018 | 17:33:00 | | | | | 20:05:28 | 2:32:28 | 2.50 |
| 6552 | LUIS  LOPEZ | 11/2/2018 | 11/2/2018 | 5:27:21 | | | | | 19:44:04 | 14:16:43 | 14.30 |
| 6552 | LUIS  LOPEZ | 11/3/2018 | 11/4/2018 | 13:13:05 | | | | | 0:04:29 | 10:49:24 | 10.90 |
| 6552 | LUIS  LOPEZ | 11/4/2018 | 11/4/2018 | 12:48:01 | Off-period | 11/4/2018 14:04 | 11/4/2018 15:03 | 58:25 | 18:19:35 | 5:31:34 | 4.52 |
| 6552 | LUIS  LOPEZ | 11/5/2018 | 11/5/2018 | 6:01:36 | Off-period | 11/5/2018 18:54 | 11/5/2018 19:25 | 31:25 | 20:37:38 | 14:36:02 | 14.08 |
| 6552 | LUIS  LOPEZ | 11/8/2018 | 11/8/2018 | 6:02:24 | | | | | 16:31:38 | 10:29:14 | 10.00 |
| 6552 | LUIS  LOPEZ | 11/9/2018 | 11/9/2018 | 7:44:53 | | | | | 18:55:31 | 11:10:38 | 10.62 |
| 6552 | LUIS  LOPEZ | 11/11/2018 | 11/12/2018 | 15:16:05 | | | | | 0:02:28 | 8:46:23 | 8.80 |
| 6552 | LUIS  LOPEZ | 11/12/2018 | 11/12/2018 | 7:04:48 | Off-period | 11/12/2018 15:46 | 11/12/2018 16:16 | 30:39 | 20:39:26 | 13:34:38 | 13.10 |
| 6552 | LUIS  LOPEZ | 11/13/2018 | 11/13/2018 | 6:04:38 | Off-period | 11/13/2018 18:30 | 11/13/2018 19:01 | 31:20 | 20:38:56 | 14:34:18 | - |
| 6552 | LUIS  LOPEZ | 11/14/2018 | 11/14/2018 | 4:56:28 | | | | | 19:11:50 | 14:15:22 | 27.23 |
| 6552 | LUIS  LOPEZ | 11/16/2018 | 11/16/2018 | 5:59:34 | Off-period | 11/16/2018 10:17 | 11/16/2018 10:47 | 29:58 | 19:18:05 | 13:18:31 | 12.80 |
| 6552 | LUIS  LOPEZ | 11/16/2018 | 11/16/2018 | 5:59:34 | Off-period | 11/16/2018 16:29 | 11/16/2018 17:00 | 30:40 | 19:18:05 | 13:18:31 | 12.80 |
| 6552 | LUIS  LOPEZ | 11/18/2018 | 11/18/2018 | 16:01:09 | | | | | 19:33:22 | 3:32:13 | 3.50 |
| 6552 | LUIS  LOPEZ | 11/19/2018 | 11/19/2018 | 5:43:56 | Off-period | 11/19/2018 11:42 | 11/19/2018 12:25 | 43:13 | 17:54:03 | 12:10:07 | 11.48 |
| 6552 | LUIS  LOPEZ | 11/19/2018 | 11/19/2018 | 5:43:56 | Off-period | 11/19/2018 15:41 | 11/19/2018 16:15 | 34:31 | 17:54:03 | 12:10:07 | 11.48 |

| 6552 | LUIS LOPEZ | 11/20/2018 | 11/20/2018 | 5:50:21 | | Off-period | 11/20/2018 14:32 | 11/20/2018 15:03 | 30:57 | 20:14:04 | 14:23:43 | 13.88 |
|------|-----------|-----------|-----------|---------|--|------------|------------------|------------------|-------|----------|----------|-------|
| 6552 | LUIS LOPEZ | 11/25/2018 | 11/25/2018 | 12:04:51 | | | | | | 19:31:38 | 7:26:47 | 7.50 |
| 6552 | LUIS LOPEZ | 11/26/2018 | 11/26/2018 | 5:12:14 | | Off-period | 11/26/2018 12:18 | 11/26/2018 12:48 | 29:22 | 17:36:01 | 12:23:47 | 11.90 |
| 6552 | LUIS LOPEZ | 11/26/2018 | 11/26/2018 | 5:12:14 | | Off-period | 11/26/2018 16:20 | 11/26/2018 16:53 | 32:42 | 17:36:01 | 12:23:47 | 11.90 |
| 6552 | LUIS LOPEZ | 11/27/2018 | 11/27/2018 | 4:59:13 | | | | | | 19:19:25 | 14:20:12 | 13.77 |
| 6552 | LUIS LOPEZ | 11/30/2018 | 11/30/2018 | 6:07:31 | | Off-period | 11/30/2018 13:28 | 11/30/2018 13:58 | 29:58 | 18:52:47 | 12:45:16 | 12.30 |
| 6552 | LUIS LOPEZ | 11/30/2018 | 11/30/2018 | 6:07:31 | | Off-period | 11/30/2018 16:25 | 11/30/2018 17:01 | 35:54 | 18:52:47 | 12:45:16 | 12.30 |
| 6552 | LUIS LOPEZ | 12/2/2018 | 12/2/2018 | 7:56:43 | | Off-period | 12/2/2018 12:49 | 12/2/2018 13:22 | 33:02 | 17:40:36 | 9:43:53 | 9.15 |
| 6552 | LUIS LOPEZ | 12/3/2018 | 12/3/2018 | 5:47:25 | | Off-period | 12/3/2018 13:12 | 12/3/2018 13:43 | 30:44 | 20:57:00 | 15:09:35 | 14.68 |
| 6552 | LUIS LOPEZ | 12/3/2018 | 12/3/2018 | 5:47:25 | | Off-period | 12/3/2018 19:44 | 12/3/2018 20:15 | 30:48 | 20:57:00 | 15:09:35 | 14.68 |
| 6552 | LUIS LOPEZ | 12/4/2018 | 12/4/2018 | 6:06:22 | | Off-period | 12/4/2018 11:05 | 12/4/2018 11:35 | 30:35 | 16:07:41 | 10:01:19 | 9.50 |
| 6552 | LUIS LOPEZ | 12/7/2018 | 12/7/2018 | 5:13:09 | | Off-period | 12/7/2018 11:08 | 12/7/2018 11:38 | 29:55 | 14:18:12 | 9:05:03 | 8.50 |
| 6552 | LUIS LOPEZ | 12/9/2018 | 12/9/2018 | 10:03:55 | | Off-period | 12/9/2018 16:22 | 12/9/2018 16:56 | 34:33 | 20:02:05 | 9:58:10 | 9.43 |
| 6552 | LUIS LOPEZ | 12/10/2018 | 12/10/2018 | 5:29:22 | | Off-period | 12/10/2018 13:49 | 12/10/2018 14:24 | 35:26 | 19:34:31 | 14:05:09 | 13.52 |
| 6552 | LUIS LOPEZ | 12/11/2018 | 12/11/2018 | 11:20:43 | | Off-period | 12/11/2018 18:04 | 12/11/2018 18:51 | 46:57 | 22:19:28 | 10:58:45 | 10.22 |
| 6552 | LUIS LOPEZ | 12/13/2018 | 12/13/2018 | 5:42:23 | | Off-period | 12/13/2018 11:36 | 12/13/2018 12:07 | 31:00 | 17:19:39 | 11:37:16 | 11.08 |
| 6552 | LUIS LOPEZ | 12/13/2018 | 12/13/2018 | 5:42:23 | | Off-period | 12/13/2018 16:06 | 12/13/2018 16:40 | 33:49 | 17:19:39 | 11:37:16 | 11.08 |
| 6552 | LUIS LOPEZ | 12/14/2018 | 12/14/2018 | 4:55:25 | | Off-period | 12/14/2018 10:20 | 12/14/2018 10:50 | 30:18 | 19:00:20 | 14:04:55 | 13.60 |
| 6552 | LUIS LOPEZ | 12/14/2018 | 12/14/2018 | 4:55:25 | | Off-period | 12/14/2018 16:44 | 12/14/2018 17:15 | 30:58 | 19:00:20 | 14:04:55 | 13.60 |
| 6552 | LUIS LOPEZ | 12/15/2018 | 12/15/2018 | 15:56:47 | | | | | | 20:16:37 | 4:19:50 | 4.30 |
| 6552 | LUIS LOPEZ | 12/16/2018 | 12/16/2018 | 14:00:28 | | | | | | 18:43:32 | 4:43:04 | 4.70 |
| 6552 | LUIS LOPEZ | 12/17/2018 | 12/17/2018 | 5:00:37 | | Off-period | 12/17/2018 11:14 | 12/17/2018 11:45 | 30:34 | 18:30:59 | 13:30:22 | 12.98 |
| 6552 | LUIS LOPEZ | 12/17/2018 | 12/17/2018 | 5:00:37 | | Off-period | 12/17/2018 17:59 | 12/17/2018 18:29 | 29:35 | 18:30:59 | 13:30:22 | 12.98 |
| 6552 | LUIS LOPEZ | 12/18/2018 | 12/18/2018 | 5:40:53 | | Off-period | 12/18/2018 11:58 | 12/18/2018 12:30 | 31:30 | 17:49:07 | 12:08:14 | 11.67 |
| 6552 | LUIS LOPEZ | 12/18/2018 | 12/18/2018 | 5:40:53 | | Off-period | 12/18/2018 17:01 | 12/18/2018 17:30 | 28:47 | 17:49:07 | 12:08:14 | 11.67 |
| 6552 | LUIS LOPEZ | 12/19/2018 | 12/19/2018 | 13:14:55 | | Off-period | 12/19/2018 14:54 | 12/19/2018 15:37 | 43:07 | 17:00:44 | 3:45:49 | 10.50 |
| 6552 | LUIS LOPEZ | 12/27/2018 | 12/27/2018 | 4:48:02 | | | | | | 18:35:47 | 13:47:45 | 13.27 |
| 6552 | LUIS LOPEZ | 12/28/2018 | 12/28/2018 | 5:39:10 | | | | | | 17:15:35 | 11:36:25 | 11.10 |
| 6552 | LUIS LOPEZ | 12/29/2018 | 12/29/2018 | 5:18:51 | | Off-period | 12/29/2018 12:20 | 12/29/2018 12:53 | 33:45 | 14:27:37 | 9:08:46 | 8.65 |
| 6552 | LUIS LOPEZ | 12/30/2018 | 12/30/2018 | 12:00:12 | | | | | | 19:59:36 | 7:59:24 | 8.00 |
| 6552 | LUIS LOPEZ | 12/31/2018 | 12/31/2018 | 7:49:04 | | Off-period | 12/31/2018 11:55 | 12/31/2018 12:29 | 33:23 | 18:32:53 | 10:43:49 | 10.13 |
| 6552 | LUIS LOPEZ | 1/2/2019 | 1/2/2019 | 5:00:17 | | Off-period | 1/2/2019 12:43 | 1/2/2019 13:14 | 30:53 | 18:16:25 | 13:16:08 | 12.78 |
| 6552 | LUIS LOPEZ | 1/2/2019 | 1/2/2019 | 5:00:17 | | Off-period | 1/2/2019 16:02 | 1/2/2019 16:59 | 56:39 | 18:16:25 | 13:16:08 | 12.78 |
| 6552 | LUIS LOPEZ | 1/3/2019 | 1/3/2019 | 5:56:25 | | Off-period | 1/3/2019 11:37 | 1/3/2019 12:07 | 29:19 | 19:56:57 | 14:00:32 | 13.50 |
| 6552 | LUIS LOPEZ | 1/3/2019 | 1/3/2019 | 5:56:25 | | Off-period | 1/3/2019 17:12 | 1/3/2019 17:42 | 29:55 | 19:56:57 | 14:00:32 | 13.50 |
| 6552 | LUIS LOPEZ | 1/6/2019 | 1/6/2019 | 11:03:59 | | Off-period | 1/6/2019 18:28 | 1/6/2019 19:25 | 56:45 | 19:34:26 | 8:30:27 | 7.55 |
| 6552 | LUIS LOPEZ | 1/7/2019 | 1/7/2019 | 7:36:29 | | Off-period | 1/7/2019 12:54 | 1/7/2019 13:32 | 37:53 | 16:18:54 | 8:42:25 | 8.07 |
| 6552 | LUIS LOPEZ | 1/8/2019 | 1/8/2019 | 6:03:51 | | Off-period | 1/8/2019 14:21 | 1/8/2019 14:52 | 30:37 | 17:20:40 | 11:16:49 | 10.78 |

NWC-00580

| 6552 | LUIS LOPEZ | 1/8/2019 | 1/8/2019 | 6:03:51 | Off-period | 1/8/2019 16:41 | 1/8/2019 17:14 | 32:56 | 17:20:40 | 11:16:49 | 10.78 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6552 | LUIS LOPEZ | 1/11/2019 | 1/11/2019 | 10:17:04 | Off-period | 1/11/2019 16:15 | 1/11/2019 16:45 | 29:55 | 22:28:47 | 12:11:43 | 11.70 |
| 6552 | LUIS LOPEZ | 1/11/2019 | 1/11/2019 | 10:17:04 | Off-period | 1/11/2019 20:48 | 1/11/2019 21:22 | 34:02 | 22:28:47 | 12:11:43 | 11.70 |
| 6552 | LUIS LOPEZ | 1/13/2019 | 1/13/2019 | 11:01:35 | Off-period | 1/13/2019 15:52 | 1/13/2019 16:29 | 36:56 | 19:31:15 | 8:29:40 | 7.88 |
| 6552 | LUIS LOPEZ | 1/14/2019 | 1/14/2019 | 5:20:57 | Off-period | 1/14/2019 11:02 | 1/14/2019 11:37 | 34:20 | 17:17:30 | 11:56:33 | 11.42 |
| 6552 | LUIS LOPEZ | 1/14/2019 | 1/14/2019 | 5:20:57 | Off-period | 1/14/2019 15:08 | 1/14/2019 15:39 | 31:07 | 17:17:30 | 11:56:33 | 11.42 |
| 6552 | LUIS LOPEZ | 1/15/2019 | 1/15/2019 | 6:04:31 | Off-period | 1/15/2019 12:40 | 1/15/2019 13:10 | 29:40 | 16:28:22 | 10:23:51 | 9.90 |
| 6552 | LUIS LOPEZ | 1/18/2019 | 1/18/2019 | 5:53:29 | Off-period | 1/18/2019 11:19 | 1/18/2019 11:51 | 31:41 | 14:28:25 | 8:34:56 | 8.07 |
| 6552 | LUIS LOPEZ | 1/20/2019 | 1/20/2019 | 12:00:02 | Off-period | 1/20/2019 19:35 | 1/20/2019 20:05 | 30:23 | 21:23:22 | 9:23:20 | 8.90 |
| 6552 | LUIS LOPEZ | 1/21/2019 | 1/21/2019 | 6:01:28 | Off-period | 1/21/2019 11:57 | 1/21/2019 12:27 | 29:48 | 17:19:02 | 11:17:34 | 10.80 |
| 6552 | LUIS LOPEZ | 1/21/2019 | 1/21/2019 | 6:01:28 | Off-period | 1/21/2019 15:52 | 1/21/2019 16:23 | 31:21 | 17:19:02 | 11:17:34 | 10.80 |
| 6552 | LUIS LOPEZ | 1/22/2019 | 1/22/2019 | 6:08:15 | Off-period | 1/22/2019 12:46 | 1/22/2019 13:35 | 49:27 | 16:28:53 | 10:20:38 | 9.48 |
| 6552 | LUIS LOPEZ | 1/25/2019 | 1/25/2019 | 6:03:08 | Off-period | 1/25/2019 11:46 | 1/25/2019 11:46 | 29:49 | 15:43:06 | 9:39:58 | 9.20 |
| 6552 | LUIS LOPEZ | 1/27/2019 | 1/27/2019 | 11:00:46 | Off-period | 1/27/2019 15:39 | 1/27/2019 16:21 | 41:22 | 19:39:53 | 8:39:07 | 8.00 |
| 6552 | LUIS LOPEZ | 1/28/2019 | 1/28/2019 | 6:01:48 | Off-period | 1/28/2019 11:14 | 1/28/2019 11:44 | 30:00 | 14:29:09 | 8:27:21 | 8.00 |
| 6552 | LUIS LOPEZ | 1/29/2019 | 1/29/2019 | 10:03:30 | Off-period | 1/29/2019 13:58 | 1/29/2019 14:37 | 38:19 | 19:14:55 | 9:11:25 | 8.55 |
| 6552 | LUIS LOPEZ | 2/1/2019 | 2/1/2019 | 9:13:39 | Off-period | 2/1/2019 17:52 | 2/1/2019 18:30 | 37:47 | 21:09:49 | 11:56:10 | 11.27 |
| 6552 | LUIS LOPEZ | 2/2/2019 | 2/2/2019 | 7:15:10 | | | | | 17:24:10 | 10:09:00 | 9.62 |
| 6552 | LUIS LOPEZ | 2/3/2019 | 2/3/2019 | 8:52:24 | Off-period | 2/3/2019 12:51 | 2/3/2019 13:22 | 30:19 | 17:39:54 | 8:47:30 | 8.28 |
| 6552 | LUIS LOPEZ | 2/4/2019 | 2/4/2019 | 11:41:28 | Off-period | 2/4/2019 15:40 | 2/4/2019 16:11 | 31:07 | 21:43:31 | 10:02:03 | 9.48 |
| 6552 | LUIS LOPEZ | 2/5/2019 | 2/6/2019 | 12:00:46 | Off-period | 2/5/2019 16:41 | 2/5/2019 17:11 | 30:05 | 1:00:40 | 12:59:54 | 12.50 |
| 6552 | LUIS LOPEZ | 2/8/2019 | 2/8/2019 | 5:58:15 | Off-period | 2/8/2019 13:13 | 2/8/2019 13:43 | 30:27 | 20:05:20 | 14:07:05 | 13.60 |
| 6552 | LUIS LOPEZ | 2/9/2019 | 2/9/2019 | 5:36:36 | | | | | 9:34:56 | 3:58:20 | 4.00 |
| 6552 | LUIS LOPEZ | 2/10/2019 | 2/10/2019 | 8:01:55 | Off-period | 2/10/2019 13:10 | 2/10/2019 13:47 | 37:26 | 18:41:11 | 10:39:16 | 10.08 |
| 6552 | LUIS LOPEZ | 2/11/2019 | 2/11/2019 | 5:13:28 | Off-period | 2/11/2019 10:58 | 2/11/2019 11:28 | 30:33 | 14:08:29 | 8:55:01 | 8.40 |
| 6552 | LUIS LOPEZ | 2/12/2019 | 2/12/2019 | 5:51:16 | Off-period | 2/12/2019 10:53 | 2/12/2019 11:23 | 30:33 | 15:36:59 | 9:45:43 | 9.30 |
| 6552 | LUIS LOPEZ | 2/15/2019 | 2/15/2019 | 6:11:37 | Off-period | 2/15/2019 11:33 | 2/15/2019 12:03 | 30:18 | 17:35:34 | 11:23:57 | 10.90 |
| 6552 | LUIS LOPEZ | 2/17/2019 | 2/17/2019 | 9:59:56 | Off-period | 2/17/2019 18:22 | 2/17/2019 18:55 | 32:58 | 19:42:09 | 9:42:13 | 9.15 |
| 6552 | LUIS LOPEZ | 2/18/2019 | 2/18/2019 | 5:01:27 | Off-period | 2/18/2019 9:50 | 2/18/2019 10:20 | 29:48 | 17:11:20 | 12:09:53 | 11.70 |
| 6552 | LUIS LOPEZ | 2/18/2019 | 2/18/2019 | 5:01:27 | Off-period | 2/18/2019 15:43 | 2/18/2019 15:47 | 03:49 | 17:11:20 | 12:09:53 | 11.70 |
| 6552 | LUIS LOPEZ | 2/18/2019 | 2/18/2019 | 5:01:27 | Off-period | 2/18/2019 15:49 | 2/18/2019 16:31 | 42:13 | 17:11:20 | 12:09:53 | 11.70 |
| 6552 | LUIS LOPEZ | 2/19/2019 | 2/19/2019 | 6:59:54 | Off-period | 2/19/2019 12:35 | 2/19/2019 13:10 | 34:40 | 17:31:20 | 10:31:26 | 9.92 |
| 6552 | LUIS LOPEZ | 2/22/2019 | 2/22/2019 | 5:45:46 | Off-period | 2/22/2019 12:00 | 2/22/2019 12:31 | 31:03 | 16:14:52 | 10:29:06 | 9.98 |
| 6552 | LUIS LOPEZ | 2/24/2019 | 2/24/2019 | 10:14:31 | Off-period | 2/24/2019 15:40 | 2/24/2019 16:17 | 36:51 | 20:19:29 | 10:04:58 | 9.48 |
| 6552 | LUIS LOPEZ | 2/25/2019 | 2/25/2019 | 5:50:39 | Off-period | 2/25/2019 13:16 | 2/25/2019 13:46 | 29:57 | 16:27:24 | 10:36:45 | 10.10 |
| 6552 | LUIS LOPEZ | 2/26/2019 | 2/26/2019 | 6:57:56 | Off-period | 2/26/2019 12:39 | 2/26/2019 13:09 | 29:57 | 20:04:26 | 13:06:30 | 12.60 |
| 6552 | LUIS LOPEZ | 2/26/2019 | 2/26/2019 | 6:57:56 | Off-period | 2/26/2019 18:17 | 2/26/2019 19:02 | 44:30 | 20:04:26 | 13:06:30 | 12.60 |
| 6552 | LUIS LOPEZ | 3/3/2019 | 3/3/2019 | 10:18:23 | | | | | 20:20:33 | 10:02:10 | 10.00 |

NWC-00581

| 6552 | LUIS LOPEZ | 3/4/2019 | 3/4/2019 | 5:05:39 | Off-period | 3/4/2019 11:54 | 3/4/2019 12:00 | 06:12 | 18:25:06 | 13:19:27 | 13.20 |
| 6552 | LUIS LOPEZ | 3/4/2019 | 3/4/2019 | 5:05:39 | Off-period | 3/4/2019 12:22 | 3/4/2019 12:58 | 35:47 | 18:25:06 | 13:19:27 | 13.20 |
| 6552 | LUIS LOPEZ | 3/4/2019 | 3/4/2019 | 5:05:39 | Off-period | 3/4/2019 15:39 | 3/4/2019 16:13 | 33:50 | 18:25:06 | 13:19:27 | 13.20 |
| 6552 | LUIS LOPEZ | 3/5/2019 | 3/5/2019 | 5:07:09 | Off-period | 3/5/2019 12:30 | 3/5/2019 13:01 | 30:21 | 19:15:40 | 14:08:31 | 13.58 |
| 6552 | LUIS LOPEZ | 3/5/2019 | 3/5/2019 | 5:07:09 | Off-period | 3/5/2019 17:46 | 3/5/2019 19:12 | 25:32 | 19:15:40 | 14:08:31 | 13.58 |
| 6552 | LUIS LOPEZ | 3/8/2019 | 3/8/2019 | 6:22:10 | Off-period | 3/8/2019 13:33 | 3/8/2019 14:08 | 35:38 | 20:42:22 | 14:20:12 | 13.72 |
| 6552 | LUIS LOPEZ | 3/8/2019 | 3/8/2019 | 6:22:10 | Off-period | 3/8/2019 18:52 | 3/8/2019 19:24 | 31:49 | 20:42:22 | 14:20:12 | 13.72 |
| 6552 | LUIS LOPEZ | 3/10/2019 | 3/10/2019 | 10:01:07 | Off-period | 3/10/2019 14:43 | 3/10/2019 15:18 | 35:15 | 20:22:36 | 10:21:29 | 9.82 |
| 6552 | LUIS LOPEZ | 3/11/2019 | 3/11/2019 | 5:39:17 | Off-period | 3/11/2019 13:19 | 3/11/2019 13:50 | 31:46 | 19:20:46 | 13:41:29 | 13.18 |
| 6552 | LUIS LOPEZ | 3/11/2019 | 3/11/2019 | 5:39:17 | Off-period | 3/11/2019 16:34 | 3/11/2019 17:04 | 29:47 | 19:20:46 | 13:41:29 | 13.18 |
| 6552 | LUIS LOPEZ | 3/12/2019 | 3/12/2019 | 6:58:30 | Off-period | 3/12/2019 12:09 | 3/12/2019 12:39 | 30:26 | 17:17:39 | 10:19:09 | 9.80 |
| 6552 | LUIS LOPEZ | 3/15/2019 | 3/15/2019 | 6:58:41 | Off-period | 3/15/2019 14:44 | 3/15/2019 15:20 | 36:29 | 18:32:58 | 11:34:17 | 11.00 |
| 6552 | LUIS LOPEZ | 3/17/2019 | 3/17/2019 | 10:17:43 | | | | | 21:00:00 | 10:42:17 | 6.00 |
| 6552 | LUIS LOPEZ | 3/18/2019 | 3/18/2019 | 5:00:00 | Off-period | 3/18/2019 12:00 | 3/18/2019 12:30 | 30:17 | 19:05:30 | 14:05:30 | 13.60 |
| 6552 | LUIS LOPEZ | 3/18/2019 | 3/18/2019 | 5:00:00 | Off-period | 3/18/2019 17:43 | 3/18/2019 18:30 | 47:35 | 19:05:30 | 14:05:30 | 13.60 |
| 6552 | LUIS LOPEZ | 3/19/2019 | 3/19/2019 | 5:02:34 | Off-period | 3/19/2019 10:37 | 3/19/2019 11:08 | 30:33 | 18:52:32 | 13:49:58 | 13.80 |
| 6552 | LUIS LOPEZ | 3/19/2019 | 3/19/2019 | 5:02:34 | Off-period | 3/19/2019 16:24 | 3/19/2019 16:58 | 33:57 | 18:52:32 | 13:49:58 | 13.80 |
| 6552 | LUIS LOPEZ | 3/22/2019 | 3/22/2019 | 6:59:13 | Off-period | 3/22/2019 13:02 | 3/22/2019 13:32 | 29:51 | 20:27:54 | 13:28:41 | 12.50 |
| 6552 | LUIS LOPEZ | 3/22/2019 | 3/22/2019 | 6:59:13 | Off-period | 3/22/2019 17:46 | 3/22/2019 18:16 | 30:06 | 20:27:54 | 13:28:41 | 12.50 |
| 6552 | LUIS LOPEZ | 4/5/2019 | 4/5/2019 | 6:53:50 | | | | | 19:34:35 | 12:40:45 | 11.68 |
| 6552 | LUIS LOPEZ | 4/6/2019 | 4/6/2019 | 3:20:16 | Off-period | 4/6/2019 12:42 | 4/6/2019 13:13 | 31:49 | 17:19:00 | 13:58:44 | 12.87 |
| 6552 | LUIS LOPEZ | 4/6/2019 | 4/6/2019 | 3:20:16 | Off-period | 4/6/2019 15:05 | 4/6/2019 15:42 | 36:59 | 17:19:00 | 13:58:44 | 12.87 |
| 6552 | LUIS LOPEZ | 4/7/2019 | 4/7/2019 | 10:03:47 | Off-period | 4/7/2019 14:43 | 4/7/2019 15:13 | 30:16 | 20:22:26 | 10:18:39 | 9.80 |
| 6552 | LUIS LOPEZ | 4/8/2019 | 4/8/2019 | 5:27:07 | | | | | 19:17:47 | 13:50:40 | 12.73 |
| 6552 | LUIS LOPEZ | 4/9/2019 | 4/9/2019 | 6:12:21 | Off-period | 4/9/2019 16:44 | 4/9/2019 16:45 | 00:14 | 20:08:49 | 13:56:28 | 13.85 |
| 6552 | LUIS LOPEZ | 4/9/2019 | 4/9/2019 | 6:12:21 | Off-period | 4/9/2019 16:45 | 4/9/2019 16:47 | 01:32 | 20:08:49 | 13:56:28 | 13.85 |
| 6552 | LUIS LOPEZ | 4/9/2019 | 4/9/2019 | 6:12:21 | Off-period | 4/9/2019 17:05 | 4/9/2019 17:40 | 35:06 | 20:08:49 | 13:56:28 | 13.85 |
| 6552 | LUIS LOPEZ | 4/9/2019 | 4/9/2019 | 6:12:21 | Off-period | 4/9/2019 18:46 | 4/9/2019 19:19 | 33:14 | 20:08:49 | 13:56:28 | 13.85 |
| 6552 | LUIS LOPEZ | 4/10/2019 | 4/10/2019 | 6:25:29 | | | | | 20:11:48 | 13:46:19 | 12.58 |
| 6552 | LUIS LOPEZ | 4/13/2019 | 4/13/2019 | 9:38:27 | Off-period | 4/13/2019 16:59 | 4/13/2019 17:29 | 29:57 | 23:00:10 | 13:21:43 | 12.35 |
| 6552 | LUIS LOPEZ | 4/13/2019 | 4/13/2019 | 9:38:27 | Off-period | 4/13/2019 21:56 | 4/13/2019 22:29 | 32:59 | 23:00:10 | 13:21:43 | 12.35 |
| 6552 | LUIS LOPEZ | 4/14/2019 | 4/14/2019 | 12:06:28 | Off-period | 4/14/2019 16:49 | 4/14/2019 17:21 | 31:15 | 22:14:48 | 10:08:20 | 9.57 |
| 6552 | LUIS LOPEZ | 4/15/2019 | 4/15/2019 | 5:03:13 | Off-period | 4/15/2019 14:53 | 4/15/2019 15:29 | 35:57 | 20:03:01 | 14:59:48 | 14.40 |
| 6552 | LUIS LOPEZ | 4/16/2019 | 4/16/2019 | 5:00:00 | | | | | 19:45:27 | 14:45:27 | 13.23 |
| 6552 | LUIS LOPEZ | 4/17/2019 | 4/17/2019 | 4:55:27 | Off-period | 4/17/2019 14:34 | 4/17/2019 15:19 | 45:13 | 19:03:02 | 14:07:35 | 12.85 |
| 6552 | LUIS LOPEZ | 4/17/2019 | 4/17/2019 | 4:55:27 | Off-period | 4/17/2019 17:15 | 4/17/2019 17:45 | 30:19 | 19:03:02 | 14:07:35 | 12.85 |
| 6552 | LUIS LOPEZ | 4/19/2019 | 4/19/2019 | 6:05:13 | Off-period | 4/19/2019 9:10 | 4/19/2019 9:40 | 29:23 | 19:08:43 | 13:03:30 | 11.92 |
| 6552 | LUIS LOPEZ | 4/19/2019 | 4/19/2019 | 6:05:13 | Off-period | 4/19/2019 15:58 | 4/19/2019 16:39 | 40:45 | 19:08:43 | 13:03:30 | 11.92 |

NWC-00582

| 6552 | LUIS LOPEZ | 4/20/2019 | 4/20/2019 | 4:16:28 | Off-period | 4/20/2019 11:40 | 4/20/2019 12:10 | 29:29 | 14:30:48 | 10:14:20 | 9.70 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6552 | LUIS LOPEZ | 4/21/2019 | 4/21/2019 | 3:41:35 | Off-period | 4/21/2019 10:06 | 4/21/2019 10:45 | 39:00 | 16:42:54 | 13:01:19 | 11.22 |
| 6552 | LUIS LOPEZ | 4/21/2019 | 4/21/2019 | 3:41:35 | Off-period | 4/21/2019 14:50 | 4/21/2019 15:58 | 08:00 | 16:42:54 | 13:01:19 | 11.22 |
| 6552 | LUIS LOPEZ | 4/22/2019 | 4/22/2019 | 6:28:06 | | | | | 20:11:59 | 13:43:53 | 12.53 |
| 6552 | LUIS LOPEZ | 4/23/2019 | 4/23/2019 | 5:02:14 | | | | | 19:04:45 | 14:02:31 | 12.00 |
| 6552 | LUIS LOPEZ | 4/26/2019 | 4/26/2019 | 4:54:40 | Off-period | 4/26/2019 13:42 | 4/26/2019 14:13 | 31:48 | 19:17:06 | 14:22:26 | 13.32 |
| 6552 | LUIS LOPEZ | 4/26/2019 | 4/26/2019 | 4:54:40 | Off-period | 4/26/2019 17:39 | 4/26/2019 18:13 | 33:35 | 19:17:06 | 14:22:26 | 13.32 |
| 6552 | LUIS LOPEZ | 4/27/2019 | 4/27/2019 | 4:47:50 | Off-period | 4/27/2019 12:38 | 4/27/2019 13:12 | 34:23 | 17:48:56 | 13:01:06 | 11.87 |
| 6552 | LUIS LOPEZ | 4/27/2019 | 4/27/2019 | 4:47:50 | Off-period | 4/27/2019 15:57 | 4/27/2019 16:31 | 34:07 | 17:48:56 | 13:01:06 | 11.87 |
| 6552 | LUIS LOPEZ | 4/28/2019 | 4/28/2019 | 4:05:09 | Off-period | 4/28/2019 9:34 | 4/28/2019 10:06 | 32:04 | 18:35:19 | 14:30:10 | 12.00 |
| 6552 | LUIS LOPEZ | 4/28/2019 | 4/28/2019 | 4:05:09 | Off-period | 4/28/2019 16:52 | 4/28/2019 17:30 | 37:46 | 18:35:19 | 14:30:10 | 12.00 |
| 6552 | LUIS LOPEZ | 4/29/2019 | 4/29/2019 | 4:41:16 | | | | | 18:50:51 | 14:09:35 | 13.65 |
| 6552 | LUIS LOPEZ | 4/30/2019 | 4/30/2019 | 4:46:56 | Off-period | 4/30/2019 10:31 | 4/30/2019 11:04 | 32:25 | 18:33:18 | 13:46:22 | 12.63 |
| 6552 | LUIS LOPEZ | 4/30/2019 | 4/30/2019 | 4:46:56 | Off-period | 4/30/2019 16:10 | 4/30/2019 16:47 | 37:04 | 18:33:18 | 13:46:22 | 12.63 |
| 6552 | LUIS LOPEZ | 5/3/2019 | 5/3/2019 | 4:50:10 | | | | | 18:51:55 | 14:01:45 | 12.92 |
| 6552 | LUIS LOPEZ | 5/4/2019 | 5/4/2019 | 5:03:20 | | | | | 20:59:00 | 15:55:40 | 15.90 |
| 6552 | LUIS LOPEZ | 5/5/2019 | 5/5/2019 | 6:10:34 | | | | | 14:24:45 | 8:14:11 | 8.20 |
| 6552 | LUIS LOPEZ | 5/6/2019 | 5/6/2019 | 5:00:28 | Off-period | 5/6/2019 12:00 | 5/6/2019 12:30 | 29:28 | 18:28:43 | 13:28:15 | 12.47 |
| 6552 | LUIS LOPEZ | 5/6/2019 | 5/6/2019 | 5:00:28 | Off-period | 5/6/2019 15:21 | 5/6/2019 15:53 | 32:07 | 18:28:43 | 13:28:15 | 12.47 |
| 6552 | LUIS LOPEZ | 5/7/2019 | 5/7/2019 | 5:17:57 | Off-period | 5/7/2019 14:48 | 5/7/2019 15:27 | 39:21 | 20:06:37 | 14:48:40 | 13.63 |
| 6552 | LUIS LOPEZ | 5/7/2019 | 5/7/2019 | 5:17:57 | Off-period | 5/7/2019 17:56 | 5/7/2019 18:27 | 30:48 | 20:06:37 | 14:48:40 | 13.63 |
| 6552 | LUIS LOPEZ | 5/9/2019 | 5/9/2019 | 6:57:53 | Off-period | 5/9/2019 14:25 | 5/9/2019 14:58 | 33:37 | 20:31:40 | 13:33:47 | 12.53 |
| 6552 | LUIS LOPEZ | 5/9/2019 | 5/9/2019 | 6:57:53 | Off-period | 5/9/2019 19:23 | 5/9/2019 19:53 | 29:57 | 20:31:40 | 13:33:47 | 12.53 |
| 6552 | LUIS LOPEZ | 5/10/2019 | 5/10/2019 | 4:49:13 | Off-period | 5/10/2019 13:48 | 5/10/2019 14:22 | 33:56 | 19:57:49 | 15:08:36 | 14.02 |
| 6552 | LUIS LOPEZ | 5/10/2019 | 5/10/2019 | 4:49:13 | Off-period | 5/10/2019 18:06 | 5/10/2019 18:37 | 30:40 | 19:57:49 | 15:08:36 | 14.02 |
| 6552 | LUIS LOPEZ | 5/11/2019 | 5/11/2019 | 11:09:05 | | | | | 22:02:15 | 10:53:10 | 10.90 |
| 6552 | LUIS LOPEZ | 5/12/2019 | 5/12/2019 | 9:55:22 | Off-period | 5/12/2019 14:17 | 5/12/2019 14:47 | 30:01 | 18:34:00 | 8:38:38 | 8.20 |
| 6552 | LUIS LOPEZ | 5/13/2019 | 5/13/2019 | 4:54:24 | Off-period | 5/13/2019 12:03 | 5/13/2019 12:33 | 30:18 | 19:12:12 | 14:17:48 | 13.27 |
| 6552 | LUIS LOPEZ | 5/13/2019 | 5/13/2019 | 4:54:24 | Off-period | 5/13/2019 18:39 | 5/13/2019 19:11 | 32:31 | 19:12:12 | 14:17:48 | 13.27 |
| 6552 | LUIS LOPEZ | 5/14/2019 | 5/14/2019 | 4:51:59 | Off-period | 5/14/2019 13:38 | 5/14/2019 14:09 | 30:58 | 18:52:58 | 14:00:59 | 13.48 |
| 6552 | LUIS LOPEZ | 5/17/2019 | 5/17/2019 | 5:00:00 | Off-period | 5/17/2019 12:00 | 5/17/2019 12:38 | 38:23 | 19:15:57 | 14:15:57 | 13.02 |
| 6552 | LUIS LOPEZ | 5/17/2019 | 5/17/2019 | 5:00:00 | Off-period | 5/17/2019 18:20 | 5/17/2019 18:59 | 39:17 | 19:15:57 | 14:15:57 | 13.02 |
| 6552 | LUIS LOPEZ | 5/18/2019 | 5/18/2019 | 3:04:57 | Off-period | 5/18/2019 11:02 | 5/18/2019 11:30 | 28:06 | 11:31:22 | 8:26:25 | 8.03 |
| 6552 | LUIS LOPEZ | 5/19/2019 | 5/19/2019 | 13:19:59 | Off-period | 5/19/2019 21:00 | 5/19/2019 21:42 | 42:41 | 22:55:37 | 9:35:38 | 8.90 |
| 6552 | LUIS LOPEZ | 5/20/2019 | 5/20/2019 | 6:40:49 | Off-period | 5/20/2019 12:11 | 5/20/2019 12:56 | 45:30 | 20:08:26 | 13:27:37 | 12.22 |
| 6552 | LUIS LOPEZ | 5/20/2019 | 5/20/2019 | 6:40:49 | Off-period | 5/20/2019 17:18 | 5/20/2019 17:50 | 31:20 | 20:08:26 | 13:27:37 | 12.22 |
| 6552 | LUIS LOPEZ | 5/21/2019 | 5/21/2019 | 4:54:14 | Off-period | 5/21/2019 11:56 | 5/21/2019 12:26 | 29:18 | 19:00:02 | 14:05:48 | 12.97 |
| 6552 | LUIS LOPEZ | 5/21/2019 | 5/21/2019 | 4:54:14 | Off-period | 5/21/2019 17:30 | 5/21/2019 18:08 | 37:50 | 19:00:02 | 14:05:48 | 12.97 |

NWC-00583

| 6552 | LUIS LOPEZ | 5/24/2019 | 5/24/2019 | 5:10:46 | Off-period | 5/24/2019 12:29 | 5/24/2019 13:01 | 32:02 | 20:02:12 | 14:51:26 | 13.78 |
|------|-----------|-----------|-----------|---------|------------|-----------------|-----------------|-------|----------|----------|-------|
| 6552 | LUIS LOPEZ | 5/24/2019 | 5/24/2019 | 5:10:46 | Off-period | 5/24/2019 18:46 | 5/24/2019 19:21 | 34:49 | 20:02:12 | 14:51:26 | 13.78 |
| 6552 | LUIS LOPEZ | 5/25/2019 | 5/25/2019 | 3:06:49 | | | | | 11:56:57 | 8:50:08 | 8.80 |
| 6552 | LUIS LOPEZ | 5/26/2019 | 5/26/2019 | 13:29:45 | Off-period | 5/26/2019 17:13 | 5/26/2019 18:05 | 52:18 | 22:14:42 | 8:44:57 | 7.93 |
| 6552 | LUIS LOPEZ | 5/27/2019 | 5/27/2019 | 4:50:53 | Off-period | 5/27/2019 14:20 | 5/27/2019 14:55 | 34:33 | 19:31:22 | 14:40:29 | 13.57 |
| 6552 | LUIS LOPEZ | 5/27/2019 | 5/27/2019 | 4:50:53 | Off-period | 5/27/2019 17:05 | 5/27/2019 17:38 | 32:26 | 19:31:22 | 14:40:29 | 13.57 |
| 6552 | LUIS LOPEZ | 5/28/2019 | 5/28/2019 | 4:51:51 | Off-period | 5/28/2019 12:03 | 5/28/2019 12:39 | 36:23 | 18:07:11 | 13:15:20 | 12.15 |
| 6552 | LUIS LOPEZ | 5/28/2019 | 5/28/2019 | 4:51:51 | Off-period | 5/28/2019 15:39 | 5/28/2019 16:12 | 33:31 | 18:07:11 | 13:15:20 | 12.15 |
| 6552 | LUIS LOPEZ | 5/31/2019 | 5/31/2019 | 5:22:09 | Off-period | 5/31/2019 12:20 | 5/31/2019 12:39 | 19:13 | 19:51:59 | 14:29:50 | 13.82 |
| 6552 | LUIS LOPEZ | 5/31/2019 | 5/31/2019 | 5:22:09 | Off-period | 5/31/2019 12:49 | 5/31/2019 13:11 | 21:53 | 19:51:59 | 14:29:50 | 13.82 |
| 6552 | LUIS LOPEZ | 5/31/2019 | 5/31/2019 | 5:22:09 | Off-period | 5/31/2019 18:08 | 5/31/2019 18:42 | 34:01 | 19:51:59 | 14:29:50 | 13.82 |
| 6552 | LUIS LOPEZ | 6/1/2019 | 6/1/2019 | 3:49:54 | | | | | 13:00:00 | 9:10:06 | 9.25 |
| 6552 | LUIS LOPEZ | 6/2/2019 | 6/2/2019 | 13:34:58 | Off-period | 6/2/2019 18:27 | 6/2/2019 18:57 | 30:16 | 22:42:45 | 9:07:47 | 8.60 |
| 6552 | LUIS LOPEZ | 6/3/2019 | 6/3/2019 | 5:06:06 | Off-period | 6/3/2019 12:24 | 6/3/2019 12:57 | 32:39 | 18:46:54 | 13:40:48 | 12.42 |
| 6552 | LUIS LOPEZ | 6/3/2019 | 6/3/2019 | 5:06:06 | Off-period | 6/3/2019 17:21 | 6/3/2019 18:05 | 43:39 | 18:46:54 | 13:40:48 | 12.42 |
| 6552 | LUIS LOPEZ | 6/4/2019 | 6/4/2019 | 4:49:51 | Off-period | 6/4/2019 12:27 | 6/4/2019 13:02 | 35:07 | 18:55:16 | 14:05:25 | 12.87 |
| 6552 | LUIS LOPEZ | 6/4/2019 | 6/4/2019 | 4:49:51 | Off-period | 6/4/2019 16:59 | 6/4/2019 17:38 | 38:56 | 18:55:16 | 14:05:25 | 12.87 |
| 6552 | LUIS LOPEZ | 6/7/2019 | 6/7/2019 | 5:50:19 | Off-period | 6/7/2019 13:52 | 6/7/2019 14:33 | 40:31 | 19:02:16 | 13:11:57 | 12.02 |
| 6552 | LUIS LOPEZ | 6/7/2019 | 6/7/2019 | 5:50:19 | Off-period | 6/7/2019 16:05 | 6/7/2019 16:35 | 29:16 | 19:02:16 | 13:11:57 | 12.02 |
| 6552 | LUIS LOPEZ | 6/8/2019 | 6/8/2019 | 4:09:42 | Off-period | 6/8/2019 10:01 | 6/8/2019 11:01 | 00:28 | 13:09:44 | 9:00:02 | 8.00 |
| 6552 | LUIS LOPEZ | 6/9/2019 | 6/9/2019 | 4:05:49 | Off-period | 6/9/2019 11:59 | 6/9/2019 12:41 | 42:12 | 14:35:53 | 10:30:04 | 9.80 |
| 6552 | LUIS LOPEZ | 6/10/2019 | 6/10/2019 | 6:04:10 | Off-period | 6/10/2019 13:32 | 6/10/2019 13:32 | 34:35 | 19:54:33 | 13:50:23 | 12.13 |
| 6552 | LUIS LOPEZ | 6/10/2019 | 6/10/2019 | 6:04:10 | Off-period | 6/10/2019 17:33 | 6/10/2019 18:38 | 04:56 | 19:54:33 | 13:50:23 | 12.13 |
| 6552 | LUIS LOPEZ | 6/14/2019 | 6/14/2019 | 4:48:07 | Off-period | 6/14/2019 15:18 | 6/14/2019 15:49 | 31:15 | 19:32:12 | 14:44:05 | 13.65 |
| 6552 | LUIS LOPEZ | 6/14/2019 | 6/14/2019 | 4:48:07 | Off-period | 6/14/2019 18:25 | 6/14/2019 18:57 | 31:20 | 19:32:12 | 14:44:05 | 13.65 |
| 6552 | LUIS LOPEZ | 6/15/2019 | 6/15/2019 | 4:56:35 | Off-period | 6/15/2019 11:08 | 6/15/2019 11:38 | 30:24 | 19:01:18 | 14:04:43 | 12.97 |
| 6552 | LUIS LOPEZ | 6/15/2019 | 6/15/2019 | 4:56:35 | Off-period | 6/15/2019 18:10 | 6/15/2019 18:48 | 38:20 | 19:01:18 | 14:04:43 | 12.97 |
| 6552 | LUIS LOPEZ | 6/16/2019 | 6/16/2019 | 6:58:09 | Off-period | 6/16/2019 13:58 | 6/16/2019 14:32 | 33:41 | 17:58:40 | 11:00:31 | 10.43 |
| 6552 | LUIS LOPEZ | 6/17/2019 | 6/17/2019 | 5:03:07 | Off-period | 6/17/2019 12:07 | 6/17/2019 12:39 | 31:53 | 19:02:27 | 13:59:20 | 12.80 |
| 6552 | LUIS LOPEZ | 6/17/2019 | 6/17/2019 | 5:03:07 | Off-period | 6/17/2019 16:40 | 6/17/2019 17:20 | 39:52 | 19:02:27 | 13:59:20 | 12.80 |
| 6552 | LUIS LOPEZ | 6/20/2019 | 6/20/2019 | 5:02:33 | Off-period | 6/20/2019 13:00 | 6/20/2019 13:40 | 39:13 | 18:58:29 | 13:55:56 | 12.72 |
| 6552 | LUIS LOPEZ | 6/20/2019 | 6/20/2019 | 5:02:33 | Off-period | 6/20/2019 17:07 | 6/20/2019 17:38 | 31:36 | 18:58:29 | 13:55:56 | 12.72 |
| 6552 | LUIS LOPEZ | 6/21/2019 | 6/21/2019 | 4:47:53 | Off-period | 6/21/2019 13:10 | 6/21/2019 13:40 | 30:34 | 19:39:24 | 14:51:31 | 11.63 |
| 6552 | LUIS LOPEZ | 6/21/2019 | 6/21/2019 | 4:47:53 | Off-period | 6/21/2019 18:04 | 6/21/2019 18:35 | 30:58 | 19:39:24 | 14:51:31 | 11.63 |
| 6552 | LUIS LOPEZ | 6/22/2019 | 6/22/2019 | 4:04:41 | Off-period | 6/22/2019 12:26 | 6/22/2019 13:00 | 33:39 | 17:12:01 | 13:07:20 | 12.00 |
| 6552 | LUIS LOPEZ | 6/23/2019 | 6/23/2019 | 8:43:18 | Off-period | 6/23/2019 16:04 | 6/23/2019 16:53 | 49:00 | 21:14:20 | 12:31:02 | 11.13 |
| 6552 | LUIS LOPEZ | 6/23/2019 | 6/23/2019 | 8:43:18 | Off-period | 6/23/2019 19:16 | 6/23/2019 19:49 | 32:33 | 21:14:20 | 12:31:02 | 11.13 |
| 6552 | LUIS LOPEZ | 6/24/2019 | 6/24/2019 | 4:09:09 | Off-period | 6/24/2019 12:20 | 6/24/2019 12:53 | 32:52 | 19:24:43 | 15:15:34 | 14.23 |

NWC-00584

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6552 | LUIS LOPEZ | 6/24/2019 | 6/24/2019 | 4:09:09 | Off-period | 6/24/2019 18:14 | 6/24/2019 18:45 | 31:45 | 19:24:43 | 15:15:34 | 14.23 |
| 6552 | LUIS LOPEZ | 6/28/2019 | 6/28/2019 | 5:12:03 | Off-period | 6/28/2019 11:13 | 6/28/2019 11:49 | 36:04 | 19:44:49 | 14:32:46 | 13.33 |
| 6552 | LUIS LOPEZ | 6/28/2019 | 6/28/2019 | 5:12:03 | Off-period | 6/28/2019 19:10 | 6/28/2019 19:44 | 34:32 | 19:44:49 | 14:32:46 | 13.33 |
| 6552 | LUIS LOPEZ | 6/29/2019 | 6/29/2019 | 6:42:54 | Off-period | 6/29/2019 13:49 | 6/29/2019 18:34 | 44:39 | 18:35:00 | 11:52:06 | 11.50 |
| 6552 | LUIS LOPEZ | 6/30/2019 | 6/30/2019 | 11:00:42 | | | | | 19:29:03 | 8:28:21 | 7.98 |
| 6552 | LUIS LOPEZ | 7/1/2019 | 7/1/2019 | 4:47:25 | Off-period | 7/1/2019 11:36 | 7/1/2019 12:06 | 29:16 | 18:15:26 | 13:28:01 | 12.38 |
| 6552 | LUIS LOPEZ | 7/1/2019 | 7/1/2019 | 4:47:25 | Off-period | 7/1/2019 15:58 | 7/1/2019 16:35 | 36:47 | 18:15:26 | 13:28:01 | 12.38 |
| 6552 | LUIS LOPEZ | 7/4/2019 | 7/4/2019 | 6:05:50 | | | | | 19:00:00 | 12:54:10 | 10.00 |
| 6552 | LUIS LOPEZ | 8/2/2019 | 8/2/2019 | 5:00:47 | | | | | 20:02:43 | 15:01:56 | 14.53 |
| 6552 | LUIS LOPEZ | 8/4/2019 | 8/4/2019 | 4:15:09 | Off-period | 8/4/2019 12:00 | 8/4/2019 13:55 | 54:51 | 19:40:14 | 15:25:05 | 13.48 |
| 6552 | LUIS LOPEZ | 8/5/2019 | 8/5/2019 | 5:05:59 | Off-period | 8/5/2019 15:42 | 8/5/2019 16:28 | 45:49 | 18:15:18 | 13:09:19 | 12.43 |
| 6552 | LUIS LOPEZ | 8/12/2019 | 8/12/2019 | 5:04:36 | | | | | 18:02:48 | 12:58:12 | 12.00 |
| 6552 | LUIS LOPEZ | 8/15/2019 | 8/15/2019 | 5:39:32 | Off-period | 8/15/2019 16:39 | 8/15/2019 17:10 | 30:31 | 18:18:37 | 12:39:05 | 12.15 |
| 6552 | LUIS LOPEZ | 8/17/2019 | 8/17/2019 | 13:48:10 | Off-period | 8/17/2019 22:05 | 8/17/2019 22:36 | 30:46 | 23:26:23 | 9:38:13 | 9.08 |
| 6552 | LUIS LOPEZ | 8/18/2019 | 8/18/2019 | 7:44:20 | Off-period | 8/18/2019 13:41 | 8/18/2019 13:41 | 00:18 | 19:53:17 | 12:08:57 | 11.10 |
| 6552 | LUIS LOPEZ | 8/18/2019 | 8/18/2019 | 7:44:20 | Off-period | 8/18/2019 13:41 | 8/18/2019 14:12 | 30:21 | 19:53:17 | 12:08:57 | 11.10 |
| 6552 | LUIS LOPEZ | 8/18/2019 | 8/18/2019 | 7:44:20 | Off-period | 8/18/2019 17:36 | 8/18/2019 18:11 | 35:26 | 19:53:17 | 12:08:57 | 11.10 |
| 6552 | LUIS LOPEZ | 8/19/2019 | 8/19/2019 | 4:45:17 | Off-period | 8/19/2019 11:58 | 8/19/2019 12:30 | 31:44 | 19:32:17 | 14:47:00 | 13.65 |
| 6552 | LUIS LOPEZ | 8/19/2019 | 8/19/2019 | 4:45:17 | Off-period | 8/19/2019 17:37 | 8/19/2019 18:14 | 37:42 | 19:32:17 | 14:47:00 | 13.65 |
| 6552 | LUIS LOPEZ | 8/20/2019 | 8/20/2019 | 5:00:00 | Off-period | 8/20/2019 17:19 | 8/20/2019 18:21 | 01:43 | 20:15:19 | 15:15:19 | 14.27 |
| 6552 | LUIS LOPEZ | 8/22/2019 | 8/22/2019 | 5:01:28 | Off-period | 8/22/2019 14:22 | 8/22/2019 14:52 | 29:34 | 16:31:32 | 11:30:04 | 9.77 |
| 6552 | LUIS LOPEZ | 8/23/2019 | 8/23/2019 | 4:50:20 | Off-period | 8/23/2019 11:55 | 8/23/2019 12:27 | 31:29 | 17:56:15 | 13:05:55 | 11.88 |
| 6552 | LUIS LOPEZ | 8/23/2019 | 8/23/2019 | 4:50:20 | Off-period | 8/23/2019 15:41 | 8/23/2019 16:22 | 40:24 | 17:56:15 | 13:05:55 | 11.88 |
| 6552 | LUIS LOPEZ | 8/24/2019 | 8/24/2019 | 4:01:46 | Off-period | 8/24/2019 10:46 | 8/24/2019 11:21 | 34:42 | 13:36:49 | 9:35:03 | 9.02 |
| 6552 | LUIS LOPEZ | 8/25/2019 | 8/25/2019 | 8:54:31 | Off-period | 8/25/2019 17:29 | 8/25/2019 18:03 | 33:44 | 19:30:43 | 10:36:12 | 10.03 |
| 6552 | LUIS LOPEZ | 8/26/2019 | 8/26/2019 | 4:38:27 | Off-period | 8/26/2019 16:19 | 8/26/2019 17:20 | 01:05 | 18:49:37 | 14:11:10 | 13.18 |
| 6552 | LUIS LOPEZ | 8/29/2019 | 8/29/2019 | 5:04:26 | Off-period | 8/29/2019 12:25 | 8/29/2019 12:59 | 33:55 | 16:19:23 | 11:14:57 | 10.73 |
| 6552 | LUIS LOPEZ | 8/31/2019 | 8/31/2019 | 4:54:34 | Off-period | 8/31/2019 10:39 | 8/31/2019 11:40 | 00:18 | 16:09:53 | 11:15:19 | 10.28 |
| 6552 | LUIS LOPEZ | 9/1/2019 | 9/1/2019 | 7:07:16 | Off-period | 9/1/2019 12:27 | 9/1/2019 12:57 | 30:08 | 19:00:47 | 11:53:31 | 11.67 |
| 6552 | LUIS LOPEZ | 9/1/2019 | 9/1/2019 | 7:07:16 | Off-period | 9/1/2019 18:19 | 9/1/2019 18:48 | 28:56 | 19:00:47 | 11:53:31 | 11.67 |
| 6552 | LUIS LOPEZ | 9/2/2019 | 9/2/2019 | 4:43:58 | Off-period | 9/2/2019 11:56 | 9/2/2019 12:26 | 30:13 | 19:01:56 | 14:17:58 | 13.22 |
| 6552 | LUIS LOPEZ | 9/2/2019 | 9/2/2019 | 4:43:58 | Off-period | 9/2/2019 18:16 | 9/2/2019 18:51 | 35:01 | 19:01:56 | 14:17:58 | 13.22 |
| 6552 | LUIS LOPEZ | 9/5/2019 | 9/5/2019 | 5:00:38 | Off-period | 9/5/2019 10:43 | 9/5/2019 11:16 | 32:37 | 19:00:23 | 13:59:45 | 12.93 |
| 6552 | LUIS LOPEZ | 9/5/2019 | 9/5/2019 | 5:00:38 | Off-period | 9/5/2019 15:38 | 9/5/2019 16:09 | 30:46 | 19:00:23 | 13:59:45 | 12.93 |
| 6552 | LUIS LOPEZ | 9/6/2019 | 9/6/2019 | 4:47:42 | Off-period | 9/6/2019 13:21 | 9/6/2019 13:53 | 31:12 | 19:07:31 | 14:19:49 | 13.18 |
| 6552 | LUIS LOPEZ | 9/6/2019 | 9/6/2019 | 4:47:42 | Off-period | 9/6/2019 15:58 | 9/6/2019 16:33 | 34:22 | 19:07:31 | 14:19:49 | 13.18 |
| 6552 | LUIS LOPEZ | 9/7/2019 | 9/7/2019 | 4:48:28 | Off-period | 9/7/2019 12:03 | 9/7/2019 12:52 | 48:55 | 13:59:41 | 9:11:13 | 8.38 |
| 6552 | LUIS LOPEZ | 9/8/2019 | 9/8/2019 | 10:28:06 | Off-period | 9/8/2019 16:56 | 9/8/2019 17:42 | 46:03 | 22:44:59 | 12:16:53 | 11.53 |

| 6552 | LUIS LOPEZ | 9/9/2019 | 9/9/2019 | 4:49:15 | Off-period | 9/9/2019 13:45 | 9/9/2019 14:15 | 30:31 | 20:08:40 | 15:19:25 | 14.27 |
|------|-----------|----------|----------|---------|------------|----------------|----------------|-------|----------|----------|-------|
| 6552 | LUIS LOPEZ | 9/9/2019 | 9/9/2019 | 4:49:15 | Off-period | 9/9/2019 18:04 | 9/9/2019 18:36 | 31:32 | 20:08:40 | 15:19:25 | 14.27 |
| 6552 | LUIS LOPEZ | 9/12/2019 | 9/12/2019 | 5:07:04 | Off-period | 9/12/2019 14:45 | 9/12/2019 15:16 | 30:54 | 19:11:09 | 14:04:05 | 13.08 |
| 6552 | LUIS LOPEZ | 9/12/2019 | 9/12/2019 | 5:07:04 | Off-period | 9/12/2019 17:57 | 9/12/2019 18:27 | 30:09 | 19:11:09 | 14:04:05 | 13.08 |
| 6552 | LUIS LOPEZ | 9/13/2019 | 9/13/2019 | 4:59:26 | Off-period | 9/13/2019 10:44 | 9/13/2019 11:16 | 32:00 | 19:12:46 | 14:13:20 | 13.17 |
| 6552 | LUIS LOPEZ | 9/13/2019 | 9/13/2019 | 4:59:26 | Off-period | 9/13/2019 17:28 | 9/13/2019 17:58 | 29:56 | 19:12:46 | 14:13:20 | 13.17 |
| 6552 | LUIS LOPEZ | 9/14/2019 | 9/14/2019 | 4:58:22 | Off-period | 9/14/2019 11:00 | 9/14/2019 11:31 | 30:16 | 19:26:57 | 14:28:35 | 13.43 |
| 6552 | LUIS LOPEZ | 9/14/2019 | 9/14/2019 | 4:58:22 | Off-period | 9/14/2019 18:23 | 9/14/2019 18:56 | 32:30 | 19:26:57 | 14:28:35 | 13.43 |
| 6552 | LUIS LOPEZ | 9/15/2019 | 9/15/2019 | 3:35:25 | Off-period | 9/15/2019 13:31 | 9/15/2019 14:01 | 29:39 | 14:35:01 | 10:59:36 | 10.50 |
| 6552 | LUIS LOPEZ | 9/16/2019 | 9/16/2019 | 4:50:10 | Off-period | 9/16/2019 11:47 | 9/16/2019 12:18 | 30:29 | 18:36:43 | 13:46:33 | 12.67 |
| 6552 | LUIS LOPEZ | 9/16/2019 | 9/16/2019 | 4:50:10 | Off-period | 9/16/2019 16:11 | 9/16/2019 16:48 | 37:19 | 18:36:43 | 13:46:33 | 12.67 |
| 6552 | LUIS LOPEZ | 9/18/2019 | 9/18/2019 | 5:00:00 | Off-period | 9/18/2019 12:32 | 9/18/2019 13:02 | 29:49 | 19:54:52 | 14:54:52 | 13.58 |
| 6552 | LUIS LOPEZ | 9/18/2019 | 9/18/2019 | 5:00:00 | Off-period | 9/18/2019 18:38 | 9/18/2019 19:27 | 48:21 | 19:54:52 | 14:54:52 | 13.58 |
| 6552 | LUIS LOPEZ | 9/19/2019 | 9/19/2019 | 4:12:26 | Off-period | 9/19/2019 14:44 | 9/19/2019 14:44 | 00:01 | 18:22:25 | 14:09:59 | 13.68 |
| 6552 | LUIS LOPEZ | 9/19/2019 | 9/19/2019 | 4:12:26 | Off-period | 9/19/2019 14:44 | 9/19/2019 15:15 | 31:47 | 18:22:25 | 14:09:59 | 13.68 |
| 6552 | LUIS LOPEZ | 9/19/2019 | 9/19/2019 | 4:12:26 | Off-period | 9/19/2019 16:45 | 9/19/2019 17:53 | 08:14 | 18:22:25 | 14:09:59 | 13.68 |
| 6552 | LUIS LOPEZ | 9/20/2019 | 9/20/2019 | 4:44:17 | Off-period | 9/20/2019 14:13 | 9/20/2019 14:46 | 33:36 | 18:01:49 | 13:17:32 | 12.25 |
| 6552 | LUIS LOPEZ | 9/20/2019 | 9/20/2019 | 4:44:17 | Off-period | 9/20/2019 16:30 | 9/20/2019 17:00 | 29:30 | 18:01:49 | 13:17:32 | 12.25 |
| 6552 | LUIS LOPEZ | 9/21/2019 | 9/21/2019 | 5:00:23 | Off-period | 9/21/2019 11:15 | 9/21/2019 11:46 | 31:10 | 16:29:01 | 11:28:38 | 10.98 |
| 6552 | LUIS LOPEZ | 9/22/2019 | 9/22/2019 | 10:28:13 | | | | | 20:03:18 | 9:35:05 | 9.50 |
| 6552 | LUIS LOPEZ | 9/23/2019 | 9/23/2019 | 5:00:00 | Off-period | 9/23/2019 14:58 | 9/23/2019 15:38 | 40:11 | 19:01:53 | 14:01:53 | 12.80 |
| 6552 | LUIS LOPEZ | 9/23/2019 | 9/23/2019 | 5:00:00 | Off-period | 9/23/2019 17:56 | 9/23/2019 18:28 | 32:02 | 19:01:53 | 14:01:53 | 12.80 |
| 6552 | LUIS LOPEZ | 9/26/2019 | 9/26/2019 | 5:00:00 | Off-period | 9/26/2019 18:07 | 9/26/2019 18:37 | 30:34 | 19:01:34 | 14:01:34 | 13.50 |
| 6552 | LUIS LOPEZ | 9/27/2019 | 9/27/2019 | 4:52:20 | Off-period | 9/27/2019 12:59 | 9/27/2019 13:30 | 30:42 | 20:32:53 | 15:40:33 | 15.18 |
| 6552 | LUIS LOPEZ | 9/28/2019 | 9/28/2019 | 3:47:14 | Off-period | 9/28/2019 11:29 | 9/28/2019 12:19 | 50:36 | 17:43:39 | 13:56:25 | 13.07 |
| 6552 | LUIS LOPEZ | 9/30/2019 | 9/30/2019 | 6:13:30 | Off-period | 9/30/2019 19:00 | 9/30/2019 19:31 | 31:10 | 21:03:38 | 14:50:08 | 12.50 |
| 6552 | LUIS LOPEZ | 10/3/2019 | 10/3/2019 | 10:32:04 | Off-period | 10/3/2019 19:20 | 10/3/2019 20:22 | 01:43 | 23:32:52 | 13:00:48 | 11.97 |
| 6552 | LUIS LOPEZ | 10/4/2019 | 10/4/2019 | 14:00:00 | | | | | 22:32:22 | 8:32:22 | 8.50 |
| 6552 | LUIS LOPEZ | 10/5/2019 | 10/5/2019 | 12:04:03 | Off-period | 10/5/2019 16:46 | 10/5/2019 17:19 | 32:37 | 20:31:45 | 8:27:42 | 7.95 |
| 6552 | LUIS LOPEZ | 10/6/2019 | 10/6/2019 | 9:47:02 | Off-period | 10/6/2019 13:00 | 10/6/2019 14:00 | 00:30 | 20:30:08 | 10:43:06 | 9.70 |
| 6552 | LUIS LOPEZ | 10/7/2019 | 10/7/2019 | 4:35:51 | Off-period | 10/7/2019 15:31 | 10/7/2019 16:07 | 36:20 | 18:36:15 | 14:00:24 | 12.82 |
| 6552 | LUIS LOPEZ | 10/7/2019 | 10/7/2019 | 4:35:51 | Off-period | 10/7/2019 17:23 | 10/7/2019 17:58 | 35:34 | 18:36:15 | 14:00:24 | 12.82 |
| 6552 | LUIS LOPEZ | 10/10/2019 | 10/10/2019 | 5:10:17 | Off-period | 10/10/2019 17:01 | 10/10/2019 18:05 | 03:29 | 19:34:29 | 14:24:12 | 13.33 |
| 6552 | LUIS LOPEZ | 10/11/2019 | 10/11/2019 | 4:58:41 | | | | | 20:45:16 | 15:46:35 | 15.80 |
| 6552 | LUIS LOPEZ | 10/12/2019 | 10/12/2019 | 12:57:46 | Off-period | 10/12/2019 18:41 | 10/12/2019 19:12 | 31:03 | 23:03:02 | 10:05:16 | 9.58 |
| 6552 | LUIS LOPEZ | 10/13/2019 | 10/13/2019 | 10:58:50 | Off-period | 10/13/2019 17:55 | 10/13/2019 18:25 | 30:16 | 21:31:20 | 10:32:30 | 10.10 |
| 6552 | LUIS LOPEZ | 10/14/2019 | 10/14/2019 | 4:53:05 | Off-period | 10/14/2019 12:05 | 10/14/2019 12:41 | 35:45 | 18:55:33 | 14:02:28 | 12.77 |
| 6552 | LUIS LOPEZ | 10/14/2019 | 10/14/2019 | 4:53:05 | Off-period | 10/14/2019 16:57 | 10/14/2019 17:35 | 38:46 | 18:55:33 | 14:02:28 | 12.77 |

| 6552 | LUIS LOPEZ | 10/17/2019 | 10/17/2019 | 4:56:50 | Off-period | 10/17/2019 12:51 | 10/17/2019 13:28 | 37:20 | 15:29:51 | 10:33:01 | 9.98 |
|------|-----------|-----------|-----------|---------|-----------|-----------|-----------|-------|---------|---------|------|
| 6552 | LUIS LOPEZ | 10/18/2019 | 10/19/2019 | 10:04:50 | | | | | 0:04:20 | ####### | 12.93 |
| 6552 | LUIS LOPEZ | 10/19/2019 | 10/20/2019 | 18:05:39 | | | | | 0:22:53 | ####### | 6.30 |
| 6552 | LUIS LOPEZ | 10/20/2019 | 10/20/2019 | 10:03:16 | | | | | 20:32:43 | 10:29:27 | 10.50 |
| 6552 | LUIS LOPEZ | 10/21/2019 | 10/21/2019 | 5:00:00 | Off-period | 10/21/2019 15:09 | 10/21/2019 16:15 | 06:50 | 17:37:26 | 12:37:26 | 11.50 |
| 6552 | LUIS LOPEZ | 10/25/2019 | 10/25/2019 | 11:04:57 | | | | | 22:00:58 | 10:56:01 | 10.90 |
| 6552 | LUIS LOPEZ | 10/27/2019 | 10/27/2019 | 11:03:27 | | | | | 21:34:26 | 10:30:59 | 10.50 |
| 6552 | LUIS LOPEZ | 10/28/2019 | 10/28/2019 | 5:30:00 | | | | | 16:49:18 | 11:19:18 | 11.00 |
| 6552 | LUIS LOPEZ | 10/31/2019 | 10/31/2019 | 5:06:39 | Off-period | 10/31/2019 13:20 | 10/31/2019 13:51 | 30:05 | 19:21:51 | 14:15:12 | 13.25 |
| 6552 | LUIS LOPEZ | 10/31/2019 | 10/31/2019 | 5:06:39 | Off-period | 10/31/2019 18:01 | 10/31/2019 18:33 | 31:31 | 19:21:51 | 14:15:12 | 13.25 |
| 6552 | LUIS LOPEZ | 11/1/2019 | 11/1/2019 | 7:06:39 | | | | | 22:00:00 | 14:53:21 | 13.75 |
| 6552 | LUIS LOPEZ | 11/3/2019 | 11/3/2019 | 11:06:26 | | | | | 19:37:42 | 8:31:16 | 8.00 |
| 6552 | LUIS LOPEZ | 11/4/2019 | 11/4/2019 | 5:00:00 | Off-period | 11/4/2019 14:17 | 11/4/2019 14:48 | 30:49 | 19:01:50 | 14:01:50 | 12.98 |
| 6552 | LUIS LOPEZ | 11/4/2019 | 11/4/2019 | 5:00:00 | Off-period | 11/4/2019 18:00 | 11/4/2019 18:30 | 29:51 | 19:01:50 | 14:01:50 | 12.98 |
| 6552 | LUIS LOPEZ | 11/7/2019 | 11/7/2019 | 10:10:52 | | | | | 18:36:45 | 8:25:53 | 8.40 |
| 6552 | LUIS LOPEZ | 11/8/2019 | 11/8/2019 | 4:51:11 | Off-period | 11/8/2019 13:28 | 11/8/2019 14:00 | 31:06 | 17:28:04 | 12:36:53 | 12.07 |
| 6552 | LUIS LOPEZ | 11/10/2019 | 11/10/2019 | 14:05:12 | | | | | 21:37:05 | 7:31:53 | 7.50 |
| 6552 | LUIS LOPEZ | 11/11/2019 | 11/11/2019 | 5:03:15 | Off-period | 11/11/2019 12:57 | 11/11/2019 13:40 | 43:17 | 16:34:16 | 11:31:01 | 10.78 |
| 6552 | LUIS LOPEZ | 11/14/2019 | 11/14/2019 | 8:15:18 | Off-period | 11/14/2019 15:24 | 11/14/2019 16:01 | 36:48 | 18:15:18 | 10:00:00 | 9.38 |
| 6552 | LUIS LOPEZ | 11/15/2019 | 11/15/2019 | 4:59:18 | Off-period | 11/15/2019 15:02 | 11/15/2019 15:42 | 39:52 | 18:29:30 | 13:30:12 | 12.33 |
| 6552 | LUIS LOPEZ | 11/15/2019 | 11/15/2019 | 4:59:18 | Off-period | 11/15/2019 17:08 | 11/15/2019 17:38 | 30:08 | 18:29:30 | 13:30:12 | 12.33 |
| 6552 | LUIS LOPEZ | 11/17/2019 | 11/17/2019 | 9:38:01 | Off-period | 11/17/2019 19:26 | 11/17/2019 20:05 | 38:41 | 20:06:00 | 10:27:59 | 12.00 |
| 6552 | LUIS LOPEZ | 11/18/2019 | 11/18/2019 | 5:30:00 | Off-period | 11/18/2019 16:36 | 11/18/2019 17:12 | 35:39 | 19:34:28 | 14:04:28 | 12.90 |
| 6552 | LUIS LOPEZ | 11/18/2019 | 11/18/2019 | 5:30:00 | Off-period | 11/18/2019 18:07 | 11/18/2019 18:43 | 35:38 | 19:34:28 | 14:04:28 | 12.90 |
| 6552 | LUIS LOPEZ | 11/21/2019 | 11/21/2019 | 8:22:26 | Off-period | 11/21/2019 14:27 | 11/21/2019 14:58 | 30:33 | 16:58:08 | 8:35:42 | 8.08 |
| 6552 | LUIS LOPEZ | 11/22/2019 | 11/22/2019 | 4:48:37 | Off-period | 11/22/2019 11:38 | 11/22/2019 12:08 | 30:17 | 15:42:09 | 10:53:32 | 10.40 |
| 6552 | LUIS LOPEZ | 11/23/2019 | 11/23/2019 | 10:31:52 | Off-period | 11/23/2019 16:45 | 11/23/2019 17:17 | 31:43 | 19:06:44 | 8:34:52 | 8.07 |
| 6552 | LUIS LOPEZ | 11/24/2019 | 11/24/2019 | 11:07:36 | | | | | 19:08:42 | 8:01:06 | 8.00 |
| 6552 | LUIS LOPEZ | 11/25/2019 | 11/25/2019 | 4:45:31 | Off-period | 11/25/2019 12:10 | 11/25/2019 12:43 | 33:00 | 14:02:28 | 9:16:57 | 8.75 |
| 6552 | LUIS LOPEZ | 11/30/2019 | 11/30/2019 | 5:08:10 | | | | | 15:11:16 | 10:03:06 | 9.58 |
| 6552 | LUIS LOPEZ | 12/1/2019 | 12/1/2019 | 10:32:44 | | | | | 19:00:38 | 8:27:54 | 8.50 |
| 6552 | LUIS LOPEZ | 12/2/2019 | 12/2/2019 | 5:00:00 | Off-period | 12/2/2019 13:18 | 12/2/2019 13:59 | 40:24 | 19:01:13 | 14:01:13 | 13.32 |
| 6552 | LUIS LOPEZ | 12/5/2019 | 12/5/2019 | 5:59:06 | Off-period | 12/5/2019 12:37 | 12/5/2019 13:09 | 31:27 | 17:02:55 | 11:03:49 | 10.57 |
| 6552 | LUIS LOPEZ | 12/6/2019 | 12/6/2019 | 4:48:19 | Off-period | 12/6/2019 10:55 | 12/6/2019 11:27 | 31:42 | 19:09:16 | 14:20:57 | 13.47 |
| 6552 | LUIS LOPEZ | 12/6/2019 | 12/6/2019 | 4:48:19 | Off-period | 12/6/2019 15:42 | 12/6/2019 16:06 | 24:18 | 19:09:16 | 14:20:57 | 13.47 |
| 6552 | LUIS LOPEZ | 12/8/2019 | 12/8/2019 | 4:47:12 | Off-period | 12/8/2019 11:48 | 12/8/2019 12:21 | 33:33 | 14:36:19 | 9:49:07 | 9.25 |
| 6552 | LUIS LOPEZ | 12/19/2019 | 12/19/2019 | 7:25:20 | Off-period | 12/19/2019 11:01 | 12/19/2019 11:31 | 29:54 | 16:01:11 | 8:35:51 | 8.10 |
| 6552 | LUIS LOPEZ | 12/20/2019 | 12/20/2019 | 5:01:59 | Off-period | 12/20/2019 10:21 | 12/20/2019 11:00 | 38:21 | 18:59:15 | 13:57:16 | 12.42 |

EXHIBIT C

1               UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    LUIS LOPEZ,                )

5           Plaintiff,     )

6    vs.                  )    No. 3:21-cv-06150-KAW

7    NORTHWEST CASCADE, INC.,    )

     and DOES 1 to 10,

8                       )

           Defendants.

9   _____)

10

11

12

13

          REMOTE VIDEO RECORDED DEPOSITION OF

14

            LUIS ALBERTO LOPEZ IBANEZ

15

             Walnut Creek, California

16

           Monday, February 28, 2022

17

                Volume I

18

19

20

21

22   Reported by:

     LISA ANDREASEN

23   CSR No. 9584

24   Job No. 5079190

25   PAGES 1 - 157

                                 Page 1

```
1        A    The hitch, it completely separated from the

2    truck.

3        Q    And how did you hurt your back and neck?

4        A    Because I had to stop the trailer to cause

5    an accident.  Because the trailer was over to go          02:02:04

6    over the cars over the next -- to the other lanes.

7    So I slammed the brakes on my truck, and the trailer

8    hit me.  Because it was the only way to stop it.

9        Q    Okay.  So the impact from the trailer

10   hitting the cab is what injured your back?               02:02:21

11       A    Yeah, because --

12       Q    Okay.

13       A    -- it was a heavy trailer.

14       Q    Sure.  I misunderstood earlier because we

15   were talking about your falling off the trailer.  So     02:02:35

16   that's a direct impact onto the ground.  And then we

17   talked about your knee, and that was a direct impact

18   on the wood.  So I was just trying to understand

19   what exactly caused the injury in 2017.

20       A    Oh.                                             02:02:49

21       Q    So that was from the impact of the trailer

22   to the tractor?

23       A    Yes, the truck.

24       Q    All right.  After that 2017 injury, did you

25   miss any work?                                          02:03:01
```

                                              Page 124

```
 1        A    Yes.

 2        Q    How long or how many days did you miss?

 3        A    For the accident?

 4        Q    Yeah.

 5        A    Oh, I didn't miss a day.  They put me in    02:03:14

 6    the office to do computer work for two weeks.

 7        Q    Is that something you requested or they

 8    suggested?

 9        A    No, they suggested.

10        Q    Did you at that point when you were         02:03:33

11    recovering from that 2017 injury request any other

12    accommodations from Northwest Cascade?

13        A    No.

14        Q    And after those two weeks in the office --

15    you said it was two weeks; right?                    02:03:52

16        A    Yes, two weeks.

17        Q    After those two weeks in the office, did

18    you feel you were ready to go back to work on

19    regular duty?

20        A    No, but they put a helper to do the job.    02:04:02

21    So I started doing it again.

22        Q    Okay.  And then how long did you require

23    the aid of the helper?

24        A    They gave me a helper for, like, two or

25    three weeks.                                         02:04:19

                                            Page 125
```

```
 1        Q    After those two or three weeks, did you

 2   feel like you were ready for regular return to duty?

 3        A    Yes.

 4        Q    Okay.  Did a doctor clear you for return to

 5   regular duty, or did you just say, yeah, I'm all         02:04:38

 6   right now?

 7        A    The doctor did it.

 8        Q    A doctor did it.  Okay.  So in that

 9   instance, Northwest Cascade accommodated you by

10   putting you in office work and then gave you a           02:04:59

11   helper out on your drive until your doctor cleared

12   you for regular duty?

13        A    Yes.

14             MR. BROWN:  Glen, when you get to a good

15   spot, if can we take a break, please.                    02:05:15

16             MR. WILLIAMS:  Oh, sure.  That's fine.

17   Before I get to the injuries, we can -- we can

18   take -- do you need five or ten?

19             MR. BROWN:  How about ten.

20             MR. WILLIAMS:  Ten sounds good.  Thank you      02:05:23

21   for holding me to that.

22             THE VIDEOGRAPHER:  All right.  We're going

23   off the record.  Time is 2:05 p.m., and this is the

24   end of Media Number 3.

25             (Recess taken.)                                 02:05:35
```

Page 126

```
 1          Q    Okay.  And was that disability leave or

 2     just paid time off?  Do you know?

 3          A    The company paid me for it.  They were

 4     paying me 40 hours a week.

 5          Q    Did you seek the care of a doctor for        02:19:30

 6     addressing that 2019 injury?

 7          A    Yes.

 8          Q    Do you recall what the doctor's name was?

 9          A    No.

10          Q    Did you see U.S. HealthWorks for that        02:19:44

11     injury?

12          A    Yes, in San Jose.

13          Q    And when you returned from work after that

14     month, was that after receiving a doctor's note

15     saying you could return to work?                       02:20:10

16          A    Yes.  Even though I was complaining with

17     pain, they said, go back to work.  You will feel

18     better.

19          Q    Okay.  And when you went back to work, did

20     you request any accommodations, like desk duty or a    02:20:26

21     helper on the route?

22          A    A helper.

23          Q    Okay.  And were you given a helper on the

24     route?

25          A    Yes, they did.                               02:20:34
```

Page 128

1        Q    For how long?  For how long?

2        A    A few weeks.  I don't remember.

3        Q    Did you request any other accommodations

4    other than a helper?

5        A    Yes.                                    02:20:51

6        Q    What else did you request?

7        A    I request to be allowed to use the forklift

8    to load my stuff on weekends.

9        Q    And what was Northwest Cascade's response

10   to that?                                         02:21:05

11       A    They didn't give me a key to use it.  So I

12   was asking to a person in the yard to help me load

13   it on Friday night for my Saturday route, but I was

14   doing it by myself on Sundays.

15       Q    Okay.  So you had some help on Friday night  02:21:26

16   but not on Sunday?

17       A    Um-hmm.

18       Q    When you requested the forklift, who did

19   you request that from?

20       A    Pat.                                    02:21:38

21       Q    Did you request that in an email or just

22   over the phone?

23       A    Over the phone.

24       Q    And what did Pat tell you on the phone when

25   you requested that?                             02:21:56

                                                    Page 129

1           I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    remotely by me at the time herein set forth; that any

6    witnesses in the foregoing proceedings, prior to

7    testifying, were administered an oath; that a record of

8    the proceedings was made by me using machine shorthand

9    which was thereafter transcribed under my direction;

10   that the foregoing transcript is a true record of the

11   testimony given.

12        Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review of the

15   transcript [X] was [ ] was not requested.

16        I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or any party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  March 14, 2022

23

24                  LISA ANDREASEN

25                  CSR No. 9584, RPR

Page 157

# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4     LUIS LOPEZ,                        )

5                     Plaintiff,        ) Case No.

6     vs.                               ) 3:21-cv-06150-

7     NORTHWEST CASCADE, INC., and      ) KAW

8     DOES 1 to 10,                     )

9                     Defendants.       )

10

11

12

13

14          VIDEOTAPED DEPOSITION OF LUIS LOPEZ

15                    March 25, 2022

16

17

18

19

20

21     REPORTED REMOTELY BY:

22     AMBER S. WILLIAMS, C.S.R. No. 1080

23     Notary public

24

25

                                        Page 1

| | | |
|---|---|---|
| 1 | Q.   Okay.  And similarly, you wouldn't do | 11:18AM |
| 2 | any work for your job after you had clocked out for | 11:18AM |
| 3 | the day, right? | 11:18AM |
| 4 | A.   Sometimes I did, yes. | 11:18AM |
| 5 | Q.   Okay.  What would cause you to do any | 11:18AM |
| 6 | work after you clocked out? | 11:18AM |
| 7 | A.   If they don't have enough units to clean | 11:18AM |
| 8 | it, then I -- I unload my -- my trailer and truck and | 11:18AM |
| 9 | then the yard guys, they can pull everything in and | 11:18AM |
| 10 | wash it for the next day.  Sometimes we were short -- | 11:18AM |
| 11 | they were short for the material. | 11:18AM |
| 12 | Q.   Okay.  So what in that information | 11:18AM |
| 13 | required you to clock out and then work past the | 11:18AM |
| 14 | clock-out time? | 11:19AM |
| 15 | A.   Not to go over my 14 hours. | 11:19AM |
| 16 | Q.   Okay.  So -- | 11:19AM |
| 17 | A.   It would take me, like, maybe 20 minutes | 11:19AM |
| 18 | to untie my ropes, and sometimes the junk guys, they | 11:19AM |
| 19 | helped me out to unload it so it wasn't too much | 11:19AM |
| 20 | time.  20 minutes. | 11:19AM |
| 21 | Q.   And if that happened, would you notify | 11:19AM |
| 22 | your supervisor that you had clocked out and | 11:19AM |
| 23 | continued working? | 11:19AM |
| 24 | A.   Yes.  I told Pat a couple of times that | 11:19AM |
| 25 | I -- if I had to do that, I -- he says, "No problem. | 11:19AM |

Page 55

| | | |
|---|---|---|
| 1 | It's fine.  Just be careful." | 11:19AM |
| 2 | Q.    What did -- did you have an | 11:19AM |
| 3 | understanding of what he meant by "Just be careful"? | 11:19AM |
| 4 | A.    Yes. | 11:19AM |
| 5 | Q.    What was that? | 11:19AM |
| 6 | A.    Not to get injury or no -- out of the | 11:19AM |
| 7 | time that you were working. | 11:19AM |
| 8 | Q.    Did you understand that you were | 11:19AM |
| 9 | supposed to be clocked in for all time that you | 11:19AM |
| 10 | worked? | 11:19AM |
| 11 | A.    Yes. | 11:19AM |
| 12 | Q.    Okay.  And so why did you clock out and | 11:19AM |
| 13 | then continue working? | 11:19AM |
| 14 | A.    Because I really liked to be following | 11:19AM |
| 15 | the rules for the DOT.  I don't want to get my | 11:20AM |
| 16 | license suspended, so -- I never had any problems | 11:20AM |
| 17 | with that. | 11:20AM |
| 18 | Q.    Okay.  And for those times that you | 11:20AM |
| 19 | worked beyond 14 hours after clocking out, were you | 11:20AM |
| 20 | compensated for the time that you worked past those | 11:20AM |
| 21 | 14 hours? | 11:20AM |
| 22 | A.    No. | 11:20AM |
| 23 | Q.    Okay.  Do you know what -- when those | 11:20AM |
| 24 | times happened? | 11:20AM |
| 25 | A.    No, I don't recall.  But maybe once or | 11:20AM |

Page 56

```
 1    sometimes a couple of times a week.  Not very often.    11:20AM

 2            Q.   A couple of times a week you clocked out    11:20AM

 3    and continued working?                                  11:20AM

 4            A.   Yes.  Especially in the summertime.         11:20AM

 5            Q.   And each of the times that you clocked      11:20AM

 6    out and continued working, you notified Pat?            11:20AM

 7            A.   Yes.                                        11:20AM

 8            Q.   Do you have any documentation showing       11:20AM

 9    what days you clocked out and then continued working?   11:21AM

10            A.   No.                                         11:21AM

11            Q.   But -- so it -- you -- you contend that     11:21AM

12    throughout your employment at Northwest Cascade you     11:21AM

13    worked beyond your clock-out time once or twice a       11:21AM

14    week?                                                   11:21AM

15            A.   During summertime, yes.                     11:21AM

16            Q.   During summertime?                          11:21AM

17            A.   Yes.  During summertime.  That --           11:21AM

18    this -- that kind of business is really, really busy.   11:21AM

19    I mean, if you have the paperwork on it, you can see    11:21AM

20    that I was working sometimes over 80 hours a week.      11:21AM

21            Q.   And do you have any documentation that      11:21AM

22    you worked over 80 hours a week sometimes?              11:21AM

23            A.   Yes.  I have all my pay stubs at my         11:21AM

24    house.                                                  11:22AM

25            Q.   Okay.  And -- but does any of the           11:22AM
```

Page 57

| | | |
|---|---|---|
| 1 | injury? | 12:59PM |
| 2 | A.    Yes.  And I sent pictures of my knee. | 12:59PM |
| 3 | Q.    Okay.  And you sent -- | 01:00PM |
| 4 | A.    But I -- | 01:00PM |
| 5 | Q.    You sent these via text message, right? | 01:00PM |
| 6 | A.    Yes, and also -- but it's not a piece of | 01:00PM |
| 7 | metal.  It was wood. | 01:00PM |
| 8 | Q.    Okay.  So Pat misstated that.  With | 01:00PM |
| 9 | regard to the -- the material that you hit your knee | 01:00PM |
| 10 | on, that was a mistake by Pat, to your understanding? | 01:00PM |
| 11 | A.    Yes. | 01:00PM |
| 12 | Q.    Okay.  And it says, "And would not be | 01:00PM |
| 13 | able to work 12/17."  Did you work on 12/16? | 01:00PM |
| 14 | A.    Oh, that's -- was my day off. | 01:00PM |
| 15 | Q.    Okay. | 01:00PM |
| 16 | A.    So -- | 01:00PM |
| 17 | Q.    So 12/17 was the next day you were | 01:00PM |
| 18 | scheduled to work? | 01:00PM |
| 19 | A.    Yes.  But I -- I talked to Pat and I | 01:00PM |
| 20 | told him, "I need a few days and see if I can even | 01:00PM |
| 21 | walk and I will let you know."  So I was not even | 01:00PM |
| 22 | able to get out of the house.  How can I go to the | 01:00PM |
| 23 | doctor? | 01:00PM |
| 24 | Q.    Sure.  Okay.  Down under "Action taken | 01:00PM |
| 25 | by manager," it says, "Asked for incident report. | 01:01PM |

Page 119

```
1     is from you, and it says, "My boy, I just had a hit        01:26PM

2     on my knee."                                               01:26PM

3               Do you remember texting that to                  01:26PM

4     Mr. Garcia?                                                01:26PM

5          A.    Yeah.  But you can see it's like a --           01:26PM

6     the phone, sometimes they send different words.            01:26PM

7          Q.    Okay.  The next one -- the next time            01:26PM

8     you -- there was an exchange of text messages was on       01:26PM

9     Thursday, December 17th, 2020.  That was expected to       01:26PM

10    be the day that you would come back after your day         01:26PM

11    off, but you could not work on that day, correct?          01:26PM

12         A.    Correct.                                        01:26PM

13         Q.    Okay.  And it's a text from Ceasar and          01:26PM

14    it says, "My boy, Pat needs the report.  His boss is       01:27PM

15    pushing him."                                              01:27PM

16               Did you receive that from Ceasar on             01:27PM

17    December 17, 2020?                                         01:27PM

18         A.    Yes.                                            01:27PM

19         Q.    And it looks like you sent him a picture        01:27PM

20    of a report on that same date.  Is that accurate?          01:27PM

21         A.    Yes.                                            01:27PM

22         Q.    On the next page, it appears Ceasar             01:27PM

23    responded to that, "Okay.  You are good."                  01:27PM

24               Was that still on December 17?                  01:27PM

25         A.    Yes.                                            01:27PM
```

Page 137

```
1              Q.   You responded, "I thought I sent it,"      01:27PM

2    right?                                                    01:27PM

3              A.   Right.                                     01:27PM

4              Q.   Okay.  And he responded, "Eric Wright is   01:27PM

5    pushing him."                                             01:27PM

6                   Is that an accurate translation there?     01:27PM

7              A.   Yeah, pretty much.                         01:27PM

8              Q.   And the next one, this is -- these are     01:27PM

9    still on December 17th.  Ceasar said, "Are you coming     01:28PM

10   to work tomorrow?"                                        01:28PM

11                  Did you receive that on December 17th?     01:28PM

12             A.   Yes.                                       01:28PM

13             Q.   And did you respond to him on              01:28PM

14   December 17th?                                            01:28PM

15             A.   Called him.                                01:28PM

16             Q.   Okay.  And what did you tell Ceasar on     01:28PM

17   December 17th in response to his question whether         01:28PM

18   you're coming to work tomorrow?                           01:28PM

19             A.   I told him that I needed more days         01:28PM

20   because I can barely walk, my pain was really,            01:28PM

21   really -- you know, was really hard to even walk to       01:28PM

22   the restroom.  So I told him I am going to need a few     01:28PM

23   days and he told me, "Call Pat and let him know."         01:28PM

24             Q.   Okay.  And that conversation was on        01:28PM

25   December 17th?                                            01:28PM

                                                              Page 138
```

```
 1              Q.   I'm sorry.  What was the last part?        01:40PM
 2              A.   Yes, the same -- you know, I told him      01:40PM
 3    that I need to take a few days and see if I can walk      01:41PM
 4    normal and go back to work.                               01:41PM
 5              Q.   Okay.  But the text message said, "Sorry   01:41PM
 6    Pat, I don't think I can work tomorrow," right?           01:41PM
 7              A.   Right.                                      01:41PM
 8              Q.   Okay.  But you're saying on the phone       01:41PM
 9    you told him you needed more than one day off?            01:41PM
10              A.   Yeah, I told him, "I might need a few       01:41PM
11    days.  I will let you know."                              01:41PM
12                   And he says, "Yes, no problem.  Just let   01:41PM
13    me know."                                                 01:41PM
14              Q.   And when he said, "Just let me know,"      01:41PM
15    did -- was there an understanding between you two         01:41PM
16    about how regularly you would check in?                   01:41PM
17              A.   Yes.                                        01:41PM
18              Q.   How regularly -- when were you expected    01:41PM
19    to contact him again after that conversation on the      01:41PM
20    16th?                                                     01:41PM
21              A.   At least next Monday.  I was going to      01:41PM
22    take the whole weekend off and see if I can move my      01:41PM
23    leg.  That's what I told him.  I told Pat and I told     01:41PM
24    Ceasar.                                                   01:41PM
25              Q.   Next sentence says, "I asked him to call  01:41PM
```

                                                  Page 148

| | | |
|---|---|---|
| 1 | I think we're -- I think we're at a | 02:34PM |
| 2 | crossroads here. You're still thinking about that | 02:34PM |
| 3 | first day of the week where you're coming in late. I | 02:35PM |
| 4 | mean any other time where you were running a little | 02:35PM |
| 5 | bit late, or you were sick perhaps, did you text | 02:35PM |
| 6 | message people if you were going to be late? | 02:35PM |
| 7 | A.   I text them and I call them, say, "I'm | 02:35PM |
| 8 | not showing up because I'm sick" or "I'm coming | 02:35PM |
| 9 | late." | 02:35PM |
| 10 | Q.   Okay.  And you liked to do it via text | 02:35PM |
| 11 | so that you had the record? | 02:35PM |
| 12 | A.   Both, yes.  But I used -- I used to call | 02:35PM |
| 13 | Ceasar or Pat, and if I had no answer from Pat, I | 02:35PM |
| 14 | will text him. | 02:35PM |
| 15 | Q.   Okay.  So at any point did you text | 02:35PM |
| 16 | anybody -- well, let me back up. | 02:35PM |
| 17 | We talked a little earlier about how | 02:35PM |
| 18 | when you got to your 14 hours and you clocked out but | 02:35PM |
| 19 | you had to work a little bit longer than the 14 hours | 02:35PM |
| 20 | to finish things up.  Remember that discussion? | 02:35PM |
| 21 | A.   Yes. | 02:35PM |
| 22 | Q.   Okay.  Did you ever text Pat about that | 02:35PM |
| 23 | or was that just over the phone? | 02:36PM |
| 24 | A.   It was over the phone.  So I got -- | 02:36PM |
| 25 | talked to him a few times and he says, "Just don't go | 02:36PM |

Page 156

1    over, you know, the limit that -- don't -- if it                02:36PM

2    is" -- once -- I think he told me once, "If you're              02:36PM

3    going to be helping about an hour, don't clock out,"            02:36PM

4    but -- because he says that he can prove, like, okay,           02:36PM

5    he was working in the yard so he doesn't do anything            02:36PM

6    with the DOT time.                                              02:36PM

7         Q.   The 14-hour limit is applicable to drive             02:36PM

8    time, right?                                                    02:36PM

9         A.   Yeah.  Pretty much, yes.                             02:36PM

10         Q.   Okay.  But it was common practice to not            02:36PM

11   want to be on the clock for more than 14 hours to              02:36PM

12   risk that?                                                      02:36PM

13         A.   Unless they call me on my way to send me           02:36PM

14   someplace else and say, "You know what?  We need this         02:36PM

15   done," then I usually say, "But I'm going to be over          02:36PM

16   my 14 hours."  And sometimes they told me I'm going          02:36PM

17   to be over my 70-hour limit a week, and they told me,        02:36PM

18   "Yeah, this needs to be done, so help us and don't           02:37PM

19   worry about the time."  So that's what I did.                 02:37PM

20         Q.   Okay.  And we -- we broke down -- we               02:37PM

21   broke down one of your days earlier about how long it         02:37PM

22   took to do certain tasks, right?                               02:37PM

23         A.   Right.                                             02:37PM

24         Q.   And we -- you know, it was roughly an             02:37PM

25   hour and a half first thing in the morning?                   02:37PM

                                                    Page 157

```
 1            A.    Yes.                                02:56PM

 2            Q.    Okay.  And you said it was a couple of   02:56PM

 3   hours per week?                                   02:56PM

 4            A.    Yes.                                02:56PM

 5            Q.    And any -- any instances where it was   02:56PM

 6   more than two hours in that week that -- that you   02:56PM

 7   were not compensated for?                         02:56PM

 8            A.    I never took any breaks when I -- the   02:56PM

 9   whole time that I was working for Honey Bucket    02:56PM

10   because they always kept me busy, so I don't know we   02:56PM

11   can say anything about that.  I don't know.  It's,   02:57PM

12   like, maybe a half an hour a day for the breaks.  But   02:57PM

13   I -- I don't think that I request any of that.    02:57PM

14            Q.    Okay.  So you're not seeking          02:57PM

15   compensation for the breaks?                      02:57PM

16            A.    I don't know what to say.           02:57PM

17            Q.    Well, are you or are you not seeking   02:57PM

18   compensation for not receiving rest periods?      02:57PM

19            MR. BROWN:  Overbroad, vague, lacks       02:57PM

20   foundation.                                       02:57PM

21            THE WITNESS:  Oh, yes.  I -- I work for it.   02:57PM

22            Q.    (BY MR. WILLIAMS):  And we talked I   02:57PM

23   think the last time about knowing the policies in the   02:57PM

24   handbook, right?                                  02:57PM

25            A.    Yes.                                02:57PM

                                            Page 172
```

```
1           Q.   And that there were clear policies in        02:57PM

2      place at Northwest Cascade about meal periods and       02:57PM

3      rest breaks, right?                                     02:57PM

4           A.   Yes.                                          02:57PM

5           Q.   And nobody ever told you that you             02:57PM

6      couldn't take rest periods, right?                      02:57PM

7           A.   No.  No one told me that.                     02:58PM

8           Q.   Okay.  Nobody ever tried to interfere         02:58PM

9      with you taking the rest breaks you were entitled to,   02:58PM

10     right?                                                  02:58PM

11          A.   Oh, sometimes, but not for long.  So a        02:58PM

12     couple of minutes to ask me if I can do extra things.   02:58PM

13          Q.   Okay.  When did those -- when did those       02:58PM

14     times happen?                                           02:58PM

15          MR. BROWN:  Overbroad.                             02:58PM

16          THE WITNESS:  During lunch times.                  02:58PM

17          Q.   (BY MR. WILLIAMS):  Well, we're talking       02:58PM

18     about rest breaks now.  We already have talked about    02:58PM

19     meal periods.                                           02:58PM

20          A.   Oh, okay.                                     02:58PM

21          Q.   Just rest breaks.  Did you ever -- did        02:58PM

22     anyone ever interfere with your ability to take rest    02:58PM

23     periods?                                                02:58PM

24          A.   No.                                           02:58PM

25          Q.   Okay.  And did you ever complain to any       02:58PM
```

Page 173

```
 1    of your supervisors that you were not able to take      02:58PM

 2    rest breaks for any reason?                             02:58PM

 3         A.   Yes.  I told them that I want to finish       02:58PM

 4    my route, you know, not to leave anything for next      02:58PM

 5    day.  So that's why I said I don't think that I can     02:58PM

 6    take breaks.  There's too much work, and --             02:58PM

 7         Q.   Okay.  Who did you tell that to?              02:58PM

 8         MR. BROWN:  Whoa.  Whoa.  Whoa.  Let the           02:59PM

 9    record reflect the witness has not completed his        02:59PM

10    response.                                               02:59PM

11         Go ahead.                                          02:59PM

12         THE WITNESS:  Well, I -- I talked to Pat           02:59PM

13    because I told him, you know, if I take breaks,         02:59PM

14    especially in San Francisco, there is no way that I     02:59PM

15    can say, "Okay.  It is my break time."  How can I do    02:59PM

16    that?  It's -- it's not easy, and it's a big city.      02:59PM

17    There's a lot of traffic.  If you park, you can get a   02:59PM

18    ticket or you can -- you know, a lot of people will     02:59PM

19    be, you know, asking you to move your truck.  So it     02:59PM

20    is -- it's -- it's really hard to get a -- even a       02:59PM

21    lunch break.  You had to go around the city to find a   02:59PM

22    place to park with your truck and trailer to get your   02:59PM

23    meal.                                                   02:59PM

24         Q.   Okay.  And what did Pat tell you in           02:59PM

25    response to you informing him you didn't think you      02:59PM
```

                                                    Page 174

```
 1        could take your rest breaks?                      02:59PM
 2              A.   I think he didn't say anything.  He    02:59PM
 3        said, "Just try your best, if you can take them." 02:59PM
 4              Q.   Did he encourage you to take them if you  02:59PM
 5        could?                                            02:59PM
 6              A.   No.                                     02:59PM
 7              Q.   Well, you just said he told you to try  02:59PM
 8        your best to take them, right?                    03:00PM
 9              A.   Yes.  Yes.                              03:00PM
10              Q.   Did you take that as Pat encouraging you  03:00PM
11        to take a rest break?                             03:00PM
12              A.   Yes.                                    03:00PM
13              Q.   And when did you complain about this to  03:00PM
14        Pat?  When was this?                              03:00PM
15              A.   The first time that I -- it was 2016    03:00PM
16        that I was working a lot of hours and days, so -- 03:00PM
17              Q.   So he tell you -- I didn't mean to      03:00PM
18        interrupt.  I'm sorry.  Keep going.               03:00PM
19              A.   No.  No.  You know, it's like -- like I 03:00PM
20        said, you check my records.  Like, I really like to 03:00PM
21        work.  So I'm not like, "Oh, let me take breaks any 03:00PM
22        time I want to."  No.  I keep myself moving because 03:00PM
23        it -- it -- it is the best way that I cannot have  03:00PM
24        a -- you know, like, breaks and -- or, you know, the 03:00PM
25        equipment.                                        03:00PM
```

Page 175

| | | |
|---|---|---|
| 1 | Q.   And Jayson's white? | 03:24PM |
| 2 | A.   Yes. | 03:24PM |
| 3 | Q.   And then in 2018, the two supervisors | 03:24PM |
| 4 | promoted, Dane and Jacob, are white? | 03:24PM |
| 5 | A.   Yes. | 03:25PM |
| 6 | Q.   And did -- did anything about the 2016 | 03:25PM |
| 7 | promotion decisions make you think that you didn't | 03:25PM |
| 8 | receive that opportunity because of your race or | 03:25PM |
| 9 | nationality? | 03:25PM |
| 10 | A.   Yeah, I start thinking about that. | 03:25PM |
| 11 | Q.   Yeah.  What -- what was the reason you | 03:25PM |
| 12 | believed that was related to your race or | 03:25PM |
| 13 | nationality? | 03:25PM |
| 14 | A.   Because nobody has the experience that I | 03:25PM |
| 15 | have and not even the years working in the same | 03:25PM |
| 16 | fields.  They pretty much -- they all were new to | 03:25PM |
| 17 | this business and I have seven years of experience | 03:25PM |
| 18 | doing supervising with Adam's Sanitation. | 03:25PM |
| 19 | Q.   Did anybody at Northwest Cascade ever | 03:25PM |
| 20 | tell you anything that made you think that that | 03:25PM |
| 21 | decision was based upon your race or nationality? | 03:26PM |
| 22 | A.   No.  But I -- I -- I had a phone call | 03:26PM |
| 23 | from Washington, somebody who was human resources, | 03:26PM |
| 24 | and he asked me a few questions about, you know, my | 03:26PM |
| 25 | application, and then he -- and I told him everything | 03:26PM |

Page 194

| | | |
|---|---|---|
| 1 | was only positions for new drivers. | 03:29PM |
| 2 | Q.    Okay.  So the question I'm asking is how | 03:29PM |
| 3 | often during your employment did you check the online | 03:29PM |
| 4 | posting? | 03:29PM |
| 5 | A.    Like, every three months because I -- I | 03:29PM |
| 6 | was bringing more people into the company, new | 03:29PM |
| 7 | drivers. | 03:30PM |
| 8 | Q.    Do you know when Juan and Cruz were | 03:30PM |
| 9 | promoted to their positions in Santa Rosa? | 03:30PM |
| 10 | A.    I think they were supervisors before I | 03:30PM |
| 11 | was hired.  I'm not sure because what -- I believe | 03:30PM |
| 12 | Cruz was working with the company that they bought in | 03:30PM |
| 13 | Santa Rosa. | 03:30PM |
| 14 | Q.    All right.  So back -- looking back at | 03:30PM |
| 15 | Exhibit 30, in Paragraph 14 there, it says -- on | 03:30PM |
| 16 | Line 12, the sentence there says, "Plaintiff has | 03:30PM |
| 17 | applied for multiple positions" -- excuse me -- | 03:30PM |
| 18 | "Plaintiff has applied for multiple promotions | 03:30PM |
| 19 | without success." | 03:30PM |
| 20 | So the two applications we've talked | 03:30PM |
| 21 | about, 2016 and 2018, those are the only two that | 03:30PM |
| 22 | you've applied for, right? | 03:31PM |
| 23 | A.    Yes. | 03:31PM |
| 24 | Q.    Okay.  And the sentence continues, "and | 03:31PM |
| 25 | witnessed less-experienced Caucasian employees | 03:31PM |

Page 198

| | | |
|---|---|---|
| 1 | receive these opportunities." | 03:31PM |
| 2 | So is that with regard to Jayson, Jacob, | 03:31PM |
| 3 | and Dane? | 03:31PM |
| 4 | A.   Yes. | 03:31PM |
| 5 | Q.   Okay.  And you believed that they were | 03:31PM |
| 6 | less experienced than you? | 03:31PM |
| 7 | A.   I do because they had no experience in | 03:31PM |
| 8 | this business.  And even Ceasar, he was a supervisor | 03:31PM |
| 9 | for, like, three months with Farwest. | 03:31PM |
| 10 | Q.   Okay.  And did you ever ask Jayson, | 03:31PM |
| 11 | Dane, and Jacob what their past experience was? | 03:31PM |
| 12 | A.   No. | 03:31PM |
| 13 | Q.   So how did you know that they were less | 03:31PM |
| 14 | experienced? | 03:31PM |
| 15 | A.   Because they -- they -- they -- if you | 03:31PM |
| 16 | had experience, you should be hired as a supervisor, | 03:31PM |
| 17 | not as a driver.  But they were drivers before and | 03:31PM |
| 18 | they only spend, like, maybe eight months being | 03:31PM |
| 19 | drivers and then become supervisors.  How can -- you | 03:31PM |
| 20 | know, how can -- it's not possible when you have | 03:32PM |
| 21 | people who has more experience and more years in this | 03:32PM |
| 22 | field. | 03:32PM |
| 23 | Q.   Well, you weren't hired as a supervisor, | 03:32PM |
| 24 | right?  You were just hired as a driver? | 03:32PM |
| 25 | A.   Yes. | 03:32PM |
| | | Page 199 |

```
1        Q.    Okay.  The next sentence reads,          03:32PM

2   "Defendant also treated Plaintiff and other         03:32PM

3   non-Caucasian workers differently by assigning them 03:32PM

4   longer hours and heavier workloads than Caucasian   03:32PM

5   employees."                                         03:32PM

6             So what non-Caucasian workers were        03:32PM

7   assigned longer hours and heavier workloads than    03:32PM

8   Caucasian workers?                                  03:32PM

9        A.    That's on No. 16, right?                 03:32PM

10       Q.    No.  It's Line 14 to 15 in Paragraph 14. 03:32PM

11       A.    Okay.  Okay.  Okay.                      03:32PM

12       Q.    I'm asking you which non-Caucasian       03:32PM

13   workers were assigned longer hours and heavier     03:33PM

14   workloads?                                         03:33PM

15       A.    Lucas Robles, Michael Morales, Jerry --  03:33PM

16   I don't remember his last name -- Jerry Valera.    03:33PM

17       Q.    Did you get assigned longer hours and    03:33PM

18   heavier workloads than Caucasian employees?        03:33PM

19       A.    Yes.                                     03:33PM

20       Q.    Anybody else -- non-Caucasian workers    03:33PM

21   being assigned longer hours and heavier workloads? 03:33PM

22       A.    No.                                      03:33PM

23       Q.    Okay.  What -- what Caucasian employees  03:33PM

24   were receiving shorter hours and lighter workload  03:33PM

25   assignments?                                       03:33PM
```

Page 200

```
 1    load -- workload, were there any other actions taken     03:38PM
 2    by Jayson that you felt were discriminating or in        03:38PM
 3    retaliation against you relating to your medical         03:38PM
 4    leaves?                                                  03:38PM
 5            A.   No.  I don't remember that anymore.         03:38PM
 6            Q.   Okay.  Other than Jayson, did anybody       03:38PM
 7    else at Northwest Cascade take any actions towards       03:39PM
 8    you that you felt were either discriminatory or          03:39PM
 9    retaliatory related to your medical leaves or            03:39PM
10    injuries?                                                03:39PM
11            A.   Not sure.  But every time that I have an    03:39PM
12    injury, even if I told him that I was not completely     03:39PM
13    okay to go back to work, they -- they say "Oh, what?     03:39PM
14    We need you, so come back to work and we going to        03:39PM
15    give you a helper."  So pretty much I was forced to      03:39PM
16    work with an injury.                                     03:39PM
17            Q.   Okay.  And who do you believe was           03:39PM
18    forcing you to work with an injury?                      03:39PM
19            A.   Well, I can say Pat because he says,        03:39PM
20    "You're going to be just right, and so we're going to    03:39PM
21    send you a helper."  But anyways, it's -- you know,      03:39PM
22    it was my back, so now I'm still dealing with pain.      03:39PM
23            Q.   Okay.  And which instances -- well, let     03:40PM
24    me ask -- okay.                                          03:40PM
25                 So you've just said that Pat forced you     03:40PM
```

Page 204

```
1                    REPORTER'S CERTIFICATE
2              I, Amber S. Williams, CSR NO. 1080,
3       Certified Shorthand Reporter, certify:
4              That the foregoing proceedings were taken
5       before me at the time and place therein set forth, at
6       which time the witness was put under oath by me.
7              That the testimony and all objections made
8       were recorded stenographically by me and transcribed
9       by me or under my direction.
10             That the foregoing is a true and correct
11      record of all testimony given, to the best of my
12      ability.
13             I further certify that I am not a relative
14      or employee of any attorney or party, nor am I
15      financially interested in the action.
16             IN WITNESS WHEREOF, I set my hand and seal
17      this 6th day of April, 2022.
18
19
20
                       <%11663,Signature%>
21                     AMBER S. WILLIAMS, CSR NO. 1080
22                     Notary Public
23                     Post Office Box 2636
24                     Boise, Idaho  83701-2636
25      My commission expires June 1, 2027

                                              Page 217
```

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

LUIS LOPEZ,                      )
                                )
          Plaintiff,            )
                                )
     vs.                        )   Case No. 3:21-cv-06150
                                )
NORTHWEST CASCADE, INC.,        )
dba HONEY BUCKETT,              )
                                )
          Defendant.            )
_____)


REMOTE VIDEO DEPOSITION OF CESAR GARCIA

Thursday, May 26, 2022

10:00 a.m. - 12:30 p.m.

Via Zoom Videoconference


Reported Remotely By:  Patricia Rosinski, CSR No. 4555

Patricia Callahan Reporting
Certified Shorthand Reporters
(510) 885-2371
depos@callahanreporting.com

1    Q.    Okay.  And about how long did that online

2    course take?

3    A.    I think it was an eight-hour course, if I

4    remember correctly.

10:36AM  5    Q.    And the eight hours, was this a course and

6    some sort of test at the end, if --

7    A.    It was a combination online course, yes.

8    Q.    Okay.  At any time -- and this was -- I'm

9    sorry -- every two years; is that correct?

10:37AM 10    A.    I don't -- if I recall correctly, it was,

11    yeah.

12    Q.    At any time while you were a supervisor at

13    Honeybucket, did you receive training in

14    anti-harassment practices or policies?

10:37AM 15    A.    I think that was all wrapped up in that

16    one -- one -- sorry, I don't remember the name of

17    the -- of the course, I mean, I -- all of that was

18    pretty much covered in that course.

19    Q.    And where did you physically take the

10:37AM 20    online course?

21    A.    In my house online.

22    Q.    Have you ever heard the term

23    "whistleblower"?

24    A.    Yes.

10:37AM 25    Q.    And what's your understanding of what that

PATRICIA CALLAHAN REPORTING    (510) 885-2371          40

1    means?

2    A.    In layman's term, a rat like you call them

3    in the street or -- or somebody who brings somebody

4    up to -- some -- someone who brings to the attention

10:37AM    5    of another, that's what I can describe.

6    Well, not necessarily a rat.  I'm sorry I

7    said "rat," because that would be something...

8    But, yeah, I think that's what my -- my

9    understanding of a whistleblower, somebody that goes

10:38AM    10    out and rats out on something that they think is

11    wrong.

12    Sorry for the lack of a better term, but...

13    Q.    No, that's fine.  I mean, it's your

14    testimony.  That's perfectly fine.

10:38AM    15    Why do you refer to it, though, as a rat or

16    a rat-like connotation?

17    A.    Too many Soprano movies, maybe.

18    Q.    You're a Soprano fan?

19    A.    I watch them.

10:38AM    20    Q.    How many times through have you seen the

21    Sopranos?

22    A.    I had no -- never saw it again.  Just went

23    through the pain of watching it once.

24    Q.    I've done it twice.  I'm with you.

10:38AM    25    Did Honeybucket -- or while you were at

```
 1        Q.   Okay.  And how was he good about doing

 2   that?

 3        A.   I -- I looked -- the way he told -- the way

 4   he did it to me when he told me, you know, If you

 5   ever have any concerns and you want to come straight

 6   to me, yeah, he was -- he was pretty -- pretty open

 7   to -- to taking -- he's got an open-door policy

 8   where you -- you can go talk to him.

 9        Q.   If an employee at Honeybucket had a

10   complaint about something in the workplace, did they

11   have to fill out written forms, or could they just

12   verbally tell Pat or you or some other supervisor?

13        A.   They can verbally just say it.

14        Q.   Okay.  And when you say "open-door policy,"

15   what do you mean by that?

16        A.   That -- that you can walk in with Pat and

17   sit down with him and ask him anything job related.

18        Q.   Okay.  And if an employee had a verbal --

19   had a complaint, they could express it verbally or

20   orally.  They didn't have to put it out in writing;

21   is that correct?

22        A.   That's correct.

23        Q.   As a supervisor at Honeybucket, did you

24   receive any training in learning how to spot

25   discrimination in the workplace?
```

10:43AM (line 5)
10:43AM (line 10)
10:43AM (line 15)
10:44AM (line 20)
10:44AM (line 25)

1    A.   No.

2    Q.   At Honeybucket did you receive any or

3    review any policies or procedures about taking

4    medical leave?

10:44AM   5    A.   No.

6    Q.   Have you ever heard of what's called the

7    Family Medical Leave Act or FMLA?

8    A.   Yes.

9    Q.   Okay.  And what's your understanding of the

10:44AM   10   FMLA?

11   A.   Well, I used it one time in my life, so...

12   It's if you needed to take care of a family member

13   or a loved one -- and I know there's certain

14   guidelines.  I used it for my father -- that you

10:44AM   15   could take, I believe -- I took six months off from

16   the garbage company.

17   Q.   Okay.  And was that to assist your father

18   or a family member?

19   A.   Yes.  To -- to assist my father, yes.

10:45AM   20   Q.   And do you understand the FMLA also applies

21   to you or employees themselves who have serious

22   medical injuries?

23   A.   I probably could -- no, I'm not one

24   hundred -- I know I used it for my father, but -- so

10:45AM   25   for a loved one, I'm not sure if it applies to me if

1    I want to use it.

2           You mean FMLA on my own person?

3       Q.    Correct.

4       A.    No, I did not know that.

10:45AM 5       Q.    Okay.  Do you understand that FMLA or the

6    Family Medical Leave Act, it's a labor law that

7    requires certain employers to protect employees'

8    jobs where they do take medical leave?

9       A.    Well, it sounds like something that should

10:45AM 10   happen, yes.

11      Q.    Okay.  Have you received any training

12   specifically on FMLA while at Honeybucket?

13      A.    No.

14      Q.    But have you learned, or do you believe

10:46AM 15   it's illegal to fire somebody for having a medical

16   condition?

17      A.    Yeah, I believe that's illegal, yes.

18      Q.    Okay.  What about disability; have you

19   received any training or do you believe that it's

10:46AM 20   illegal to fire somebody for having a disability?

21      A.    I haven't received any training, but I do

22   agree it should be illegal.

23      Q.    How about what's called the California

24   Family Rights Act or CFRA; have you ever heard that

10:46AM 25   term before?

1       A.   No, I have not.

2       Q.   Okay.  Have you ever heard of a phrase

3  called "disability accommodation laws" or something

4  to that -- along those lines?

10:46AM  5       MR.  WILLIAMS:   It calls for expert

6  testimony.  It calls for a legal conclusion.

7  Relevance.

8            You can answer.

9            THE WITNESS:  No.

10:46AM  10       MR.  BROWN:   Q.   Okay.  As a supervisor at

11  Honeybucket, did you ever hear or become familiar

12  with the term "interactive process"?

13       A.   No.

14       Q.   And have you ever heard the phrase or term

10:47AM  15  "reasonable accommodation" with respect to being a

16  supervisor at Honeybucket?

17       A.   Reasonable -- I don't understand what

18  you -- what that means.

19       Q.   That's fine.

10:47AM  20            Do you understand that an employer has

21  certain obligations or may have certain obligations

22  to an employee to return his or her job to them

23  after an injury?

24       A.   You mean light duty?

10:47AM  25       Q.   Well, it could be light duty or something

|  | 1 | where he was.  We expected him to come back Friday. |
|---|---|---|
|  | 2 | Q.   And did he respond? |
|  | 3 | A.   No. |
|  | 4 | Q.   Do you recall any other phone conversations |
| 11:53AM | 5 | you had with him after December 15th? |
|  | 6 | A.   No. |
|  | 7 | Q.   Did you have any concern about Mr. Lopez's |
|  | 8 | knee and ability to return to work? |
|  | 9 | A.   No. |
| 11:54AM | 10 | MR. BROWN:  Let's look at next in order, PD |
|  | 11 | to EW 12/21/20, please. |
|  | 12 | (Whereupon, Plaintiff's Exhibit 7 was |
|  | 13 | remotely introduced and provided |
|  | 14 | electronically to the reporter.) |
| 11:54AM | 15 | MR. BROWN:  Q.  Mr. Garcia, when you spoke |
|  | 16 | to Mr. Lopez on the 15th, did he ever tell you he |
|  | 17 | was quitting Honeybucket? |
|  | 18 | A.   No. |
|  | 19 | Q.   Did he ever tell -- did he ever say |
| 11:54AM | 20 | anything about abandoning his job? |
|  | 21 | A.   No. |
|  | 22 | Q.   Okay.  And did you understand that |
|  | 23 | Mr. Lopez was entitled to take time off for medical |
|  | 24 | leave on December 15th? |
| 11:55AM | 25 | A.   No, I don't -- I'm sure if he was hurt. |

```
 1        Q.   And because he was hurt, did you understand
 2   he's entitled to take time off?
 3             MR. WILLIAMS:  It calls for --
 4             (Overlapping speakers.)
 5             THE WITNESS:  It's not my decision.
 6   They're entitled -- he's entitled, yes.
 7             MR. BROWN:  Q.  Okay.  Did you have any
 8   doubt as to the seriousness of Mr. Lopez's knee
 9   after talking to him?
10             MR. WILLIAMS:  Vague --
11             THE WITNESS:  Well --
12             MR. WILLIAMS:  -- as to "doubt."
13             MR. BROWN:  Q.  I'm sorry.  I didn't hear
14   you, Mr. Garcia.
15        A.   Can you repeat your question?
16        Q.   Sure.
17             After speaking to Mr. Lopez, did you ever
18   have any doubt about the seriousness of his injury?
19        A.   Did I have any doubt about -- after I spoke
20   to him, he said he was going to continue working.  I
21   didn't think too much of it.
22        Q.   And did he actually tell you that, that he
23   was going to continue working?
24        A.   Yes.
25        Q.   And he said, meaning -- what did you
```

```
 1    understand that to mean?
 2        A.   That he was going to keep going.  So I
 3    would have told him if he gets -- if you feel you
 4    need any -- you will have to contact dispatch if it
 5    got any worse, if he felt it was getting worse.
 6            But he was -- he was pretty much laughing
 7    when he called me because he felt -- he said he felt
 8    ridiculous tripping on his -- falling on his knees.
 9        Q.   After your conversation with Mr. Lopez, did
10    you ever believe he walked off or quit his job at
11    Honeybucket?
12        A.   No.
13        Q.   Now, if you look at plaintiff's next in
14    order, it's an email -- are we going to call that
15    up, the exhibit?
16            It's an email from Mr. Donohoue to
17    Mr. Wright, dated December 21st, 2020, regarding
18    Luis Lopez's injury.  This is a two-page document
19    produced by the defense, Bates-stamped 114 through
20    115.
21            Mr. Lopez have you seen this document
22    before?
23        A.   Have I seen -- now I have.
24        Q.   Before today have you seen it?
25        A.   I don't recall seeing it.
```

Timestamps in left margin:
11:56AM (line 5)
11:56AM (line 10)
11:56AM (line 15)
11:57AM (line 20)
11:57AM (line 25)

```
 1              of December 12, 2020.
 2              Did I read that correctly, more or less?
 3              MR. WILLIAMS:  December 22?  You said 12,
 4      Scott.
 5              MR. BROWN:  Yes, December 22nd, 2020, yes.
 6      I appreciate it.
 7         Q.   Is that accurate, Mr. Garcia?
 8         A.   Yes.
 9         Q.   If you look at the last sentence here which
10      says, "As a result, you have violated company
11      policy," do you know what company policy
12      Mr. Donohoue is referring to?
13         A.   To the no-call, no-show?
14         Q.   Yes.
15         A.   Yeah, I -- yes.
16         Q.   What is he referring to?
17         A.   That he was terminated for no-call, no-show
18      for several days.
19         Q.   I appreciate that, but my question is a
20      little different.  He refers to a company policy.
21              Are you aware of any written policy that
22      sets out how many days an employee can miss before
23      he's considered to have abandoned his job?
24         A.   No, I don't recall what the handbook says.
25         Q.   Do you know if the handbook has any policy
```

|     |     |
| --- | --- |
|  | 1 |

```
         1    on abandonment of a job?
         2         A.    I don't recall if it has it.
         3         Q.    Okay.  Do you know how Mr. Donohoue gets
         4    four days as the limit for a no-call, no-show?
12:18PM  5         A.    I don't -- I don't know what he thinks or
         6    what's his threshold.
         7         Q.    Okay.  And you're not aware of any written
         8    policy that sets forth four days as the termination
         9    period, are you?
12:19PM 10         A.    I don't recall reading anything like that.
        11         Q.    Did you ever have any discussions with
        12    Mr. Donohoue of why -- about why he terminated
        13    Mr. Lopez?
        14         A.    I asked him -- once I found out, he said
12:19PM 15    for job abandonment, and that was it for me.
        16         Q.    Well, did you have any response or any
        17    dialogue with him?
        18         A.    With Pat, no.
        19         Q.    Did you consider Mr. Lopez a valuable
12:19PM 20    employee?
        21         A.    Yes, I did.
        22         Q.    Did you consider him a solid driver?
        23         A.    Yes, I do.
        24         Q.    Were you upset that he was let go?
12:19PM 25         A.    Yes.
```

|   |   |
|---|---|
| 1 | days until after Christmas so he could see a doctor? |
| 2 | MR. WILLIAMS:  The same two objections. |
| 3 | THE WITNESS:  No, I don't think it would |
| 4 | have been reasonable. |
| 12:28PM  5 | MR. BROWN:  Q.  Okay.  Do you see any |
| 6 | downside or burden to Honeybucket that you can think |
| 7 | of? |
| 8 | MR. WILLIAMS:  It calls for speculation. |
| 9 | It lacks foundation. |
| 12:28PM  10 | THE WITNESS:  I don't understand your |
| 11 | question. |
| 12 | MR. BROWN:  Q.  Is there any downside to |
| 13 | Honeybucket waiting a few days before terminating |
| 14 | him? |
| 12:28PM  15 | MR. WILLIAMS:  It calls for speculation. |
| 16 | It lacks foundation.  Incomplete hypothetical. |
| 17 | THE WITNESS:  I would just be guessing. |
| 18 | No, I don't know. |
| 19 | MR. BROWN:  Q.  And I don't want you |
| 12:29PM  20 | guessing, but I want your best personal belief or |
| 21 | understanding. |
| 22 | Are you aware of any burden to Honeybucket, |
| 23 | any downside you could think of to wait a few days |
| 24 | until after Christmas before terminating Mr. Lopez? |
| 12:29PM  25 | MR. WILLIAMS:  The same objections. |

|    |    |
|----|----|
| 1  | THE WITNESS:  No, I have no opinion on |
| 2  | that. |
| 3  | MR. BROWN:  Q.  Do you know anyone else at |
| 4  | Honeybucket that's been terminated by abandonment? |
| 5  | A.    I don't recall. |

12:29PM (line 5)

```
 6      Q.    Do you know anyone -- okay.  Fair enough.
 7            You're not aware of anyone?
 8      A.    I -- I don't recall.  The turnaround there
 9   is so big I don't -- I don't know why anybody
10   would -- you know, I don't know.
11      Q.    And what do you mean by "the turnaround
12   there is so big"?
13      A.    Well, that job is not for everybody, so
14   people come and go.
15      Q.    Okay.  All right.  Now, those are all the
16   questions I have right now.
17            Thank you, Mr. Garcia.
18      A.    Thank you.
19            MR. WILLIAMS:  I don't have any questions.
20            THE VIDEOGRAPHER:  Anything further on the
21   record?
22            THE REPORTER:  Yes.  I need to get the
23   order.
24            Mr. Williams, do you want a copy?
25            MR. WILLIAMS:  Yes, please.
```

12:29PM (lines 10, 15, 20); 12:30PM (line 25)

1          REPORTER'S CERTIFICATE

2    STATE OF CALIFORNIA     )
                             ) ss.
3    COUNTY OF MARIN         )

4          I, PATRICIA ROSINSKI, Certified Shorthand Reporter

5    No. 4555 for the State of California, certify:

6          That CESAR GARCIA, the witness in the foregoing

7    deposition, was by me first duly sworn to testify to

8    the truth in said cause;

9          That said proceedings were taken remotely at the

10   time and place therein stated by me and were

11   thereafter transcribed by me on computer, after which

12   the witness was afforded the opportunity to read,

13   correct, and sign the deposition;

14         That if unsigned, the witness shall not have

15   availed him- or herself of the opportunity to sign, or

16   signature has been waived.

17         I further certify that I am not interested in

18   the outcome of said action, nor connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21         IN WITNESS WHEREOF, I have hereunto set my hand

22   this 1st of June, 2022.

23

24   _____

25          Patricia Rosinski

# EXHIBIT F

# Allman & Petersen Economics, LLC

7677 Oakport Street, Suite 610
Oakland, CA 94621
(510) 382-1550
(510) 382-1472 (FAX)

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max D. Allman, MA, CFA
www.allmaneconomics.com

Federal Rule 26(a)(2)(B)
Lopez v. Northwest Cascade
Report of Plaintiff's Economic Expert

June 27, 2022

1. My name is Phillip H. Allman.

2. My resume is attached. I received a Ph.D. in economics from Michigan State University in 1982. My primary fields of expertise are financial economics, labor economics and econometrics. I have published articles in economics on topics such as the application of statistical methods to class action data, forecasting interest rates, wage growth, and valuing pensions. I have testified in over 800 trials and arbitrations involving the valuation of economic damages. My fee schedule for report preparation and testimony is attached. The list of trials and depositions in which I have testified over the last four years is attached.

3. I have been retained by plaintiff's counsel to conduct an analysis of the economic loss sustained by Luis Lopez as a result of his termination from Northwest Cascade (Honey Bucket) on or around December 22, 2020; I have also been asked to determine amounts due for wage and hour violations (meal break and rest break violations and the unpaid wages, penalties and interest associated with California employment law violations) prior to his termination. **The present discounted value of Mr. Lopez's economic loss with respect to his wrongful termination claim is $355,006; the total wage and hour violations associated with Mr. Lopez's employer pre-termination California employment law violations is $37,889.**

4. To perform this analysis I have:

- interviewed Mr. Lopez
- reviewed Defendant Northwest Cascade Attachments to Initial Disclosures
- reviewed Defendant Northwest Cascade Supplemental Initial Disclosures
- reviewed Mr. Lopez's most recent W-2 and pay statement with Stevenson Smith Enterprises (Crystal Springs)
- reviewed Mr. Lopez's Prudential 401(k) withdrawal statement dated February 26, 2021
- reviewed wage data from the U.S. Bureau of Labor Statistics and Occupational Employment Statistics Survey, California Employment Development Department
- reviewed data on work life expectancy and retirement ages
- projected future wage growth utilizing data from the U.S. Bureau of Labor Statistics
- projected future interest rates and inflation rates utilizing data and literature from the Federal Reserve Bank and the U.S. Bureau of Labor Statistics.

- reviewed Barry Ben-Zion, *Neutralizing the Adverse Tax Consequences of a Lump-Sum Award in Employment Cases*, Journal of Forensic Economics, 13(3), 2000, pp.233-244
- reviewed literature from the California Labor Code and California Employment Development Department information on wage and hour employment laws (Sections 203, 226, and 512)
- Reviewed Naranjo v Spectrum Security Supreme Court of California ruling on meal and rest period premium treatment as wages

5. Mr. Lopez was a Route Driver with Northwest Cascade (Honey Bucket). His hourly wage rate was $27.4187 per hour at the date of the incident.[1] In addition to his hourly wage, he earned a premium for overtime, and earned a bonus. During the first 51 weeks of 2020, he worked 1,809.86 regular hours (including holiday and paid-time-off), 767.72 overtime hours, and 129.36 double time hours.[2] These hours annualize to 1,845 regular hours, 783 overtime hours, and 132 double time hours. He also earned a bonus of $3,350 in 2020. At $27.4187 per hour, his 2020 annualized hours amount to $93,379 of income.[3]

6. The annual employer cost of Mr. Lopez's healthcare benefits was $6,739 in 2020.[4]

7. Mr. Lopez's employer was contributing 2.0 % of his income towards his 401(k) plan.[5]

8. Mr. Lopez secured work with Crystal Springs (Stevenson Smith Enterprises) as a light truck driver on or about August 17, 2021. He is earning $22.00 per hour working full time with no overtime.[6]

9. Due to need for income, Mr. Lopez took an early withdrawal from his 401(k) plan which triggered a penalty of $3,640.[7]

10. Mr. Lopez's past loss is calculated from January 1, 2021[8] through the date of this report. Mr. Lopez's past loss of income with Honey Bucket is $141,185.[9] His past loss of health insurance is $10,321.[10] His past loss of retirement benefits is $2,824. His early withdrawal penalty is $3,640. His past actual (mitigating) income is $33,525.[11] His total past loss sums to **$124,445.**[12]

---

[1] Source: NWC 508.
[2] Source: NWC 541-542.
[3] $27.4187 per hour (regular wage rate; source: payroll records) x (1,845 regular hours per year (2020 annualized regular hours including holiday and PTO) + (783 overtime hours per year (2020 annualized overtime hours) x 1.5 (overtime factor)) + (132 double time hours per year (2020 annualized double time) x 2 (double time factor))) + $3,350 (2020 bonus).
[4] Source: NWC 541-542.
[5] Source: NWC 508.
[6] Source: Mr. Lopez and pay statements.
[7] 10% (IRS Penalty on early withdrawals; source: IRS website) x $36,397 (withdrawal amount; source: Prudential statement dated 2/26/2021).
[8] This report assumes that Mr. Lopez would have returned to work on January 1, 2021, if he was not terminated.
[9] See Table 1.
[10] See Table 2.
[11] See Table 3.
[12] See Economic Loss Summary Table.

11. Interest on past losses calculated at 10% simple totals $10,180.[13]

12. As of the report date, the annual loss differential on Mr. Lopez's compensation is $54,300.[14] I have projected that Mr. Lopez's *with-termination income* will converge with his *without-termination income* over the next five years.[15]

13. Future values for the next year are discounted to present value using the six-month Treasury bill rate of 2.51 percent. All periods after one year are discounted to present value using an interest rate of 3.5 percent. This rate is based on the historic yield of a balanced portfolio of three-month and ten-year Treasury securities. Since 1955, the average yield on this portfolio has been 1.5 percent higher than the rate of inflation. The rate of general inflation is projected to be 2.0 percent which is Federal Reserve Board of Governors current inflationary target in its conduct of monetary policy.

14. No future wage growth is projected for the year following the trial date. Future wage growth from one year forward is projected at 2.60 percent. This projection is based on the rate of growth for all workers in the United States. According to the Employment Cost Index, wages have grown 0.60 percent faster than the rate of inflation since 1982. Inflation is again projected to grow at 2.0 percent per year which is Federal Reserve Board of Governors current inflationary target.

15. The present discounted value of Mr. Lopez's future loss of compensation is **$159,548**.[16]

16. Presented with a lump-sum award as replacement value to a flow of income over the course of time, the injured party may be faced with a tax expense which is well in excess of tax payments over the course of time. In his seminal article related to this issue, Barry Ben-Zion has termed this impact as the "adverse tax consequence" of a lump-sum award.[17] This consequence is due to the progressive income tax system both federally and in California.

Given that the lump-sum award includes an additional amount to cover the adverse tax impact, the size of the lump-sum payment will again increase which in turn exposes the injured party to even more additional tax requirements. As this progression will occur over and over as an iterative process, additional amounts must be provided to the injured party in order to make her/him whole. Dr. Ben-Zion has adopted the term, "tax neutralization", to identify the computation of the additional amount needed to fully iterate the lump-sum award such that the injured party is ultimately made whole.

The tax neutralization amount is **$60,834**.[18]

---

[13] See Table 4.
[14] See Table A.
[15] Five year increments are recorded in census data related to life cycle / seniority rates of change with respect to the average income of workers.
[16] See Economic Loss Summary Table, Table 4 and Table 5.
[17] Barry Ben-Zion, *Neutralizing the Adverse Tax Consequences of a Lump-Sum Award in Employment Cases*, Journal of Forensic Economics, 13(3), 2000, pp.233-244.
[18] See Table 6.

17. Mr. Lopez's total economic loss with respect to his wrongful termination claim is the sum of past and future losses plus past interest plus the tax neutralization amount. **The present discounted value of Mr. Lopez's economic loss is $355,006.[19]**

18. I have identified 353 meal period violations of California Labor Code Section 512 during the period from August 10, 2018 to August 10, 2021 (filing date of claim). Based on the Mr. Lopez's regular wage rate at the time of each violation, this amounts to **$9,110** of meal period premium wages. Interest calculated at 10% simple for these wages is **$2,491**.

19. I have identified 486 rest period violations of California Labor Code Section 226.7 during the period from August 10, 2018 to August 10, 2021 (filing date of claim). Based on the Mr. Lopez's regular wage rate at the time of each violation, this amounts to **$12,673** of rest period premium wages. Interest calculated at 10% simple for these wages is **$3,252**.

20. Waiting time penalties (Labor Code 203) on the meal and rest period premium wages is: 30 days (maximum) x 8 hours per day x $26.52 per hour (average wage rate during period) = **$6,364**.

21. Inaccurate wage statement penalties (Labor Code 226) amount to **$4,000**.[20]

22. Unpaid wages due to inaccurate reporting of hours has not yet been determined. Mr. Lopez stated that he believes he was consistently not paid for all the hours he worked. Furthermore, there appear to be numerous inconsistencies in the daily ledger of hours paid relative to hours worked based on the time punch information that was supplied. I will supplement this report when a methodology for determination of these amounts is created along with obtaining the necessary data to perform these calculations. Interest on these amounts will also be calculated.

23. **Mr. Lopez's total wage and hour violations amounts to: $37,889** (not including unpaid wages and interest as discussed in Paragraph 21).

24. The attached set of tables detail the projections and calculations described above.

25. I am prepared to testify to these projections in deposition or at trial if called upon to do so.

26. The projections are based on the cited references and sources. Thus, these figures are subject to change if the parameters on which they were based change.

*Phillip Allman*

_____

Phillip H. Allman, Ph.D.

_____

[19] See Summary Table.
[20] Maximum amount threshold of $4,000 achieved. ($50 for initial pay perod in which violation occurs and $100 for each violation).

4

| ECONOMIC LOSS SUMMARY FOR LUIS LOPEZ | | |
|---|---|---|
| | Full Value | Present Discounted Value |
| **PAST LOSS** | | |
| Income | $ 141,185 [1] | $ 141,185 [1] |
| Health Insurance | $ 10,321 [2] | $ 10,321 [2] |
| Employer Pension Contributions | $ 2,824 [A] | $ 2,824 [A] |
| IRS Penalty on Early 401(k) Withdrawal | $ 3,640 [B] | $ 3,640 [B] |
| Mitigating (Actual) Wages | $ (33,525) [3] | $ (33,525) [3] |
| TOTAL PAST LOSS | $ 124,445 | $ 124,445 |
| INTEREST ON PAST LOSS | $ 10,180 [4] | $ 10,180 [4] |
| FUTURE LOSS | $ 168,658 [5] | $ 159,548 [5] |
| TAX NEUTRALIZATION AMOUNT FOR ADVERSE TAX CONSEQUENCE OF LUMP SUM AWARD | $ 60,834 [6] | $ 60,834 [6] |
| **TOTAL ECONOMIC LOSS** | $ 364,117 | $ 355,006 |

Note: all numbered footnotes refer to table numbers.

A.  2.0% (employer contribution as a percent of gross income; source: pay statements) x Income.

B.  10% (IRS Penalty on early withdrawals; source: IRS website) x $36,397 (withdrawal amount; source: Prudential statement dated 2/26/2021).

**LUIS LOPEZ WAGE AND HOUR VIOLATION SUMMARY**
**(Summary of Penalties, Wages Due & Interest Due)**

| | | |
|---|---|---:|
| MEAL PERIOD VIOLATIONS (LABOR CODE SECTION 512) | | |
| Number of Violations | | 353 |
| Meal Period Premium Wages Due (calculated at base rate of pay) | $ | 9,110 |
| Interest Due | $ | 2,491 |
| REST PERIOD VIOLATIONS (LABOR CODE SECTION 226.7) | | |
| Number of Violations | | 486 |
| Rest Period Premium Wages Due (calculated at base rate of pay) | $ | 12,673 |
| Interest Due | $ | 3,252 |
| WAITING TIME PENALTY (LABOR CODE 203) | $ | 6,364 |
| INACCURATE WAGE STATEMENT PENALTY (LABOR CODE 226) | $ | 4,000 |
| UNPAID WAGES | | |
| Wages | | N/A |
| Interest Due | | N/A |
| **TOTAL WAGE AND HOUR VIOLATIONS** | $ | 37,889 |

# EXHIBIT G

**Scott Brown**

| | |
|---|---|
| **From:** | Scott Brown |
| **Sent:** | Friday, June 10, 2022 11:49 AM |
| **To:** | Glen A. Williams; Rex D. Berry |
| **Subject:** | Honey Bucket's supplemental production of documents |

Counsel,

I am writing regarding Defendant's untimely production of documents, bate stamped 579-603, on June 2 at noon, the day before Mr. Donohoue's deposition.  These documents contain material information that should have been produced at the inception of this case, certainly at the time you served your GO 71 disclosures.

The time reports and exported spreadsheets identified by Mr. Donohoue are significant because they confirm that Mr. Lopez was not paid the total amount of time he worked as set forth in the "Trip start time" and "Trip end time" columns of the spreadsheet.  They also show that Honey Bucket did not compensate Mr. Lopez for meals to which he was entitled (i.e., 10/1/18 – 10/16/18, bate stamp #579).  I am sure you understand the significance of this.  At a minimum, Mr. Lopez will prevail at trial on his causes of action 1-5 for violations of the FLSA and Labor Codes, which include attorney fees, costs, and liquidated damages.

At a minimum, this documents will defeat any summary judgment motion on these claims.  On this note, if you pursue an MSJ, we will attach this letter as an exhibit to Plaintiff's opposition and reserve the right to seek sanctions for filing a false pleading.

Plaintiff has been prejudiced by your untimely production.  Factual discovery cut-off is June 6.  Had these reports been produced earlier in this case I would have noticed the Person Most Knowledgeable regarding these documents.  Equally disturbing is Mr. Donohoue's testimony that he provided all documents months ago, which means you have had bate stamp nos. 579-603 in your possession, and withheld them until the last possible moment, ensuring that I would have limited time to digest and use them.  Accordingly, Plaintiff reserves all recourse and remedies regarding this misconduct.

Regards,

Scott A. Brown
Brown | Poore LLP
3100 Oak Road, Suite 100
Walnut Creek, CA 94597
(925) 943-1166

1