UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS LOPEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>NORTHWEST CASCADE, INC.,<br><br>        Defendant. | Case No. 21-cv-06150-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 25 |

On August 10, 2021, Plaintiff Luis Lopez filed the instant suit against Defendant Northwest Cascade, Inc., alleging violations of various wage and labor laws. (Compl., Dkt. No. 1.) Pending before the Court is Defendant's motion for summary judgment. (Def.'s Mot. for Summ. J., Dkt. No. 25.) Having considered the parties' filings, the relevant legal authorities, and the arguments made at the August 4, 2022 hearing, the Court GRANTS IN PART AND DENIES Defendant's motion for summary judgment.

## I. BACKGROUND

Defendant and its subsidiary, Honey Bucket, provide construction and sanitation products and services, such as portable restrooms. (Berry Decl., Exh. D ("Donohoue Decl.") ¶ 2, Dkt. No. 25-1.) On June 15, 2015, Plaintiff began his employment with Honey Bucket at the Richmond facility as a route driver. (Berry Decl., Exh. A ("Def.'s Lopez Depo., Vol. I") at 53:10-25, Exh. 2.) Plaintiff was a non-exempt employee throughout his employment. (Def.'s Lopez Depo., Vol. I at 13-16.) Plaintiff's duties included cleaning, repairing, picking up, and delivering portable toilets and hand washer stations. (Lopez Decl. ¶ 2, Dkt. No. 27-2.)

Plaintiff asserts that throughout his employment, he would sometimes work past the 14-hour daily limit. (Brown Decl., Exh. C ("Pl.'s Lopez Depo., Vol. II at 55:1-11), Dkt. No. 27-1.)

When this occurred, he would inform Operations Manager Pat Donohoue, who told him, "No problem. It's fine. Just be careful." (Pl.'s Lopez Depo., Vol. II at 55:21-56:1.) Plaintiff states that he was not compensated for time worked beyond 14 hours, and that this happened particularly in the summertime. (Pl.'s Lopez Depo., Vol. II at 56:18-57:4.) Plaintiff was also sometimes asked to work over his 70-hour weekly limit. (Pl.'s Lopez Depo., Vol. II at 157:10-19.) Plaintiff would notice wage discrepancies on his paychecks throughout his employment; when he reported those errors to his supervisors, they would tell him they would "make it up" on the next paycheck. (Lopez Decl. ¶ 3.) Plaintiff contends that Honey Bucket did not make full and complete payment, and that he would complain about the wages owed to him. (Lopez Decl. ¶ 3.) Plaintiff, however, testified that after ADP was hired in 2019, he never had any problems with overtime compensation. (*See* Berry Decl., Exh. B ("Def.'s Lopez Depo., Vol. II") at 170:23-24 ("when they hired ADP to track all the time, I never had any problems with my checks"), 170:25-171:3 ("Q. Okay. So after ADP took over payment of your -- your paychecks, you had no inaccuracies in overtime compensation? A. Yeah, no problems at all."), 170:6-9 ("Q. Okay. So you're not seeking any overtime compensation for the time period after ADP took over? A. No.").)

Defendant provides Plaintiff's employee timecard log in and log out time reports. (Berry Decl., Exh. E ("Perry Decl.").) The time reports indicate the trip start time, end time, and total time, as well as the hours paid and off-period time (*i.e.*, lunch break). (*See* Perry Decl., Exh. B.) For example, an October 5, 2018 entry indicates that Plaintiff worked 11 hours and 40 minutes, and was paid 10 hours. (*Id.* at NWC-00579.) No off-period is logged. (*Id.*) Operations Manager Donohoue states that on October 18, 2018, Plaintiff had requested to be paid for 10 hours on October 5, 2018. (Supp. Donohoue Decl. ¶ 3, Dkt. No. 28-1.) Operations Manager Donohoue noted that it was not unusual for drivers, including Plaintiff, to tell him that they had an issue clocking in or out, or that they had forgotten to clock out for a lunch period. (Supp. Donohoue Decl. ¶ 3.)

Plaintiff testified that he was given verbal warnings regarding taking lunch, was counseled to take his lunch, and received messages that it was time to take his lunch break. (Def.'s Lopez Dep., Vol. I at 149:20-150:7, 151:5-17.) Plaintiff further testified that as of November 9, 2018, he

2

ensured that he took his 30-minute lunches, and that he did not recall skipping any lunches before November 9, 2018. (Def.'s Lopez Dep., Vol. I at 152:24-154:9.)

During his employment, Plaintiff was on occasion counseled and given warnings regarding communications with management when he was going to be late, but was not otherwise subjected to any suspension, demotion, pay cut, denial of a regular raise, or denial of a requested leave of absence. (Donohoue Decl. ¶ 3; Def.'s Lopez Depo., Vol. II at 100:24-101:5 104:21-105:3, 107:6-108:6, 111:16-112:21, 113:24-114:16.) Plaintiff applied for multiple promotions, but was never offered a promotion. (Lopez Decl. ¶ 4.) Plaintiff asserts that his supervisors antagonized and belittled him about his race and nationality, made disparaging remarks about his accent, and informed him that he was not promoted because he "spoke horrible English." (Lopez Decl. ¶¶ 4, 15.) Plaintiff contends that instead, less experienced Caucasian employees would receive promotions, and that he and non-Caucasian workers would be assigned longer and heavier workloads than Caucasian employees. (Lopez Decl. ¶¶ 4, 14.)

Throughout his employment, Plaintiff also made complaints about Defendant's business practice of cleaning its portable toilets. (Def.'s Lopez Depo., Vol. II at 207:8-18.) The toilets were cleaned on a concrete slab in the Richmond yard, where they were sprayed with soap, bleach, and chemicals to separate the fecal matter. (Lopez Decl. ¶ 5.) Because the slab was not level and contained only one drain, contaminated water would collect in stagnant pools. (Lopez Decl. ¶ 5, Exh. A.) Plaintiff would complain twice a year about the cleaning conditions, including during the last several months of his employment, but would be told that workers could wear "a few more socks" and that "[n]othing's going to help it." (Def.'s Lopez Depo., Vol. II at 208:13-210:3; Lopez Decl. ¶ 6.) During the last few months of his employment, Plaintiff also complained about other unsafe working conditions, including hazardous storage of chemicals near the cleaning station, employees racing forklifts and driving them in a dangerous manner, and the consumption of alcohol on work premises by employees' families. (Lopez Decl. ¶ 6.)

On Tuesday, December 15, 2020, Plaintiff injured his knee while replacing a foot pump on a handwashing station. (Lopez Decl. ¶ 8; Def.'s Lopez Depo., Vol. II at 116:9-12.) That same day, he informed his supervisor, Cesar Garcia, of the injury. (Lopez Decl. ¶ 8; Lopez Depo., Vol.

3

1  II, Exh. 26.)  Plaintiff also completed an incident report in Spanish.  (Lopez Depo., Vol. II, Exh.
2  24.)
3        On Wednesday, December 16, 2020, Plaintiff was not scheduled to work.  (Lopez Decl. ¶
4  9; Donohoue Decl. ¶ 10.)  Plaintiff texted Operations Manager Donohoue a picture of his knee,
5  stating: "Sorry Pat, I don't think I can work tomorrow.  I hit my knee yesterday and I tough [sic] it
6  was nothing but I can barely walk."  (Lopez Decl. ¶ 9; Def.'s Lopez Depo., Vol. II, Exh. 25.)
7  While unclear, it appears Plaintiff informed both Operations Manager Donohoue and Supervisor
8  Garcia that he was going to take the weekend off to see if he could move his leg.  (Pl.'s Lopez
9  Depo., Vol. II at 148:18-24.)
10       On Thursday, December 17, 2020, Supervisor Garcia texted Plaintiff, asking for the
11 incident report.  (Def.'s Lopez Depo., Vol. II at 137:13-15, Exh. 26.)  Plaintiff responded with a
12 picture of the report.  (Def.'s Lopez Depo., Vol. II at 137:19-21, Exh. 26.)  Supervisor Garcia
13 stated: "Okay. You are good."  (Def.'s Lopez Depo., Vol. II at 137:22-25, Exh. 26.)  Supervisor
14 Garcia asked if Plaintiff was coming to work on December 18, 2020.  (Def.'s Lopez Depo., Vol. II
15 at 138:8-10.)  Plaintiff responded by calling Supervisor Garcia, and informed him that he needed
16 more days because he could barely walk and was in pain.  (Def.'s Lopez Depo., Vol. II at 138:16-
17 22, 148:21-24.)  Supervisor Garcia told Plaintiff to let Operations Manager Donohoue know.
18 (Def.'s Lopez Depo., Vol. II at 138:22-23.)
19       That day, Plaintiff informed Operations Manager Donohoue by telephone, stating: "I need
20 a few days and see if I can even walk and I will let you know."  (Lopez Decl. ¶ 10; Def.'s Lopez
21 Depo., Vol. II at 119:19-21.)  Operations Manager Donohoue told Plaintiff to stay home and rest.
22 (Lopez Decl. ¶ 10.)
23       Plaintiff did not go to work on December 18, 19, 20, and 21, 2020, nor did he contact
24 Defendant.  (Donohoue Decl. ¶ 10.)  On Friday, December 18, 2020, Plaintiff broke his cell
25 phone, and his nephew took his car to Sacramento with his work phone in it from December 18
26 through  December 30.  (Lopez Decl. ¶ 11; Def.'s Lopez Depo., Vol. II at 125:7-14, 127:1-14.)
27 That same day, Supervisor Garcia and Operations Manager Donohoue both texted Plaintiff as to
28 his status.  (Def.'s Lopez Depo., Vol. II at 124:25-125:3, Exh. 26.)

1    On Monday, December 21, 2020, Operations Manager Donohoue attempted to call
2 Plaintiff and texted him, stating: "I need to see how you are doing and what is going on. Please
3 call me to let me know. Thanks." (Def.'s Lopez Depo., Vol. II at 125:15-18, Exh. 25.)
4 Supervisor Garcia also texted Plaintiff, noting that a few days had gone by without notice from
5 him. (Def.'s Lopez Depo., Vol. II at 142:1-8, Exh. 26.) Supervisor Garcia also called and left a
6 voicemail. (Berry Decl., Exh. C ("Garcia Depo.") at 21:18-22:6, Exh. 2.) That same day,
7 Supervisor Garcia translated Plaintiff's incident report into English, and Operations Manager
8 Donohoue completed his own incident report. (Brown Decl., Exh. B at NWC-00110-11, NWC-
9 00115.)
10   On Tuesday, December 22, 2020, Operations Manager Donohoue decided to terminate
11 Plaintiff's employment for job abandonment based on his failure to appear or respond on
12 December 18, 19, 20, and 21. (Donohoue Decl. ¶ 11.) Operations Manager Donohoue asserts that
13 he made this decision based solely on Plaintiff's absences and his failure to contact Defendant
14 since December 17, 2020, and for no other reason. (Donohoue Decl. ¶ 11.) Operations Manager
15 Donohoue testified that there was no written policy that an employee would be terminated for
16 abandonment after missing four days of work, or that four days was the limit for deciding
17 termination by job abandonment. (Brown Decl., Exh. A ("Pl.'s Donohoue Depo.") at 81:22-18.)
18 Rather, Operations Manager Donohoue believed that four days was too many days to miss. (Pl.'s
19 Donohoue Depo. at 83:18-19.) Operations Manager Donohoue then made his recommendation to
20 terminate to CEO Greg Potts and COO Jason Perry (Pl.'s Donohoue Depo. at 21:14-19, 83:24-
21 84:5.) CEO Potts and COO Perry told Operations Manager Donohoue that termination was the
22 right course of action, with CEO Potts approving the recommendation for termination. (Pl.'s
23 Donohoue Depo. at 84:6-8, 106:16-21.)
24   Plaintiff asserts that he never told anyone at Honey Bucket that he abandoned his job.
25 (Lopez Decl. ¶ 12.) Supervisor Garcia also did not believe that Plaintiff had walked off or quit his
26 job at Honey Bucket. (Brown Decl., Exh. E ("Pl.'s Garcia Depo.") at 106:9-12.)
27   On December 30, 2020, Plaintiff texted Operations Manager Donohoue, stating: "I am
28 doing good, I been walking normal just a little pain trying to get things, but I will be back in few

United States District Court
Northern District of California

days. I also noticed that I didn't get paid, do You want me to make a doctor's appointment to send it to You?" (Def.'s Lopez Depo., Vol. II, Exh. 25.) Operations Manager Donohoue responded: "Your employment was terminated due to job abandonment. I sent a certified letter because we could not get a hold of you. Your final check was $0 because of your pension loan. We did open a claim in case you needed to seek medical attention and we were unaware of your status." (*Id.*) Operations Manager Donohoue testified that there was nothing Plaintiff could have said that would make him consider reinstating him, and that he had no interest in changing his decision to terminate his employment after hearing back from Plaintiff. (Pl.'s Donohoue Depo. at 126:3-14.)

Plaintiff then filed suit, bringing claims for: (1) failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), (2) failure to pay overtime in violation of the California Labor Code, (3) failure to pay for missed meal breaks in violation of the California Labor Code and IWC Wage Order, (4) waiting time penalties, (5) failure to provide accurate itemized wage statements, (6) retaliation in violation of California Labor Code § 1102.5, (7) race and disability discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), (8) retaliation in violation of California Labor Code § 6310, and (9) wrongful termination in violation of public policies. On June 23, 2022, Defendant filed the instant motion for summary judgment. On July 7, 2022, Plaintiff filed his opposition. (Pl.'s Opp'n, Dkt. No. 27.) On July 14, 2022, Defendant filed its reply. (Def.'s Reply, Dkt. No. 28.)

## II. LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses

that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.   DISCUSSION

**A.   Defendant's Objections**

Defendant objects to the following evidence provided by Plaintiff.

### i. Lopez Decl. ¶ 13, Exh. C

Paragraph 13 of Plaintiff's declaration describes Exhibit C as "a true and correct copy of a photograph I took of the amount of wages I estimate I am owed by Honey Bucket for unpaid overtime and breaks. I calculated the amount of unpaid overtime by multiplying the number of hours by my hourly rate per year of employment. I calculated the amount of unpaid breaks by multiplying my hourly rate by the estimated number of hours lost per year of employment. I made these estimates in good faith. I provided this document to my attorney, whom I understand, produced it during discovery." Exhibit C, in turn, is a handwritten document that lists the year, number of hours, hourly rate, and amount due per year. While the document notes "20 minutes per day" and "2 hours per week" for breaks, as well as "2 hrs per week spring and summer" for overtime, it is unclear how the number of hours was calculated. For example, Plaintiff claims overtime hours of 36 hours in 2015, 52 hours in 2016, 52 hours in 2017, 36 hours in 2018, 52 hours in 2019, and 52 hours in 2020.

Defendant objects that this exhibit lacks foundation, and is conclusory and speculative. (Def.'s Reply at 4-5.) The Court SUSTAINS Defendant's objection. There is no information as to the basis of this document or when it was created. Plaintiff does not explain how he determined the number of overtime hours he was not paid or breaks not taken; for example, even assuming 2 hours per week during the spring and summer, this does not explain why the amount of overtime fluctuated between 36 and 52. Further highlighting the document's lack of basis is that it is contradicted by Plaintiff's own testimony that he never had any problems with overtime compensation after ADP was hired in 2019.[1]

### ii. Brown Decl. ¶ 3, Exh. B

Paragraph 3 of Attorney Brown's declaration states: "Attached as Exhibit B are true and correct copies of excerpts from Defendant's production of documents in this litigation." Exhibit B

---

[1] Plaintiff appears to suggest that his deposition testimony is unreliable because Defendant produced time records after Plaintiff's deposition, such that Plaintiff did not have the opportunity to review those records beforehand. (Pl.'s Opp'n at 13.) Plaintiff does not state that his deposition testimony would have changed after reviewing the record. Further, Plaintiff does not suggest that the handwritten document was based on a review of the records.

consists of various employment records, each of which is bates stamped "NWC-###." Defendant objects that the documents are not sufficiently authenticated. (Def.'s Reply at 5-6.) The Court OVERRULES this objection. "[D]ocuments produced by a party in discovery are deemed authentic when they are offered by the party opponent." *Benaron v. Simic*, No. 3:19-cv-01653-SB, 2021 U.S. Dist. LEXIS 186938, at *18 (D. Or. Sep. 29, 2021) (citing *Orr v. Bank of Am.*, 285 F.3d 764, 777 n.20 (9th Cir. 2002)); *see also Maljack Prods. v. Goodtimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996) (finding that the district court did not err in considering documents attached to an attorney's declaration because the documents were produced by the party opponent during discovery). Indeed, many of the pertinent records are identical to those proffered by Defendant. (*Compare* Brown Decl., Exh. B at NWC-00579-87 *with* Perry Decl., Exh. B at NWC-00579-87.)

### iii. Brown Decl. ¶ 7, Exh. F

Paragraph 7 of Attorney Brown's declaration states: "Attached as Exhibit F is a true and correct copy of excerpts from Plaintiff's Initial Expert Disclosure on June 28, 2022, including an Affidavit from Dr. Philip H. Allman." Exhibit F is Dr. Allman's expert report. Defendant objects on the ground that there is no foundational evidence offered for Dr. Allman's opinion. (Def.'s Reply at 6.) The Court OVERRULES this objection. Dr. Allman identifies the evidence he reviewed in preparing his expert report, including an interview with Plaintiff and review of Defendant's initial disclosures. At this stage, this is sufficient; this ruling does not preclude a *Daubert* motion, nor does it necessarily go to the admissibility of specific opinion.

## B. Retaliation (First, Sixth, and Eighth Causes of Action)

Plaintiff brings retaliation claims under the FLSA and California Labor Code Sections 1102.5 and 6310. The FLSA prohibits retaliation against an employee who makes a complaint or institutes a proceeding under or related to the FLSA. 29 U.S.C. § 215(a)(3). California Labor Code § 1102.5, in turn, prohibits retaliation against an employee for reporting a violation of state or federal statute or of a local, state, or federal rule or regulation. Finally, California Labor Code § 6310 prevents retaliation for making complaints regarding employee safety or health.

To establish a prima facie case for retaliation under the three statutes, Plaintiff must show:

(1) he engaged in a protected activity, (2) he was subjected to an adverse employment action, and (3) a causal link between the two. *See Singh v. Jutla*, 214 F. Supp. 2d 1056, 1059 (N.D. Cal. 2002) (FLSA); *Mokler v. Cty. of Orange*, 157 Cal. App. 4th 121, 138 (2007) (California Labor Code § 1102.5); *Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 964 (N.D. Cal. 2014) (California Labor Code § 6310). Defendant then has the burden of demonstrating "a legitimate, non-retaliatory reason for the adverse employment action." *See Reyes v. Transamerica Life Ins. Co.*, No. CV 15-3452 DMG (FFMx), 2015 U.S. Dist. LEXIS 190104, at *10 (C.D. Cal. Dec. 23, 2015) (FLSA); *Mokler*, 157 Cal. App. 4th at 140; *Cuevas*, 17 F. Supp. 3d at 965. Finally, as to the FLSA and California Labor Code § 6310, the burden shifts back to Plaintiff to demonstrate pretext. *See Reyes*, 2015 U.S. Dist. LEXIS 190104, at *10; *Cuevas*, 17 F. Supp. 3d at 966.[2]

### i. Prima Facie Case

The Court finds that Plaintiff has established a prima facie case for retaliation. The first two prongs are not in serious dispute. Plaintiff engaged in protected activity because he made complaints about owed wages, the safety of Defendant's process for cleaning portable toilets, the hazardous storage of chemicals near the cleaning station, employees driving forklifts dangerously, and the consumption of alcohol on work premises by employees' families. (Lopez Decl. ¶¶ 3, 6; Def.'s Lopez Depo., Vol. II at 208:13-210:3.) Plaintiff suffered an adverse employment action when he was terminated in December 2020.

The parties strongly dispute whether Plaintiff can demonstrate causation. Defendant argues that Plaintiff cannot because "Plaintiff's employment was terminated for one reason only; his four days of 'no call/no show' to work, and his failure or refusal to respond to [Defendant]'s inquiries as to his status." (Def.'s Mot. for Summ. J. at 12.) Plaintiff responds that "Defendant's sole one reason for terminating Plaintiff—job abandonment—is riddled with inconsistencies and not credible." (Pl.'s Opp'n at 9.) The Court agrees with Plaintiff.

---

[2] As to California Labor Code § 1102.5, the California Supreme Court has clarified that "a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual. Even if the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 716 (2022).

1    The Ninth Circuit has found that "the causation and pretext inquiries are often
2    overlapping." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 729 (9th Cir. 2012) (citing *Farrell v. Planters*
3    *Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)).  In turn, Plaintiff "can prove pretext '(1)
4    indirectly, by showing that the employer's proffered explanation is 'unworthy of credence'
5    because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that
6    unlawful discrimination more likely motivated the employer." *Raad v. Fairbanks N. Star*
7    *Borough*, 323 F.3d 1185, 1194 (9th Cir. 2003).

8    Here, there is a dispute of fact as to whether Defendant's termination of Plaintiff for job
9    abandonment was credible.  Again, Operations Manager Donohoue asserts that he terminated
10   Plaintiff for failing to appear or respond on December 18, 19, 20, and 21.  (Donohoue Decl. ¶ 11.)
11   Yet Plaintiff states that around December 16, 2021, he informed Supervisor Garcia and Operations
12   Manager Donohoue that he was going to take the weekend (December 19 and 20) off.  (Pl.'s
13   Lopez Depo., Vol. II at 148:18-24.)  Further, on December 17, 2021, he told Supervisor Garcia
14   that he needed more days because he could barely walk and was in pain, and told Operations
15   Manager Donohoue that he needed a few days to see if he could even walk.  (Def.'s Lopez Depo.,
16   Vol. II at 119:19-21 138:16-22, 148:21-24; Lopez Decl. ¶ 10.)  Operations Manager Donohoue
17   then told Plaintiff to stay home and rest.  (Lopez Decl. ¶ 10.)  Operations Manager Donohoue also
18   opened a worker's compensation claim for Plaintiff, an apparent acknowledgment of Plaintiff's
19   workplace injury.  (Pl.'s Donohoue Depo. at 93:13-22.)  Thus, a jury could find that Operations
20   Manager Donohoue knew of Plaintiff's injury and had approved Plaintiff's planned absence for a
21   few days, yet fired him for not appearing on those same days.  Moreover, the refusal of Operations
22   Manager Donohoue to consider rescinding the termination despite knowing that Plaintiff was out
23   due to his injury also suggests that the stated reason for termination was pretextual.  (Pl.'s
24   Donohoue Depo. at 126:3-14.)  Viewing the evidence in a light most favorable to Plaintiff, the
25   Court finds that a jury could conclude that Defendant's proffered reason lacked credibility, and
26   that Plaintiff's termination was for a different, improper reason.

27   To the extent Defendant relies on its PTO policy, this does not negate the dispute of fact.
28   The PTO policy states: "Failure to call in may result in disciplinary action, including termination

11

1   for repeated violations. Repeated lateness for work, absence without proper notification to
2   immediate supervisor, or abuse of unscheduled PTO will not be tolerated." (*See* Donohoue Decl.
3   ¶ 7.) Defendant argues that Plaintiff knew he was required to call in advance when he was going
4   to be absent, and that his failure to call in each day justified his termination. (*See* Def.'s Reply at
5   8.) As an initial matter, the Court notes that the policy does not make termination mandatory.
6   Moreover, it does not appear that the policy requires that an employee call *each* day he would be
7   absent; rather, it requires that an employee provide proper notification of an absence. Again,
8   Plaintiff testified that he had told Operations Manager Donohoue and Supervisor Garcia that he
9   would need to take the weekend off. (Pl.'s Lopez Depo., Vol. II at 148:18-24.) On December 17,
10  2020, Plaintiff also informed Supervisor Garcia and Operations Manager Donohoue that he
11  needed more days because he could barely walk. (Def.'s Lopez Depo., Vol. II at 119:19-21,
12  138:16-22, 148:21-24; Lopez Decl. ¶ 10.) Thus, a jury could very well find that Plaintiff did not
13  violate the PTO policy because he already gave "proper notification" that he would be absent
14  between December 18 through December 21.

15  In the alternative, Defendant argues that Plaintiff had complained about the safety of the
16  cleaning station for five years, such that it made no sense for Defendant to wait five years to
17  retaliate against him. (Def.'s Mot. for Summ. J. at 12.) Defendant thus contends that there is no
18  "temporal proximity" between Plaintiff's complaints and his termination. (Def.'s Reply at 8.)
19  The Court does not find this argument persuasive. Temporal proximity, of course, is only one way
20  of demonstrating causation; it is not the only way. Moreover, Defendant cites no authority that the
21  fact that an employee made the same complaints over the years demonstrates a lack of causation.
22  A jury could find that Plaintiff's continued complaints over the years, including complaints made
23  in the last few months of his employment about dangerous forklift driving and hazardous storage
24  of chemicals, were ultimately the reason for his termination.

25  Finally, Defendant argues that Plaintiff cannot establish causation because Defendant
26  terminated fifteen other individuals for the same violations as Plaintiff. (Def.'s Mot. for Summ. J.
27  at 14; Def.'s Reply at 8.) The Court acknowledges that "[e]vidence that a similarly situated
28  employee was treated in a similar manner as a plaintiff negates a showing of pretext." *Jackson v.*

12

*Foodland Super Mkt., Ltd.*, 958 F. Supp. 2d 1133, 1145 (D. Haw. 2013) (citing *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001)). There is, however, no evidence in the record that any of the fifteen other individuals were similarly situated. There is no information regarding how many days these employees missed, or if their missed days occurred immediately after informing their supervisors of a significant injury that necessitated days off. An individual who abruptly misses work for three weeks for no apparent reason is in an appreciably different situation than an individual who misses four days after suffering a work injury and informing his supervisor of the need to miss work due to the inability to walk.

Accordingly, the Court finds that Plaintiff has established a prima facie case for retaliation.

### ii. Legitimate, Non-Discriminatory Reason for the Adverse Action and Pretext

The parties dispute whether Defendant can establish a legitimate, non-discriminatory reason for Plaintiff's termination. Again, Defendant relies on Plaintiff's failure to appear or respond for four days. (Def.'s Mot. for Summ. J. at 14-15; Def.'s Reply at 8.) As discussed above, there is a dispute of material fact as to whether Supervisor Garcia and Operations Manager Donohoue knew that Plaintiff would be out for those days, such that it was not credible that Operations Manager Donohoue would fire Plaintiff for being absent. Thus, summary judgment is inappropriate as to Plaintiff's retaliation claims.

### C.  Race and Disability Discrimination (Seventh Cause of Action)

Plaintiff brings a FEHA claim based on race and disability discrimination. As an initial matter, Plaintiff's complaint is limited to a FEHA claim based on the termination of Plaintiff's employment. (*See* Compl. ¶ 54.) In Plaintiff's opposition, however, Plaintiff asserts disability discrimination based on Defendant's failure to offer a reasonable accommodation to Plaintiff after his injury, as well as Defendant's failure to engage in the interactive process. (*See* Pl.'s Opp'n at 15-18.) As Defendant points out, these claims are not alleged in the complaint. (Def.'s Reply at 6-7.)

At the hearing, Plaintiff argued, without providing legal authority, that the reasonable accommodation and interactive process claims are "inherent" in his FEHA claim. Thus, Plaintiff contends that Defendant should have known that these claims were included, despite making **no**

1 reference to reasonable accommodations or the interactive process in his complaint. This

2 argument is borderline absurd. Defendant is not required to "infer" a claim that is not stated in the

3 complaint.[3] Thus, the Court will not consider these claims, and will limit its analysis to Plaintiff's

4 termination.

5   To establish a FEHA discrimination claim, a "plaintiff must generally show that: he or she

6 was a member of a protected class; was qualified for the position he sought; suffered an adverse

7 employment action, and there were circumstances suggesting that the employer acted with a

8 discriminatory motive." *Jones v. Dep't of Corr. & Rehab.*, 152 Cal. App. 4th 1367, 1379 (2007).

9 As with the retaliation claims, the burden then shifts to Defendant to present legitimate reasons for

10 the adverse action, after which Plaintiff much demonstrate a genuine issue of material fact as to

11 pretext. *Means v. City & Cty. of S.F.*, 749 F. Supp. 2d 998, 1004-05 (N.D. Cal. 2010).

12   As before, the Court finds that summary judgment is not warranted. First, Plaintiff is a

13 member of a protected class, as he is Hispanic and of Mexican ancestry and suffered a physical

14 disability in the form of his knee injury.

15   Second, the parties dispute whether Plaintiff was performing his job competently.

16 Defendant contends that he was not because he abandoned his job. (Def.'s Mot. for Summ. J. at

17 14.) Viewing the facts most favorably to Plaintiff, however, the Court finds that a jury could find

18 that Plaintiff was qualified for his position. Again, there is a genuine dispute as to whether

19 Plaintiff had abandoned his job, given that he told Supervisor Garcia and Operations Manager

20 Donohoue that he needed to take a few days off on December 17, 2020, and whether this was

21 approved.

22   Third, Plaintiff was terminated.

23   Fourth, there is evidence of discriminatory motive. As discussed above, there is a genuine

24 dispute as to whether Defendant's proffered reason for Plaintiff's termination is legitimate or

---

[3] To the extent Plaintiff intends to file a new complaint alleging the reasonable accommodations and interactive process claims based on the same facts in this case, such a complaint would be subject to dismissal for failure to allege the claims in the instant complaint once judgment is entered in this case. *See W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) ("Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action.").

14

pretextual. Further, Plaintiff points to evidence of discrimination on the basis of race, including being told he did not receive promotions because he "spoke horrible English." (Lopez Decl. ¶¶ 4, 15.) Plaintiff also asserts that he and other non-Caucasian workers were given longer hours and heavier workloads than Caucasian employees. (Lopez Decl. ¶ 4.) While Defendant is correct that Plaintiff cannot bring a claim based on the failure to promote, such evidence goes to causation and whether Plaintiff's termination was due in part to hostility towards his race. (*See* Def.'s Mot. for Summ. J. at 14.) As to disability discrimination, the termination occurred one week after he suffered an injury, and while he was out because of that injury. Such temporal proximity could support a finding of discriminatory motive. *See Artega v. Brink's, Inc.*, 163 Cal. App. 4th 327, 354 (2008) (very close temporal proximity can establish a prima facie case of discrimination).

Finally, the Court again finds that whether Defendant articulated a legitimate, non-discriminatory reason for Plaintiff's termination and whether Defendant's reason was pretextual are questions for the jury to determine. Accordingly, summary judgment is not appropriate on Plaintiff's FEHA claim.

### D. Wrongful Discharge in Violation of Public Policy (Ninth Cause of Action)

Defendant asserts that because Plaintiff's wrongful discharge claim is derivative of his FEHA and California Labor Code claims, it fails for the same reasons as those claims. (Def.'s Mot. for Summ. J. at 15.) As the Court finds that these claims are viable, the Court denies Defendant's motion for summary judgment on Plaintiff's wrongful discharge claim.

### E. Overtime Claim (First and Second Causes of Action)

The Court finds that there is a genuine dispute of material fact as to Plaintiff's overtime claim. Plaintiff testified that during the summertime, he worked beyond 14 hours after clocking out, for which he was not compensated. (Pl.'s Lopez Depo., Vol. II at 56:18-57:15.) Defendant, in turn, argues that Plaintiff has failed to identify with any specificity the number of uncompensated overtime hours worked. (Def.'s Mot. for Summ. J. at 17.) This, however, goes to the amount of damages, not whether Plaintiff worked uncompensated overtime. In the alternative, Defendant points to Plaintiff's testimony that he had no problems with overtime after ADP took over payroll services in 2019, and that he was not seeking overtime compensation for the period

after ADP took over.  (Def.'s Lopez Depo., Vol. II at 170:22-171:9.)  This testimony may limit damages to when ADP took over, but it does not demonstrate that Plaintiff did not work overtime prior to that.  Accordingly, Plaintiff's testimony that he worked overtime hours without compensation is sufficient to create a triable issue of fact.  *Compare with Van v. Language Line Servs.*, No. 14-CV-03791-LHK, 2016 U.S. Dist. LEXIS 73510, at *34 (N.D. Cal. June 6, 2016).

### F.    Meal Breaks (Third Cause of Action)

Plaintiff brings a claim for unpaid meal periods in violation of IWC Wage Order No. 4 and the California Labor Code.[4]  (Compl. at 7.)  In support of its summary judgment motion, Defendant points to Plaintiff's deposition testimony, in which he affirmatively testified that he made sure to take his meal breaks at appropriate times.  (Def.'s Lopez Depo., Vol. I at 151:18-22, 153:7-9 ("Q. Okay.  So you always took your full 30-minute lunches? A. Yes.").)  Plaintiff also stated that after November 9, 2018, he ensured that he took his 30 minutes lunches.  (Def.'s Lopez Depo., Vol. I at 151:24-152:2.)  Plaintiff testified that prior to November 9, 2018, he might take his lunch break after six hours, but that he "never skip[ped] it."  (Def.'s Lopez Depo., Vol. I at 153:9-15.)

Plaintiff, in turn, points to Defendant's time records, which show that Plaintiff did not record a meal break on certain days.  (Pl.'s Opp'n at 14.)  Plaintiff's economic expert also identifies 353 meal period violations between August 10, 2018 and the filing date of the claim.  (*Id.*; *see* Brown Decl., Exh. F ("Allman Report").)  At the hearing, Plaintiff pointed to his testimony in which he stated: "I never took any breaks when I -- the whole time that I was working for Honey Bucket because they always kept me busy . . . ."  (Def.'s Lopez Depo., Vol. II at 172:8-11.)

Plaintiff's deposition testimony establishes that he took his lunch breaks.  Plaintiff's evidence to the contrary does not create a genuine issue of material fact.  Simply because a lunch break is not recorded does not mean that Plaintiff failed to take his lunch break, particularly in light of his testimony that he always took his lunch breaks.  As to Dr. Allman's expert report, Dr.

---

[4] At the hearing, Plaintiff made clear that there was only a claim for meal breaks, not rest breaks.

1    Allman does not provide any explanation for how he came to the conclusion that there were 353

2    meal period violations. (Allman Report ¶ 18.) Finally, with respect to Plaintiff's testimony that

3    he never took any breaks, Plaintiff went on to explain that this alleged inability to take breaks was

4    "a couple of minutes" "during lunch times." (Def.'s Lopez Depo., Vol. II at 173:11-12, 16.)

5    Further, this testimony that Plaintiff never took breaks conflicts with his very specific testimony

6    that he always took his lunches. Plaintiff also testified that when Defendant called him during his

7    lunches to ask if he could do extra work, adding the extra work never cut his lunch short. (Def.'s

8    Lopez Depo., Vol. I at 154:4-9 ("Q: And did adding more stops to your routes for that day make

9    you cut your lunch short ever? A. No. Q. Okay. So you always took your full 30-minute lunches?

10   A. Yes.").

11          Moreover, even if the Court was to assume that Plaintiff did miss meal breaks, Plaintiff

12   provides no evidence that he was prevented from taking his meal breaks. "The California

13   Supreme Court has interpreted [the California Labor Code and Wage Orders] as requiring

14   employers to ensure only that these meal and break periods are made available to employees."

15   *Reece v. Unitrin Auto & Home Ins. Co.*, No. 5:11-CV-03960 EJD, 2013 U.S. Dist. LEXIS 9311, at

16   *15 (N.D. Cal. Jan. 22, 2013) (citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004,

17   1038-40 (2012)). Thus, "[a]n employee must show that the employer actually prevented the

18   employee from taking breaks; mere proof of knowledge that the employee was forgoing breaks is

19   insufficient." *Id.* (citing *Brinker*, 53 Cal. 4th at 1040). Here, Plaintiff points to no evidence that

20   Defendant failed to provide or prevented Plaintiff from taking meal breaks. Rather, Plaintiff

21   testified that he received a verbal warning for failing to take his lunch break, and that Jayson

22   Mitchell would monitor Plaintiff's time and send him messages to take his lunch break. (Def.'s

23   Lopez Depo., Vol. I at 149:16-19, 151:5-17.) Notably, immediately after Plaintiff testified that he

24   allegedly never took any breaks, Plaintiff testified that nobody told him that he could not take

25   breaks and that any "interference" with his breaks during lunch were "a couple of minutes."

26   (Lopez Depo., Vol. II at 173:5-24.) Accordingly, summary judgment on this claim is warranted.

27          **G.    Wage Statements Claims (Fourth and Fifth Causes of Action)**

28          Defendant argues that it is entitled to summary judgment on Plaintiff's claims for waiting

time penalties and itemized wage statement violations because Plaintiff's overtime and meal periods claim fail. (Def.'s Mot. for Summ. J. at 19; Def.'s Reply at 13.) While the Court will grant summary judgment as to Plaintiff's meal period claim, the Court finds there is a factual dispute as to the overtime claim. Accordingly, summary judgment on these claims is denied.

### H. Punitive Damages

Finally, Defendant contends that Plaintiff's request for punitive damages must be dismissed because an officer, director, or managing agent did not make the decision to terminate Plaintiff. (Def.'s Mot. for Summ. J. at 20.) Defendant's assertion that Operations Manager Donohoue was the sole decisionmaker is contradicted by Operations Manager Donohoue's own testimony. Specifically, Operations Manager Donohoue testified that he made a *recommendation* to terminate to the CEO and COO, and that the CEO approved the recommendation. (Pl.'s Donohoue Depo. at 83:24-84:8, 106:16-21.) Because the termination was authorized and/or ratified by an officer, summary judgment is not appropriate. *See White v. Ultramar*, 21 Cal. 4th 563, 566 n.1 (1999) (explaining that a corporate employer is not "liable for punitive damages unless the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice is on the part of an officer, director, or managing agent of the corporation").

### IV. CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim for meal breaks, and DENIES Defendant's motion for summary judgment as to the remaining claims.

IT IS SO ORDERED.

Dated: August 12, 2022

KANDIS A. WESTMORE
United States Magistrate Judge